

NEW YORK    CALIFORNIA    GEORGIA    PENNSYLVANIA

**Alex J. Hartzband**
ahartzband@faruqilaw.com

March 9, 2022

**VIA ECF**

The Honorable J. Paul Oetken
U.S. District Court – S.D.N.Y.
40 Foley Square
New York, New York 10007

   Re: <u>Jackson v. American Civil Liberties Union, Inc., et al.</u>, No. 21-cv-5037(JPO)

Dear Judge Oetken:

  We represent Plaintiff Robert Jackson in this action. Pursuant to Paragraph 4(b) of Your Honor's Individual Rules and Practices, Plaintiff respectfully submits the instant motion to compel Defendants to include certain search terms in the parties' ESI Protocol and subsequently run those terms through Defendants' email and internal messaging systems. Further, Plaintiff moves for *in camera* review of two emails over which Defendants have asserted privilege.[1]

### I. RELEVANT FACTS

  Plaintiff brings claims for discrimination and retaliation against the American Civil Liberties Union, Inc. ("ACLU") and Lucia Tian ("Tian") (together, "Defendants"). In December 2019, Plaintiff and several other Black men addressed attendees at an ACLU event in Alabama called the Southern Convening to complain about structural barriers that prevent Black employees from moving up within the ACLU. *See* Ex. A ("FAC") ¶¶ 44-59. When Plaintiff returned to the ACLU's New York office, Tian—Plaintiff's supervisor and the head of the Analytics department—began retaliating against him, including by assigning him tasks that required technical and coding skills that fell well outside of his job description, thereby setting him up to fail. *Id.* ¶¶ 60-96, 111, 159. Over a period of just five months thereafter, Defendants demoted Plaintiff by four levels and cut his salary nearly in half, then pressured him to resign and sign a non-disclosure agreement ("NDA") before ultimately terminating his employment. *Id.* ¶¶ 97-163.

### II. ESI SEARCH TERMS

  Plaintiff moves to compel Defendants to include certain search terms in Attachment B to the parties' ESI Protocol, which provides the custodians, time frames, and terms for each search. *See* Ex. B.[2] The dispute terms are listed in Sections II(A)-(E), *infra*, organized by the custodians to whom each search applies. As detailed below, all of the terms should be included in the ESI Protocol because they are likely to yield ESI that is squarely relevant to the claims and defenses in this action.

---

[1] Counsel for the parties have met and conferred several times over the course of five phone calls and dozens of substantive email exchanges. While they successfully resolved the lion's share of their disputes, unfortunately, they were unable to reach agreement on the two discovery items that form the basis of the instant motion.

[2] Exhibit B reflects the parties' current disagreements as to Attachment B, with all disputed terms highlighted.



The Honorable J. Paul Oetken
March 9, 2022
Page 2

### A. The Hiring Committee

The custodians in this section each served on the hiring committee that ultimately decided to offer Plaintiff employment with the ACLU. All of the terms are appropriate, as they will likely yield discovery concerning Tian's discriminatory animus. Defendants hired Plaintiff to replace Caroline Chin ("Chin"), a former ACLU staffer with high-level coding and technical skills. Ex. C (Declaration of David Oliver) ¶¶ 23-26. The hiring committee recognized that the Analytics department already had several employees with similar skills and, as such, determined that Chin's replacement need not have a coding background. *Id.* ¶¶ 26-27. Thus, the hiring committee, led by Tian, offered Plaintiff the position. *Id.* ¶ 37. After Defendants hired Plaintiff, however, Tian began to assign him highly technical projects, knowing that they were outside of his skillset and the expectations set for his role. *Id.* ¶¶ 43-56. Notably, Tian opposed Plaintiff's hiring because she preferred to hire a candidate who, like Tian and Chin, is of Asian descent. *Id.* ¶¶ 33-36.

The terms "hire," "offer!," "responsibilit!," "qualif!," "experience," and "analytic!" are likely to reveal whether coding and/or other technical skills were required for Plaintiff's job, or if Tian gave Plaintiff highly technical assignments to set him up to fail. Documents yielded from "Caroline OR Chin" will similarly reveal whether Defendants believed Chin's replacement was required to have her level of coding experience. These documents—along with those hit by "prefer!" and "represent!"—will also speak to whether Tian preferred to hire an Asian candidate over Plaintiff, a Black man. This is relevant to proving Tian's discriminatory animus, as well as the reasonableness of Plaintiff's complaints about a lack of Black representation at the ACLU.

Further, documents resulting from these searches will be relevant to rebut Defendants' anticipated same-actor-inference defense, as Tian participated in the decision to hire Plaintiff. *See Fort Worth Emps' Ret. Fund v. J.P. Morgan Chase & Co.*, 297 F.R.D. 99, 109 (S.D.N.Y. 2013) ("The defendants are clearly obligated to turn over documents supporting their defenses").

### B. Plaintiff's Supervisors

The custodians in this section each directly or indirectly supervised Plaintiff's work and retaliated against him for his protected activities during and after the Southern Convening. The search terms are addressed separately in two groups: one set of terms unqualified by any connectors; the other, connected to iterations of Plaintiff's name and his ACLU email address.

The first subset of terms—including "Southern Convening," "southern collective," "Jeff Sessions," "Senator Sessions," "Attorney General Sessions," and "AG Sessions"—are squarely relevant to the Plaintiff's speech at the Southern Convening, which was inspired in part by a photo Kary Moss (a Director at the ACLU) took with Jeff Sessions during the event. *See* FAC ¶¶ 44-55. "Nettles," "Buskey," "Anwar," "Brandon Cox," "Brian McCoy," and "Rob! Stephens" refer to other Black men who addressed the Southern Convening alongside Plaintiff.

Given the very narrow construction of these terms and the fact that none of the four custodians supervised any Southern Convening speaker other than Plaintiff, any documents hit will almost certainly be relevant. As such, narrowing them through a connector is not necessary and would likely result in Plaintiff being denied important discovery.



<div style="text-align:right">
The Honorable J. Paul Oetken<br>
March 9, 2022<br>
Page 3
</div>

The second subset includes terms connected to "('Rob! Jackson' OR RJ[3] OR rjackson@aclu.org)." "Kary" refers to the photograph Kary Moss took with Jeff Sessions, spurring Plaintiff and his Black colleagues to speak at the Southern Convening. "Assign!," "budget," "dashboard," "progress," "incarcerat!," "court watching," "perform!," and "deadline!" each concern a project on which Plaintiff worked, his overall performance, and/or Defendants' claim that they fired Plaintiff because he failed to meet deadlines. *See* Ex. F (Defendants' Answer) ¶¶ 3, 9, 32, 70, 72-73, 85, 127-29, 150, 160, 166. "Asana" refers to the software used in Analytics to oversee ongoing work, and the phrase "1-1"[4] is used to refer to one-on-one performance meetings. Thus, both terms are similarly relevant to Plaintiff's performance. "Pay," "Analyst," "invest! in," "replac!," "separat!," "transition," and "NDA" all concern Defendants' retaliation against Plaintiff and the adverse actions taken against him. *See* FAC ¶¶ 97-163.

### C. Stakeholders for Particular Projects Completed by Plaintiff

Here, the custodians are each ACLU stakeholders who supervised Plaintiff's work on three key projects, each of which primarily involved Plaintiff's creation of spreadsheets, hence the terms "project!" and "table!" connected to Plaintiff's name.[5] Defendants contend that they fired Plaintiff for performing poorly on these projects, citing to his purported inability to meet deadlines (*see supra* § II(B)), thus supporting the inclusion of "timeline" and "deadline!" as search terms.

### D. Human Resources Officers

The custodians for this section are Amber Hikes ("Hikes") and Sophie Kim Goldmacher ("Goldmacher"). Plaintiff complained to Hikes about discrimination and ongoing retaliation at the ACLU, including Tian's sabotaging of his work after his complaints at the Southern Convening. *See* FAC ¶¶ 70-90, 158-62. Plaintiff made similar complaints to Goldmacher, who also informed Plaintiff of his demotion and pressured him to sign the NDA. *See id.* ¶¶ 99-112, 147-59

The terms "perform!," "1-1," "Kary," "pay!," "Analyst," "separat!," "transition," "NDA" "Buskey," "Anwar," and "Brandon Cox"[6] are relevant for the same reasons outlined *supra* § II(B). "Speech" is similarly relevant and necessary to obtain discovery concerning Plaintiff's speech at the Southern Convening. Lastly, "Dav! Oliver" refers to David Oliver ("Oliver"), who—like Plaintiff—was subjected to discrimination by Tian because he is Black. *See* Ex. C. Evidence of Tian's discrimination against Oliver is discoverable. *See, e.g.*, *Lieberman v. Gant*, 630 F.2d 60, 68 (2d Cir. 1980) ("Evidence of general patterns of discrimination by an employer is relevant [ ] in an individual disparate treatment case."). Moreover, given that he and Plaintiff are both Black and worked in Analytics under Tian, Oliver is a proper comparator. *See, e.g.*, *Akinyemi v. Chertoff*, No. 07 Civ. 4048(AJP), 2008 WL 1849002, at *5 (S.D.N.Y. Apr. 25, 2008) (having worked for the same supervisor "is an important factor" in deeming another employee a proper comparator).

---

[3] In this and one other section (*see infra* § II(D)), Defendants oppose inclusion of the term "RJ" as a connector; however, documents already produced reveal that ACLU decision-makers referred to Plaintiff by his initials when discussing adverse actions against him. *See, e.g.*, Exs. D, E.

[4] Notably, Defendants do not impose including the similar term "1 on 1." *See* Ex. B.

[5] Karalyn Bonfanti supervised Plaintiff's review of the ACLU's budget over the previous five years, thus justifying the use of the term "FY." *See* FAC ¶¶ 30-33.

[6] Notably, Defendants do not oppose searching the names of three other Black men who—like Brandon Buskey, Anwar Young, and Brandon Cox—spoke with Plaintiff at the Southern Convening. *See* Ex. B.

## E. Plaintiff

The search terms in this section are to be run through Plaintiff's ACLU email and internal messaging accounts. The terms "Kary," "speech," "assign!," "Asana," "budget," "progress," "table!," "FY," "incarcerat!," "perform!," "deadline!," "1-1," "Analyst," and "separat!" are each relevant and should be searched for the various reasons noted above. *See supra* §§ II(A)-(D). The additional terms Plaintiff seeks to include are equally relevant. Specifically, "deck," "column!" and "eval!" concern the quality of Plaintiff's work, which often involved preparing spreadsheets. Further, "complain!," "equal!," "equit!," and "promot!" directly relate to Plaintiff's complaints that the ACLU did not provide equal opportunities to Black employees, including by denying them promotions. The term "Black Lives" may yield similar discovery, but is also designed to hit ESI concerning Defendants' refusal to allow Plaintiff to present at the "Data for Black Lives" conference in retaliation for his protected activities. *See* FAC ¶¶ 133-46. Likewise, "transfer!" is relevant to Defendants' retaliation against Plaintiff—namely, his demotion to the role of Analyst and his subsequent transfer out of Analytics shortly before the ACLU terminated his employment.

## F. Defendants' Undue Burden and Proportionality Objections Are Unavailing

Defendants have refused to run these additional search terms, offering no basis for the refusal other than generalized objections as to proportionality and undue burden. *See Abu Dhabi Com. Bank v. Morgan Stanley & Co. Inc.*, No. 08 Civ. 7508(SAS), 2011 WL 5244689, at *1 (S.D.N.Y. Oct. 24, 2011) ("the objecting party bears the burden of demonstrating specifically how . . . each" request is objectionable "by submitting affidavits or offering evidence").

Defendants argue that, because this is a single-plaintiff action, the additional search terms are not proportional to the needs of the case. However, proportionality is determined not by the number of parties or arbitrary limits set by counsel, but by a three-factor test under Federal Rule of Civil Procedure 26. *See Uni-Sys., LLC. v. U.S. Tennis Ass'n, Inc.*, No. 17-cv-147(KAM)(CLP), 2020 WL 8266015, at *7 (E.D.N.Y. July 6, 2020) (reciting the three factors). Here, each factor weighs in Plaintiff's favor: (1) the discovery is in no way duplicative; (2) Plaintiff has no other means to obtain the ACLU's internal emails and messages; and (3) as detailed *infra*, running the additional terms would be minimally burdensome, as they hit less than 1,000 unique documents.

Defendants claim that running the additional search terms would be unduly burdensome, but have failed to substantiate this claim with any evidence. Regardless, this objection is refuted by Defendants' hit reports, which show that the disputed terms hit only 977 unique documents. *See* Exs. G-K (hit reports); *see also* Ex. L (summary of hit reports created by Plaintiff's counsel for the Court's convenience). This is hardly a burdensome volume of ESI for Defendants to review and produce. *See Shannon v. Honeywell Fed. Mfg. & Techs., LLC*, No. 4:17-cv-00787(DGK), 2018 WL 8244890, at *2 (W.D. Mo. July 20, 2018) (ordering defendants to run plaintiff's search terms in a single-plaintiff discrimination action despite incurring $23,320 in costs); *see also Thomas v. City of N.Y.*, 336 F.R.D. 1, 3 (E.D.N.Y. 2020) (compelling search because defendants failed to offer "any specific analysis of the burden of the ESI production being sought").[7]

---

[7] Defendants may complain that they have already run an ESI search and cite to the alleged burden of running a second one. However, any burden is a problem of Defendants' own creation. Defense counsel unilaterally decided to begin their ESI search, despite the fact that several terms were still in dispute. *See* Ex. M at 7-8. Thereafter, Plaintiff's


Finally, it bears emphasis that Defendants' "assertions of undue burden and expense must be weighed against Plaintiffs' need for the ESI discovery[.]" *Black Love Resists In the Rust v. City of Buffalo, N.Y.*, 334 F.R.D. 23, 29 (W.D.N.Y. 2019); *see also supra* §§ II(A)-(E). Moreover, the burden—which Defendants have not quantified, to the extent any burden exists—is minimal. The terms Plaintiff moves to compel apply to the same custodians and timeframes as Defendants' first search. Thus, Defendants will not incur any additional data extraction or storage costs, and their review of less than 1,000 unique documents should require minimal time and effort.

### III. *IN CAMERA* REVIEW OF EMAILS CLAIMED TO BE PRIVILEGED

Plaintiff respectfully requests that the Court review *in camera* two emails referenced on Defendants' privilege log. The first email—dated January 30, 2020 with the subject line "Analytics employee matter"—was sent shortly after Plaintiff engaged in protected activities at and after the Southern Convening. *See* Ex. N at 2.

The second email—dated June 22, 2020 with the subject line "Confidential – RJ decisions"—is part of a partially-redacted chain. *See* Ex. E. The unredacted portions concern a project assigned to Plaintiff, his deadline for completing the project, and whether or not the deadline should be extended. *Id.* These communications clearly relate to managing Plaintiff and business decisions as to the work he was performing. Given the timing—roughly halfway between Plaintiff's demotion and termination—they also likely discuss the decision to fire him. While Terence Dougherty, the ACLU's general counsel, is copied on the chain, nothing in the unredacted portion suggests that there was any discussion of potential litigation or legal advice.

Notably, both emails were sent before Plaintiff asserted claims against Defendants. As such, they necessarily do not concern actual or contemplated litigation. Similarly, it is beyond dispute that the emails do not concern an internal investigation. While Plaintiff alleges multiple complaints after the Southern Convening, Defendants dispute this allegation and have advised that they did not conduct any investigation concerning Plaintiff. *See* Ex. O at 2, 4.

The emails transparently concern adverse actions taken against Plaintiff, in which the ACLU's general counsel happened to be involved. Courts have held time and time again that emails of this nature are non-privileged and discoverable. *See, e.g.*, *Gomez v. Metro. Dist.*, No. 3:11-cv-1934(JBA), 2013 WL 2489138, at *7 (D. Conn. June 10, 2013) (emails involving in-house counsel not privileged because they concerned termination decision); *Leazure v. Apria Healthcare Inc.*, No. 1:09-cv-224, 2010 WL 3895727, at *4 (E.D. Tenn. Sept. 30, 2010) (same); *Neuder v. Battelle Pac. Nw. Nat'l Lab'y*, 194 F.R.D. 289, 296-97 (D.D.C. 2000) (same); *Marten v. Yellow Freight Sys., Inc.*, No. 96-2013(GTV), 1998 WL 13244, at *10 (D. Kan. Jan. 6, 1998) (same).

---

counsel repeatedly expressed concern that Defendants would oppose a second search based on the costs of the same, despite running the initial search on their own volition. *Id.* at 1, 7; *see also Shannon*, 2018 WL 8244890, at *2 (ordering supplemental search even though defendants ran their own search before reaching agreement with plaintiff).



<div style="text-align:right">The Honorable J. Paul Oetken<br>March 9, 2022<br>Page 6</div>

\*     \*     \*

  For the foregoing reasons, Plaintiff respectfully requests that the Court schedule an informal conference to discuss the above-summarized discovery disputes, and ultimately grant the instant motion in its entirety. We thank the Court for its time and attention to this matter.

<div style="text-align:center">Respectfully submitted,

Alex J. Hartzband</div>

Cc: Counsel of Record (*via* ECF)

Encls. (15)

685 THIRD AVENUE  NEW YORK, NY 10017  PHONE: 212.983.9330  FAX: 212.983.9331  EMPLOYEERIGHTSCOUNSEL.COM  FARUQILAW.COM