# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| ROBERT JACKSON,<br><br>                    Plaintiff,<br><br>          v.<br><br>AMERICAN CIVIL LIBERTIES UNION, INC.<br>and LUCIA TIAN, in her individual and<br>professional capacities,<br><br>                    Defendants. | Civil Action No.: 21-cv-05037 (JPO)<br><br><br>**AMENDED COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff Robert Jackson ("Plaintiff"), by and through his attorneys, Faruqi & Faruqi, LLP, hereby alleges as follows against Defendants American Civil Liberties Union, Inc. ("ACLU" or the "Organization") and Lucia Tian (together, "Defendants"):

## NATURE OF THE CLAIMS

1.      The ACLU boasts that it "strives to create a world where 'we the people' truly means all [of] us — this means dismantling systemic racism and working to repair centuries of harm inflicted on communities of color."[1]

2.      Despite the good the ACLU has done for the Black community outside of its walls, it appears that the scope of its stated mission starts and ends there.

3.      As was made clear to Mr. Jackson, complaints about systemic racism within the ACLU itself are not welcome, nor are the people who speak out.

4.      In December 2019, Mr. Jackson and several other Black men made a speech to roughly 140 ACLU employees at a conference in Montgomery, Alabama in response to Kary

---

[1] *See* https://www.aclu.org/issues/racial-justice (last visited June 8, 2021).

Moss, the ACLU's Director, Affiliate Support & Nationwide Initiatives, posing for a photo with Jeff Sessions, an early supporter of and the former U.S. Attorney General under President Donald Trump:

 

5.    Mr. Jackson and his colleagues highlighted structural barriers Black men and women must overcome to move up within the Organization and offered proposals to address their lack of representation in ACLU leadership.

6.    When Mr. Jackson returned to the New York City headquarters, his direct supervisor, Defendant Lucia Tian, told him she had heard about his speech and instructed him to "keep quiet."

7.    What followed was a months' long campaign of retaliation aimed at forcing Mr. Jackson out of the ACLU, including by demoting him four levels, cutting his salary nearly in half, and pressuring him to sign a non-disclosure agreement to keep his job.

8. Undeterred, Mr. Jackson continued to speak out about inequities within the Organization and Ms. Tian's blatant targeting of him for doing so.

9. As a result, the ACLU and Ms. Tian took matters into their own hands and terminated his employment.

10. The ACLU's and Ms. Tian's mistreatment of Mr. Jackson violates, *inter alia*: (i) Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII"); (ii) Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"); (iii) the New York State Human Rights Law, N.Y. Exec. Law §§ 290, *et seq.* ("NYSHRL"); and (iv) the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101, *et seq.* ("NYCHRL").

## JURISDICTION AND VENUE

11. Pursuant to 28 U.S.C. §§ 1331, this Court has subject matter jurisdiction over this action because it involves federal questions regarding the deprivation of Plaintiff's rights under Title VII and Section 1981.

12. Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Plaintiff's related claims arising under State and City law.

13. Pursuant to 28 U.S.C. § 1391, venue is proper because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this District.

## ADMINISTRATIVE PREREQUISITES

14. On June 8, 2020, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging, *inter alia*, discrimination and retaliation in violation of Title VII.

15. Plaintiff received a Notice of Right to Sue from the EEOC on June 30, 2021.

16.     Fewer than 90 days have passed since Plaintiff received his Notice of Right to Sue.

17.     Any and all other prerequisites to the filing of this action have been met.

## PARTIES

**A.    Plaintiff Robert Jackson**

18.     Plaintiff is a resident of the State of New York and was employed by Defendants from October 1, 2019 through August 31, 2020.

19.     At all relevant times, Plaintiff was an "employee" of Defendants within the meaning of all relevant statutes and regulations.

**B.    Defendant American Civil Liberties Union**

20.     Defendants American Civil Liberties Union is a not-for-profit organization with its principal place of business located at 125 Broad Street, New York, New York 10004.

21.     At all relevant times, the ACLU was Plaintiff's "employer" within the meaning of all relevant statutes and regulations.

**C.    Defendant Lucia Tian**

22.     Defendants Lucia Tian is, upon information and belief, a resident of the State of Connecticut.

23.     Ms. Tian supervised Plaintiff's employment with the ACLU.

24.     At all relevant times, Ms. Tian was Plaintiff's "employer" within the meaning of all relevant statutes and regulations.

## FACTS

**A.    Background**

25.     On October 1, 2019, Mr. Jackson joined the ACLU as an Associate Director, Special Projects Lead working out of the Organization's New York City headquarters.

26.     Mr. Jackson reported to Ms. Tian, the ACLU's Chief Analytics Officer, and worked on projects involving data collection and analysis.

27.     As a new employee, Mr. Jackson was required to go through a six-month probationary period, after which he was to have a formal review of his performance pursuant to the ACLU's policy and standard practices.

28.     As he would come to learn, however, this policy applied differently to him than it did to his peers.

29.     Over the course of his first few weeks, Mr. Jackson quickly established himself as an asset to the ACLU, receiving exclusively positive feedback from Ms. Tian and others regarding his performance.

30.     By way of example only, the ACLU entrusted Mr. Jackson with reviewing the Organization's $800,000,000 budget and finances from the previous five years (the "Budget Project").

31.     The Budget Project was designed to help the ACLU better understand the resources it devoted to each of its initiatives and help inform how the Organization allocated resources to improve efficiency and reduce costs.

32.     Karolyn Bonfanti, the ACLU's Director of Budget and stakeholder for this project, lauded Mr. Jackson for the high quality of his work.

33.     In connection with his work on the Budget Project, Mr. Jackson received praise for helping the ACLU identify the specific costs associated with the lawsuits handled by the Organization's litigation department, enabling the ACLU to identify areas where it could reduce spending.

34.     Further, Mr. Jackson worked on a project concerning mass incarceration and, specifically, the difficulties former inmates face procuring and retaining employment after they have been released.

35.     As Mr. Jackson shared with his colleagues, this project was particularly close to his heart, as he was previously incarcerated (the charges against him have since been expunged) due to racial profiling after he was assaulted by a white man.

36.     Thus, he is intimately aware of and passionate about tearing down the barriers former inmates encounter in the job market and virtually all aspects of society.

37.     Brooke Madubuonwu, the ACLU's Director of Legal Analytics & Quantitative Research, oversaw this project and similarly commended Mr. Jackson's work, in addition to applauding his dedication to the project's goals.

38.     Mr. Jackson quickly cemented himself as a crucial team member not only in the eyes of the Organization, but also those of his peers, helping found and serving a leadership position in the ACLU's Black and LGBTQ affinity groups.

39.     Based on his strong performance, Mr. Jackson earned the opportunity to represent the ACLU's national office at the Organization's Southern Collective Convening in Montgomery, Alabama (the "Southern Convening"), which took place from December 11, 2019 through December 13, 2019.

40.     The Southern Convening is an annual conference where employees from the ACLU's headquarters and Southern offices gather to discuss issues impacting the Black community, as well as meaningful steps the ACLU can take to address those issues.

41.     After being tapped to attend the Southern Convening, Mr. Jackson met with Sondra Goldschein, the ACLU's Director of Program and Strategy, Affiliate Support and Nationwide Indicatives, as well as one of the event's organizers.

42.     Following her meeting with Mr. Jackson, Ms. Goldschein asked him to serve on the Southern Convening's leadership team.

43.     Mr. Jackson happily accepted the offer to help organize the conference and develop its itinerary.

### B.     Mr. Jackson's Protected Activity at the Southern Convening

44.     On December 12, 2019, the second day of the Southern Convening, Mr. Jackson and other attendees visited the Equal Justice Initiative's Legacy Museum: From Enslavement to Mass Incarceration (the "Museum"), as well as the National Memorial for Peace and Justice (the "Memorial")—the nation's first memorial dedicated to the legacy of enslaved Black people, people terrorized by lynching, victims of racial segregation and Jim Crow, and people of color burdened with contemporary presumptions of guilt and police violence.

45.     After visiting the Museum and Memorial, Mr. Jackson met with several Black colleagues from the ACLU's Southern offices to discuss the lack of diversity in leadership positions at the ACLU.

46.     Specifically, they examined the ACLU's pattern of denying promotions to Black employees—Black men, in particular—forcing them out of the Organization to advance in their careers and resulting in a lack of representation in leadership.

47.     While Mr. Jackson and his colleagues were discussing racial inequities and lack of diversity at the top of the ACLU, Kary Moss, the ACLU's Director, Affiliate Support &

Nationwide Initiatives, was posing with Jeff Sessions—an early supporter of and the former U.S. Attorney General under President Donald Trump—for a photo opportunity:



48. Mr. Sessions has spent his career supporting policies that disadvantage and target Black Americans—of late, restoring the federal government's use of civil asset forfeiture, instructing federal prosecutors to seek the greatest criminal charges in drug cases, vocally supporting stop-and-frisk, and decreasing federal oversight of law enforcement.

49.     The photo of Ms. Moss and Mr. Sessions circulated on social media, quickly becoming the topic of the day for the Southern Convening's attendees.

50.     When Mr. Jackson came across the photo, he was beside himself.

51.     It was not just Mr. Sessions's record, but also his racist rhetoric (or, per the ACLU, his "history of racially hostile remarks"[2]) that made this photo and Ms. Moss's decision to pose for it so disturbing to Mr. Jackson and so many of his colleagues.

52.     By way of example only, Mr. Sessions famously: (i) called the first-ever Black County Commissioner of Mobile, Alabama the n-word; (ii) called a Black Assistant U.S. Attorney "boy" and warned him, "You ought to be careful as to what you say to white people;" (iii) accused the ACLU itself of "forc[ing] civil rights down the throats of people;" and (iv) openly sympathized with members of the Ku Klux Klan.

53.     Mr. Jackson could not understand why Ms. Moss—a leader within the ACLU— would condone Mr. Session's record by smiling next to him in a photo at an event organized for the express purpose of addressing racial inequities Black Americans face.

54.     This anger and pain inspired Mr. Jackson and the same Black colleagues with whom he had been discussing racial inequities within the ACLU to raise their concerns to the Organization.

55.     The next day, they arranged to address the Southern Convening as a whole and prepared a speech to present to the roughly 140 ACLU employees in attendance.

56.     Robert Stephens from the ACLU of North Carolina and Dillon Nettles from the ACLU of Alabama read from written remarks they prepared jointly with Mr. Jackson and other Black men at the conference.  *See* Exhibit A.

---

[2] *See* https://www.aclu.org/other/jeff-sessions-facts (last visited June 8, 2021).

57.     During their address, they called out the lack of Black men in senior leadership at the ACLU and explained that, despite the Organization's public-facing rhetoric, it has not done enough to address the structural racism within its own ranks that prevents Black employees from advancing.

58.     As Mr. Stephens explained, with Mr. Jackson and others standing behind him in solidarity: "100 Black Men [of America, Inc.] are fond of saying in order to be it, you have to see it.  Unfortunately, as it currently stands, we do not see it in the ACLU."  Exhibit A.



59.     Mr. Jackson and his colleagues did not just criticize the ACLU, but also made concrete proposals to address the problem they had identified: (i) establish a dedicated pipeline to senior leadership for Black employees specifically; (ii) convert all ACLU internships to paid

internships; and (iii) put into place a policy of promoting from within to better retain Black talent. They also demanded an apology for Ms. Moss's gleeful photo with Jeff Sessions.

**C.**     **The ACLU's Retaliation against Mr. Jackson**

60.     Upon his return to the office on December 16, 2019, Mr. Jackson informed Ms. Tian that he and several others complained during the Southern Convening about structural barriers to promotion that Black men and women face within the ACLU.[3]

61.     Mr. Jackson also explained that he and the others who addressed the conference offered proposals to address this problem.

62.     Further, he confided in Ms. Tian that it was difficult for him to speak about these issues, which are of huge personal significance to him as a Black man who has encountered discrimination throughout his life and career.

63.     Given the ACLU's mission to expand civil liberties, including in employment, Mr. Jackson expected Ms. Tian to hear him and support him.

64.     Instead, she instructed him to "keep quiet" and to be "the cooler head in the room."

65.     In other words, Ms. Tian told him to stop speaking out about racial injustices within the Organization.

66.     Stunned that Ms. Tian would be so dismissive of his complaints, Mr. Jackson left Ms. Tian's office and returned to his desk.

67.     A few days later, Mr. Jackson began to hear rumors that he was being fired or resigning from the ACLU.

---

[3] Roughly six weeks after returning from the Southern Convening, Mr. Jackson also addressed ACLU Executive Director Anthony Romero during an orientation event.  Mr. Jackson asked how the Organization expects Black employees (as well as those from other groups impacted by discrimination) to show up for the ACLU while the Organization continues to support the rights of those impacting them—namely, the Ku Klux Klan.  Of note, in his teenage years, Mr. Jackson was physically assaulted by a group of Klan members.

68.     For example, Ms. Goldschein joked, with at least one other witness present, "Oh, is this your last day?"

69.     Mr. Jackson was shocked.  He was only about halfway through his probationary period, was actively working to improve the ACLU—not leave the Organization—and had received uniformly positive feedback on his work to date.

70.     Accordingly, he reached out to Ms. Tian and Amber Hikes, the ACLU's Chief Equity & Inclusion Officer, to notify them of the rumors in the hopes of confirming that his employment was not, in fact, being terminated.

71.     He also requested to take the rest of the day off.

72.     Mr. Jackson's emotions were still raw from his address and the illuminating discussions he had at the Southern Convening, and the thought that his attempt to right a wrong within the ACLU might cost him his job caused him severe anxiety.

73.     The next day, Ms. Tian summoned Mr. Jackson to her office to inform him that she was ending his project related to mass incarceration.

74.     Ms. Tian claimed that the mass incarceration project did not have a key stakeholder and was "dead," which was demonstrably untrue, and supposedly needed "more direction" to move forward—a critique she was unwilling or unable to explain.

75.     Indeed, in Fall 2019, as the Budget Project was ramping up, Mr. Jackson told Ms. Madubuonwu that he needed to pause his work on the mass incarceration project so that he could focus on completing the Budget Project since that project was a priority.

76.     Ms. Madubuonwu told Mr. Jackson that she agreed he should focus on the Budget Project and that he could continue working on the mass incarceration project once the Budget Project was finished.

77.    Despite this being the first occasion on which Ms. Tian raised concerns about Mr. Jackson's work or the viability of the mass incarceration project (less than a week after his address at the Southern Convening, no less), she declined to provide any specific feedback.

78.    In fact, Ms. Tian was unwilling to let Mr. Jackson respond to her critiques or even ask questions about the decision to end the mass incarceration project.

79.    She did not assign Mr. Jackson to any new projects, either, leaving him with just one project[4] and sending a strong signal that, due to his protected activity, his tenure at the ACLU was likely coming to a close.

80.    Mr. Jackson also noticed a stark shift in Ms. Tian's disposition toward him and willingness to involve him in work immediately after he returned from the Southern Convening.

81.    Suddenly, Ms. Tian was excluding Mr. Jackson from meetings and minimizing her contact with him wherever possible.

82.    Further, prior to the Southern Convening, Ms. Tian maintained an open dialogue with Mr. Jackson concerning his projects, soliciting questions and offering advice wherever she could.

83.    After Mr. Jackson returned, Ms. Tian was curt with him whenever he raised a question about his sole remaining project and offered little to no advice regarding the same.

84.    Indeed, whereas Ms. Tian used to hold productive, thirty-minute one-on-one meetings with Mr. Jackson, she suddenly used this time to unjustifiably malign his performance and consistently cut their meetings short.

---

[4] Notably, Mr. Jackson's one remaining project centered on an accounting of the ACLU's finances, despite his expressed aversion to finance projects, which both he and Ms. Tian agreed during the hiring process did not play to his strengths.

85.     Despite having the mass incarceration project canceled, many of his job responsibilities taken away, and the rapid deterioration of his relationship with Ms. Tian, Mr. Jackson continued his hard work and dedication to the ACLU.

86.     Mr. Jackson was similarly dedicated to addressing structural barriers he and other Black men brought to light at the Southern Convening.

87.     Thus, in mid-December 2019, Mr. Jackson and the same colleagues with whom he spoke at the conference followed up on their complaints by emailing Ms. Hikes about "the lack of African-American male leadership at the organization on both the affiliate and national level." Exhibit B.

88.     Specifically, they asked to "continue the conversation and think proactively through next steps" by scheduling a meeting in the coming days.

89.     They also attached a copy of their written address to the Southern Convening. *Id.*

90.     The next day, Ms. Hikes met with Mr. Jackson and the rest of group, who reiterated their complaints and proposals.

91.     In the following weeks, Ms. Tian continued to ignore Mr. Jackson, exclude him from meetings, and refuse to offer any meaningful support in connection with his one remaining project.

92.     Mr. Jackson approached Ms. Tian on several occasions to address this, as well as her failure to assign him to additional projects.

93.     On each occasion, Ms. Tian quickly changed the subject or cut him off, telling him she was too busy.

94.     Mr. Jackson also tried raising his concerns by providing Ms. Tian with a self-evaluation.

95.     He hoped this would provide a jumping off point for a discussion about mending their relationship.

96.     Ms. Tian offered no response.

**D.      Mr. Jackson's Retaliatory Demotion**

97.     In late January 2020, Ms. Tian told Mr. Jackson that he was not meeting her expectations, and used his self-evaluation to malign his purportedly poor performance.

98.     Still, Ms. Tian refused to recommend specific areas for improvement or let Mr. Jackson respond to any of the critiques.

99.     Instead, she walked him to a meeting with Sophia Kim Goldmacher, the ACLU's Chief People Officer.

100.    Ms. Tian and Ms. Goldmacher told Mr. Jackson that he was supposedly unqualified for his position and provided him with an ultimatum: accept a demotion to Analyst—a position four levels below Associate Director that paid roughly half the salary—or be terminated.

101.    This was not only blatantly retaliatory, but also inappropriate and contrary to ACLU policy given that Mr. Jackson was barely more than halfway through his probationary period.

102.    During the meeting, Mr. Jackson protested that the decision to demote him was "racist."

103.    The ACLU clearly hoped the demotion would cause Mr. Jackson to resign, thereby insulating the Organization from liability for its unlawful conduct.

104.    Mr. Jackson met with Ms. Goldmacher again a few days later.

105.    As he did during the first meeting, Mr. Jackson reiterated his objection to the ultimatum and explained that he had performed well during his brief tenure at the ACLU—and, up until the Southern Convening, Ms. Tian and the stakeholders on his projects seemed to agree.

106.    He also told Ms. Goldmacher that he felt Ms. Tian was retaliating against him for his protected activity.

107.    Ms. Goldmacher ended the meeting then and there.

108.    Ms. Goldmacher agreed to resume the discussion a few days later; however, she offered no solution.

109.    She told Mr. Jackson that her hands were tied, and that she needed a decision on the ultimatum as soon as possible.

110.    During another meeting later that month, Ms. Goldmacher shared with Mr. Jackson that the ACLU had not even hired a replacement Associate Director before forcing him to accept a demotion or lose his job, further revealing the ACLU's actions to be based on animus, rather than the sound operation of the Organization.

111.    Ms. Goldmacher also acknowledged that, from her perspective, Mr. Jackson had performed well on his projects, despite Ms. Tian seemingly trying to set him up for failure since the Southern Convening.

112.    Additionally, Ms. Goldmacher assured Mr. Jackson that the ACLU had every intention to "invest" in him.

113.    These conversations culminated in Mr. Jackson accepting the demotion, despite it being obviously unjust.  Faced with the prospect of unemployment, he had no choice.

114.    Shortly thereafter, Mr. Jackson took a ten-day leave of absence, as the retaliation he had experienced for speaking out at the Southern Convening had severely impacted his mental health, including by causing suicidal ideation.

115.    Mr. Jackson returned in early February 2020, after which he met with Ms. Tian and her direct report, Allison Kelley, the ACLU's Director of Engagement Analytics.

116.    During the meeting, Ms. Tian told Mr. Jackson that he would continue his monthly one-on-one meetings with her but would report directly to Ms. Kelley going forward.

117.    Ms. Tian also told Mr. Jackson that he was being assigned to three new projects, and that his six-month probationary period had been reset following his demotion to Analyst.

118.    As with the decision to demote Mr. Jackson in the middle of his probationary period without prior warning, the ACLU's resetting of Mr. Jackson's probationary period was highly irregular and indicative of unlawful animus.

119.    As news of the demotion spread throughout the New York office, countless colleagues approached Mr. Jackson to express their shock and anger over the way the ACLU was treating him.

120.    Moreover, multiple Black colleagues shared their own experiences with Ms. Tian, who had similarly interfered with their assignments and prevented them from advancing within the Organization.

121.    Among these colleagues was David Oliver, who Ms. Tian demoted and replaced with a white employee.

122.    Mr. Oliver left the ACLU in November 2020.  In his farewell email, he cited "past trauma and harm caused" by the ACLU, "especially for our BIPOC staff."  Exhibit C.

123.    Mr. Oliver went onto reference Mr. Jackson by name as one of several employees "who no longer have a voice here, but should[.]"  *Id.*

124.    Over the next several weeks, Mr. Jackson again began hearing rumors that the ACLU was planning to fire him.

125.    Mr. Jackson raised these concerns with Ms. Kelley, but she had no answers.

126.     Further, Mr. Jackson continued to wait for his assignment to the three new projects Ms. Tian had promised him, but to no avail.

127.     Mr. Jackson was eventually assigned to build a dashboard for the ACLU to track information about donations it received.

128.     Mr. Jackson completed the project quickly and on time, and Liz Fitzgerald, the ACLU's Director of Development, extolled Mr. Jackson's work on project as a "game changer."

129.     Mr. Jackson's exceptional performance on the one project he had been assigned since the Southern Convening made clear that his work was never the issue.

130.     It also left no doubt that he was grossly overqualified for the Analyst role to which he had been demoted in retaliation for suggesting that the ACLU needed to address structural racism within the Organization.

131.     After completing this project, Mr. Jackson was eager to take on more work.

132.     However, Ms. Tian refused to give him another assignment.

133.     As a result, Mr. Jackson approached Ms. Kelley and asked to help prepare a presentation for an upcoming Data for Black Lives conference at MIT.

134.     Ms. Kelley initially approved the project and promised to support Mr. Jackson's work.

135.     Mr. Jackson also discussed his proposal with Ms. Hikes, who called it "visionary."

136.     With Ms. Kelley's support, Mr. Jackson and a colleague submitted their presentation to the conference.

137.     Unfortunately, the conference, and thus the presentation, was called off due to the COVID-19 pandemic.

138.    Disappointed and eager to share their work, Mr. Jackson asked for permission to make the presentation internally to ACLU employees.

139.    Ms. Kelley and Ms. Hikes initially approved the request.

140.    However, on the day Mr. Jackson was set to deliver the presentation during a staff meeting, Ms. Kelly claimed towards the end of the meeting that there was not enough time for Mr. Jackson to present and that he could present at another staff meeting.

141.    Ms. Kelly never followed up with Mr. Jackson about rescheduling his presentation nor allocated time for Mr. Jackson to deliver his presentation.

142.    As a result, Mr. Jackson was never given an opportunity to deliver his presentation.

143.    Ms. Tian subsequently brought up the presentation during a meeting with Mr. Jackson and discouraged him from working on it any further.

144.    Ms. Tian claimed, while laughing and with palpable condescension, that Mr. Jackson did not have the necessary "skills" (though she characteristically offered no explanation as to how or why this was the case).

145.    During their next meeting, Mr. Jackson made clear to Ms. Tian that he felt she had been targeting him because of his race and color.

146.    Ms. Tian ended the meeting early shortly thereafter.

**E.    The ACLU's Efforts to Coerce Mr. Jackson to Sign Away His Rights**

147.    In May 2020, Ms. Tian scheduled Mr. Jackson for a performance review with Ms. Kelley and Ms. Goldmacher.

148.    However, Ms. Kelley had been supervising Mr. Jackson for only a few months and, per Ms. Tian, Mr. Jackson's probationary period had been reset and was only halfway complete.

149.     Once again, the ACLU refused to follow its standard policies and practices, making up rules on the fly that applied only to Mr. Jackson.

150.     Rather than provide Mr. Jackson with feedback on his performance and in yet another attempt to intimidate Mr. Jackson into voluntarily leaving the ACLU, Ms. Kelley told him that he would not pass the probationary period, even though it was not over for another three months.

151.     As Ms. Goldmacher then explained, Mr. Jackson would be assigned to work on a small, "discrete" project for Human Resources.

152.     As had been clear for months, the ACLU never intended for Mr. Jackson to succeed. Rather, his demotion one month after the Southern Convening was merely a pit stop on his predetermined path to a discriminatory and retaliatory firing.

153.     During the same meeting, Ms. Goldmacher presented Mr. Jackson with a non-disclosure agreement ("NDA") and pressured him to resign then and there, offering a severance of one month's pay if he signed and voluntarily left the ACLU.

154.     In other words, the ACLU tried to coerce Mr. Jackson to sign away his rights, using his livelihood as both a carrot and a stick—a not unprecedented move by the Organization, as has recently come to light during an ongoing unionization drive.

155.     Mr. Jackson refused to sign the NDA.

156.     In early June 2020, ever hopeful that he could improve the Organization from within and determined to succeed, Mr. Jackson applied to the ACLU's Leader U program, which aims to increase diversity within the Organization by providing minority employees with career coaching and mentors to help them earn promotions.

157.     Unsurprisingly, the ACLU denied his application.

20

158.     Mr. Jackson responded to the rejection email from Ms. Hikes, explaining that Ms. Goldmacher had misled him when she promised to "invest" in him, and making clear that he believed the decision to reject him "spurs from the Southern Convening fall out[.]"  Exhibit D.

159.     When Ms. Hikes asked for more information, Mr. Jackson summarized some of the ways in which Ms. Tian set him up to fail, as well as a conversation with Ms. Goldmacher wherein she effectively acknowledged this fact.  *See id.*

160.     In a subsequent meeting with Ms. Hikes, Mr. Jackson further explained how the ACLU had targeted him for speaking out at the Southern Convening.

161.     Ms. Hikes eventually admitted that she had "dropped the ball" with him, and that it did appear as though Ms. Tian was subjecting him to retaliation.

162.     As Ms. Hikes elaborated, she had "dropped the ball" with Mr. Jackson because there was "so much bleeding everywhere to stop"—a reference to the myriad issues with discrimination at the ACLU that she was trying to address.

**F.**     **Unlawful Termination of Mr. Jackson's Employment**

163.     On August 31, 2020, the ACLU terminated Mr. Jackson's employment.

164.     On his last day, Mr. Jackson sent a heartfelt farewell email to his colleagues at the ACLU.

165.     While he was despondent over his termination and the series of discriminatory and retaliatory events that preceded it, he was heartened by the outpouring of support he received, with several employees validating his experiences:

- "[G]ratitude to you for holding this organization and all of us to account[.]"

- "Thank you for sharing this and your courage for bringing these issues to light."

- "I have not experienced the level of retaliation that you have and of course it is not the same thing, I wanted to tell you that as a trans person I have also experienced work

21

related trauma, to the point where my therapist diagnosed me with PTSD related to the antitransness I have experienced here. This workplace shouldn't be like this, and it is. I hope wherever you go next is less racist and more able to fully value you and your work."

- "Thank you, Rob . . . for speaking truth again and again despite the ACLU continuing to fail you and other employees of color.  Beyond the outright dismissals of staffers of color, I have also seen work conditions deteriorate to the point that staffers are compelled to find other work, and then are considered to have 'found a better position/higher role' as if it's the upward mobility of ACLU folks that is the supreme driver of attrition."

166.    It was Mr. Nettles, though, who provided the most poignant words after receiving news of Mr. Jackson's departure:

> It pains me that in the nearly 9 months since we were together here in Montgomery and several Black men took that stage together, you now make the second that we are losing from the ranks of the ACLU.  As Robert Stephens from North Carolina pointed out in his exit, while we work among many courageous and amazing people in this organization it is also 'an organization where white supremacy, white fragility, and disempowerment of Black staff runs rampant.' That is still the case today and it isn't changing fast enough.

Exhibit E.

## FIRST CAUSE OF ACTION
## VIOLATIONS OF SECTION 1981: DISCRIMINATION
### (*Against All Defendants*)

167.    Plaintiff hereby repeats and realleges the foregoing allegations as if set forth fully herein.

168.    During the full statutory period, Plaintiff was protected by the provisions of Section 1981, 42 U.S.C. § 1981, and all applicable regulations thereunder.

169.    During the full statutory period, Defendants were subject to the provisions of Section 1981, 42 U.S.C. § 1981, and all applicable regulations thereunder.

170. As set forth above, Defendants discriminated against Plaintiff on the basis of his race and color in violation of Section 1981, by, *inter alia*, denying him equal terms and conditions of employment because of his race and color, demoting him, and terminating his employment.

171. Defendants' unlawful and discriminatory actions were intentional, done with malice, and showed a deliberate, willful, wanton, and reckless indifference to Plaintiff's rights under Section 1981.

172. As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of Section 1981, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of damages to the greatest extent permitted by law.

173. Plaintiff is further entitled to an award of reasonable attorneys' fees and costs.

**SECOND CAUSE OF ACTION**
**VIOLATIONS OF SECTION 1981: RETALIATION**
(***Against All Defendants***)

174. Plaintiff hereby repeats and realleges the foregoing allegations as if set forth fully herein.

175. During the full statutory period, Plaintiff was protected by the provisions of Section 1981, 42 U.S.C. § 1981, and all applicable regulations thereunder.

176. During the full statutory period, Defendants were subject to the provisions of Section 1981, 42 U.S.C. § 1981, and all applicable regulations thereunder.

177. As set forth above, Plaintiff engaged in protected activities by, *inter alia*, lodging multiple complaints of race discrimination both during and after the Southern Convening.

178. Defendants retaliated against Plaintiff for his protected activities in violation of Section 1981 by, *inter alia*, demoting him and terminating his employment.

179.     Defendants' unlawful and retaliatory actions were intentional, done with malice, and showed a deliberate, willful, wanton, and reckless indifference to Plaintiff's rights under Section 1981.

180.     As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of Section 1981, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of damages to the greatest extent permitted by law.

181.     Plaintiff is further entitled to an award of reasonable attorneys' fees and costs.

### THIRD CAUSE OF ACTION
### VIOLATIONS OF THE NYSHRL: DISCRIMINATION
#### (*Against All Defendants*)

182.     Plaintiff hereby repeats and realleges the foregoing allegations as if set forth fully herein.

183.     During the full statutory period, Plaintiff was protected by the provisions of the NYSHRL, N.Y. Exec. Law §§ 290, *et seq.*, and all applicable regulations thereunder.

184.     During the full statutory period, Defendants were subject to the provisions of the NYSHRL, N.Y. Exec. Law §§ 290, *et seq.*, and all applicable regulations thereunder.

185.     As set forth above, Defendants discriminated against Plaintiff on the basis of his race and color in violation of the NYSHRL, by, *inter alia*, denying him equal terms and conditions of employment because of his race and color, demoting him, and terminating his employment

186.     Defendants' unlawful and discriminatory actions were intentional, done with malice, and showed a deliberate, willful, wanton, and reckless indifference to Plaintiff's rights under the NYSHRL.

187.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of damages to the greatest extent permitted by law.

188.    Plaintiff is further entitled to an award of reasonable attorneys' fees and costs.

## FOURTH CAUSE OF ACTION
## VIOLATIONS OF THE NYSHRL: RETALIATION
### (*Against All Defendants*)

189.    Plaintiff hereby repeats and realleges the foregoing allegations as if set forth fully herein.

190.    During the full statutory period, Plaintiff was protected by the provisions of NYSHRL, N.Y. Exec. Law §§ 290, *et seq.*, and all applicable regulations thereunder.

191.    During the full statutory period, Defendants were subject to the provisions of NYSHRL, N.Y. Exec. Law §§ 290, *et seq.*, and all applicable regulations thereunder.

192.    As set forth above, Plaintiff engaged in protected activities by, *inter alia*, lodging multiple complaints of race and color discrimination both during and after the Southern Convening.

193.    Defendants retaliated against Plaintiff for his protected activities in violation of the NYSHRL by, *inter alia*, demoting him and terminating his employment.

194.    Defendants' unlawful and retaliatory actions were intentional, done with malice, and showed a deliberate, willful, wanton, and reckless indifference to Plaintiff's rights under the NYSHRL.

195.    As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of damages to the greatest extent permitted by law.

196.    Plaintiff is further entitled to an award of reasonable attorneys' fees and costs.

### FIFTH CAUSE OF ACTION
### VIOLATIONS OF THE NYSHRL: AIDING AND ABETTING
### *(Against Defendant Lucia Tian)*

197.    Plaintiff hereby repeats and realleges the foregoing allegations as if set forth fully herein.

198.    During the full statutory period, Plaintiff was protected by the provisions of NYSHRL, N.Y. Exec. Law §§ 290, *et seq.*, and all applicable regulations thereunder.

199.    During the full statutory period, Defendant Tian was subject to the provisions of NYSHRL, N.Y. Exec. Law §§ 290, *et seq.*, and all applicable regulations thereunder.

200.    Defendant Tian knowingly aided and abetted the unlawful employment practices, discrimination, and retaliation against Plaintiff in violation of the NYSHRL by, *inter alia*, denying him equal terms and conditions of employment because of his race and color, supporting his demotion, and supporting the termination of his employment.

201.    Defendant Tian's unlawful conduct was intentional, done with malice, and showed a deliberate, willful, wanton, and reckless indifference to Plaintiff's rights under the NYSHRL.

202.    As a direct and proximate result of Defendant Tian's unlawful conduct in violation of the NYSHRL, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of damages to the greatest extent permitted by law.

203.    Plaintiff is further entitled to an award of reasonable attorneys' fees and costs.

### SIXTH CAUSE OF ACTION
### VIOLATIONS OF THE NYCHRL: DISCRIMINATION
### *(Against All Defendants)*

204.    Plaintiff hereby repeats and realleges the foregoing allegations as if set forth fully herein.

205. During the full statutory period, Plaintiff was protected by the provisions of the NYCHRL, N.Y.C. Admin. Code §§ 8-101, *et seq.*, and all applicable regulations thereunder.

206. During the full statutory period, Defendants were subject to the provisions of the NYCHRL, N.Y.C. Admin. Code §§ 8-101, *et seq.*, and all applicable regulations thereunder.

207. As set forth above, Defendants discriminated against Plaintiff on the basis of his race and color in violation of the NYCHRL, by, *inter alia*, denying him equal terms and conditions of employment because of his race and color, demoting him, and terminating his employment.

208. Defendants' unlawful and discriminatory actions were intentional, done with malice, and showed a deliberate, willful, wanton, and reckless indifference to Plaintiff's rights under the NYCHRL.

209. As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of damages to the greatest extent permitted by law.

210. Plaintiff is further entitled to an award of reasonable attorneys' fees and costs.

**SEVENTH CAUSE OF ACTION**
**VIOLATIONS OF THE NYCHRL: RETALIATION**
**(*Against All Defendants*)**

211. Plaintiff hereby repeats and realleges the foregoing allegations as if set forth fully herein.

212. During the full statutory period, Plaintiff was protected by the provisions of NYCHRL, N.Y.C. Admin. Code §§ 8-101, *et seq.*, and all applicable regulations thereunder.

213. During the full statutory period, Defendants were subject to the provisions of NYCHRL, N.Y.C. Admin. Code §§ 8-101, *et seq.*, and all applicable regulations thereunder.

214.     As set forth above, Plaintiff engaged in protected activities by, *inter alia*, lodging multiple complaints of race and color discrimination both during and after the Southern Convening.

215.     Defendants retaliated against Plaintiff for his protected activities in violation of the NYCHRL by, *inter alia*, demoting him and terminating his employment.

216.     Defendants' unlawful and retaliatory actions were intentional, done with malice, and showed a deliberate, willful, wanton, and reckless indifference to Plaintiff's rights under the NYCHRL.

217.     As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of damages to the greatest extent permitted by law.

218.     Plaintiff is further entitled to an award of reasonable attorneys' fees and costs.

**EIGHTH CAUSE OF ACTION**
**VIOLATIONS OF THE NYCHRL: AIDING AND ABETTING**
*(Against Defendant Lucia Tian)*

219.     Plaintiff hereby repeats and realleges the foregoing allegations as if set forth fully herein.

220.     During the full statutory period, Plaintiff was protected by the provisions of NYCHRL, N.Y.C. Admin. Code §§ 8-101, *et seq.*, and all applicable regulations thereunder.

221.     During the full statutory period, Defendant Tian was subject to the provisions of NYCHRL, N.Y.C. Admin. Code §§ 8-101, *et seq.*, and all applicable regulations thereunder.

222.     Defendant Tian knowingly aided and abetted the unlawful employment practices, discrimination and retaliation against Plaintiff in violation of the NYCHRL by, *inter alia*, denying

him equal terms and conditions of employment because of his race and color, supporting his demotion, and supporting the termination of his employment.

223. Defendant Tian's unlawful conduct was intentional, done with malice, and showed a deliberate, willful, wanton, and reckless indifference to Plaintiff's rights under the NYCHRL.

224. As a direct and proximate result of Defendant Tian's unlawful conduct in violation of the NYCHRL, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of damages to the greatest extent permitted by law.

225. Plaintiff is further entitled to an award of reasonable attorneys' fees and costs.

## NINTH CAUSE OF ACTION
## VIOLATIONS OF TITLE VII: DISCRIMINATION
### (*Against Defendant ACLU*)

226. Plaintiff hereby repeats and realleges the foregoing allegations as if set forth fully herein.

227. During the full statutory period, Plaintiff was protected by the provisions of the Title VII, 42 U.S.C. §§ 2000e, *et seq.*, and all applicable regulations thereunder.

228. During the full statutory period, the ACLU was subject to the provisions of the Title VII, 42 U.S.C. §§ 2000e, *et seq.*, and all applicable regulations thereunder.

229. As set forth above, the ACLU discriminated against Plaintiff on the basis of his race and color in violation of Title VII by, *inter alia*, denying him equal terms and conditions of employment because of his race and color, demoting him, and terminating his employment.

230. The ACLU's unlawful and discriminatory actions were intentional, done with malice, and showed a deliberate, willful, wanton, and reckless indifference to Plaintiff's rights under Title VII.

231.     As a direct and proximate result of the ACLU's unlawful and discriminatory conduct in violation of Title VII, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of damages to the greatest extent permitted by law.

232.     Plaintiff is further entitled to an award of reasonable attorneys' fees and costs.

## TENTH CAUSE OF ACTION
## VIOLATIONS OF TITLE VII: RETALIATION
### (*Against Defendant ACLU*)

233.     Plaintiff hereby repeats and realleges the foregoing allegations as if set forth fully herein.

234.     During the full statutory period, Plaintiff was protected by the provisions of the Title VII, 42 U.S.C. §§ 2000e, *et seq.*, and all applicable regulations thereunder.

235.     During the full statutory period, the ACLU was subject to the provisions of the Title VII, 42 U.S.C. §§ 2000e, *et seq.*, and all applicable regulations thereunder.

236.     As set forth above, Plaintiff engaged in protected activities by, *inter alia*, lodging multiple complaints of race and color discrimination both during and after the Southern Convening.

237.     The ACLU retaliated against Plaintiff for his protected activities in violation of Title VII by, *inter alia*, demoting him and terminating his employment.

238.     Defendants' unlawful and retaliatory actions were intentional, done with malice, and showed a deliberate, willful, wanton, and reckless indifference to Plaintiff's rights under Title VII.

239.     As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of Title VII, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of damages to the greatest extent permitted by law.

240.     Plaintiff is further entitled to an award of reasonable attorneys' fees and costs.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiff respectfully requests that the Court:

A.     Declare that the practices complained of herein are unlawful under applicable, federal, State, and City law;

B.     Grant an injunction and order permanently restraining Defendants from engaging in such unlawful conduct;

C.     Grant Plaintiff an award of damages, in an amount to be determined after a hearing, to compensate him for his economic damages;

D.     Grant Plaintiff an award of damages, in an amount to be determined after a hearing, to compensate him for all non-monetary and/or compensatory damages he has suffered, including, *inter alia*, compensation for his mental anguish, humiliation, embarrassment, stress and anxiety, emotional pain and suffering, and emotional distress;

E.     Grant Plaintiff an award of damages, in an amount to be determined after a hearing, for any and all other monetary and/or non-monetary losses he has suffered;

F.     Grant Plaintiff an award of prejudgment interest on the damages he is awarded to the greatest extent permitted by law;

G.     Grant Plaintiff an award of punitive damages in an amount to be determined after a hearing;

H.     Grant Plaintiff an award of reasonable attorneys' fees to the greatest extent permitted by law;

I.     Grant Plaintiff an award of reasonable costs that he has incurred in this action, including, without limitation, expert witness fees;

J.    Grant Plaintiff all other available damages to the greatest extent permitted by law; and

K.    Grant such other and further relief as the Court may deem just and proper.

Dated: July 2, 2021  
       New York, New York

**FARUQI & FARUQI, LLP**

By: */s/ Alex J. Hartzband*       
    Alex J. Hartzband  
    Taylor J. Crabill

685 Third Avenue, 26th Floor  
New York, New York 10017  
Telephone: (212) 983-9330  
Facsimile: (212) 983-9331  
ahartzband@faruqilaw.com  
tcrabill@faruqilaw.com

*Attorneys for Plaintiff*