M4dWjacC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

ROBERT JACKSON,

                    Plaintiff,

            v.                          21 Civ. 5037 (JPO)

AMERICAN CIVIL LIBERTIES
UNION, INC., *et al.*,


                                        Telephone Conference
------------------------------x
                                        New York, N.Y.
                                        April 13, 2022
                                        4:00 p.m.

Before:

                    HON. J. PAUL OETKEN,

                                        District Judge

                            APPEARANCES

FARUQI & FARUQI, LLP
        Attorneys for Plaintiff
BY:  ALEX J. HARTZBAND
        TAYLOR J. CRABILL

KAUFF McGUIRE & MARGOLIS LLP
        Attorneys for Defendants
BY:  MICHELE A. COYNE
        TAMANNA RUBYA

M4dWjacC

```
 1            (Case called; appearances noted)

 2            THE COURT:  Good afternoon.

 3            I scheduled this conference as a result of the letters

 4       that were filed in March regarding the parties' dispute about

 5       ESI protocol search terms, and we had to put it off a couple of

 6       times, first, because of an illness.

 7            Mr. Hartzband, I hope you're feeling better.

 8            MR. HARTZBAND:  I am.  Thank you, Judge.

 9            THE COURT:  And then I had a jury trial, so I had to

10       move it.

11            Have you all made any progress?  Is everything as

12       stated in the letters still?

13            MS. COYNE:  Your Honor, the one update that I would

14       provide is that we had some outstanding discovery, (inaudible)

15       discovery to deal with at the time we sent that letter.  So

16       since the time of the letter, we've completed that and produced

17       approximately 9,000 more pages of documents.  So we're around

18       20,000 pages of documents, so a good portion of that was done

19       after our letter.

20            THE COURT:  OK.

21            All right.  Just at a high level, to the extent we can

22       do that -- we'll start with plaintiff's counsel.  You've

23       already gotten a lot of documents, obviously.  What can you

24       tell me is really missing in terms of what's proportional to

25       the case?
```

M4dWjacC

| | |
|---|---|
| 1 | MR. CRABILL:  Sure, your Honor. |
| 2 | As your Honor knows, the chief concerns, our client, |
| 3 | Robert Jackson, (inaudible) December 2019 about lack of |
| 4 | diversity in leadership positions at the ACLU, also claims that |
| 5 | he experienced retaliation that then culminated in a demotion |
| 6 | and then ultimately termination less than a year later. |
| 7 | In terms of the ESI, the categories of documents that |
| 8 | we're looking for are related to his hiring; related to his |
| 9 | supervisors; certain people that he was working with on |
| 10 | projects, certain stakeholders, as well as search of his inbox |
| 11 | as well. |
| 12 | And I guess in terms of the first category of |
| 13 | documents for the hiring, specifically looking for documents |
| 14 | related to the scope of plaintiff's position, what was |
| 15 | contemplated in terms of what his job responsibilities would be |
| 16 | for the position.  He was coming in to replace somebody who had |
| 17 | more technical coding skills experience than he did, and the |
| 18 | hiring committee, which included defendant Lucia Tian, |
| 19 | ultimately decided that he didn't need those, the person coming |
| 20 | in to replace Caroline Chin, who was the previous person in |
| 21 | that position doesn't need that same high-level coding |
| 22 | experience.  And so they hired plaintiff, who brought other |
| 23 | things to the table in terms of being stakeholder management. |
| 24 | So certain terms related to that first section are |
| 25 | geared towards understanding what the discussions were as to |

M4dWjacC

```
1    what the qualifications would be, what they were looking for in

2    terms of a candidate and what the back-and-forth with that was,

3    and also any comparison to him and Caroline Chin, who was in

4    the role that he was replacing.

5              THE COURT:  Let me stop you there.

6              Just on this category of hiring, Ms. Coyne, Ms. Rubya,

7    do you want to respond on that?

8              MS. COYNE:  Yes.  Thank you, your Honor.

9              So, the parties, of course, participated in the

10   court's mediation program for counseled employment cases, so

11   I'll just say initially that the bulk of the relevant documents

12   were already produced as part of the mediation process under

13   the court's discovery protocol.

14             In terms of hiring documents, this is, of course, not

15   a failure to hire case.  We have produced documents concerning

16   the plaintiff's hiring, but if you look at the search terms

17   that remain, they include, for example, the name of

18   Mr. Jackson's predecessor, Caroline Chin, under the theory that

19   there's a possibility that there could have been an email that

20   said something about comparing him to Caroline Chin.  That, in

21   our view, is quite a leap.

22             As you know, the standard is not (inaudible) of every

23   email that might conceivably exist but rather, as your Honor

24   alluded, to proportional to the case.  So the notion that by

25   searching, for example, for his predecessor it's possible an
```

M4dWjacC

email exists that compares them, it is, in our view, way too

speculative when we've already produced hiring documents; we've

produced notes of the folks that were involved in the hiring

process, and that leap between there could be an email to

something sort of proportional is really found throughout the

proposed search terms.  But that's particularly true with

respect to hiring documents in a case that is not a failure to

hire case.

THE COURT:  As I understand it, he was a probationary

employee for, like, a year, something like that.  What is the

defendants' position as to why he was, I guess, terminated?

MS. COYNE:  That's right, your Honor.  He was an

employee for about a year.  He was probationary during that

time, and he was ultimately terminated for performance-related

reason, which, again, we've produced documents concerning his

performance-related issues.  But to be looking --

THE COURT:  Obviously, the argument plaintiff wants to

be able to make is pretext, that the technical problems that

led to his termination could be shown to be pretext by things

showing that when he was hired, that lack of technical

expertise and coding expertise was known, and nevertheless, he

was hired.  So that would go to pretext, right?

MS. COYNE:  Your Honor, yes.  I understand that, but

when they want us to search for terms such as "analytics" --

analytics is the title of the department in which he was

1  employed -- again, there's a are theoretical possibility that

2  an email could exist, but that, I submit, is not the standard

3  for ESI protocols.  And the fact that we've already produced

4  20,000 pages for somebody who worked like something less than a

5  year demonstrates that we're already wading into a fishing

6  expedition, if you would excuse extended metaphor there.

7        THE COURT:  Yes, I say fishing expedition or hear it

8  just about every day of my life, so that's fine.

9        Did you say 20,000 documents?  Is that just for

10  emails, or how many of those are emails?

11        MS. COYNE:  I apologize, your Honor.  20,000 pages,

12  and the vast majority of the documents is ESI -- it's

13  responsive to the ESI protocols.  But I'll also say that by the

14  nature of the plaintiff's position in a data analytics

15  position, there are so many of these search terms that are

16  yielding things like lengthy PowerPoints, lengthy spreadsheets

17  from which we are then required to redact large amounts because

18  it's in the nature of the kind of work that he did.  And so

19  some of these very generic terms are coming up in, for example,

20  spreadsheets, and the page count is about 20,000, 19,000,

21  doesn't capture those because we produced those in native

22  format.  So each one is Bates-stamped with one page regardless

23  of how long the spreadsheets were.  So it's difficult to sort

24  of respond directly to how many of those make up emails, but I

25  would say the vast majority.

M4dWjacC

1          THE COURT:  Right.

2          MR. CRABILL:  Your Honor, I'm happy to respond to

3     those points, if you'd like.

4          THE COURT:  Sure.

5          MR. CRABILL:  Just in connection with this section

6     related to the hiring committee, the time frame here is quite

7     narrow, right?  Only two months, from August 1, 2019, to

8     October 31, 2019.  That concerns a period of time before the

9     plaintiff was hired and after he was hired, and the terms are

10    qualified by Rob Jackson.  Right?  So they're looking for these

11    terms in connection with our client, which at this point would

12    probably only concern his hiring or prehiring (inaudible) and

13    maybe some post, right after he was hired communications as

14    well.  So the time frames are very narrow, and the terms are

15    specifically tailored to the situation of comparing him to his

16    predecessor, Caroline Chin, and also to his field and

17    responsibilities (inaudible), which, as your Honor just said,

18    would relate to showing pretext in defendants' supposed reasons

19    for taking these adverse actions against him.

20          MS. COYNE:  Your Honor, if I may add one more point to

21    this?

22          THE COURT:  Yes.

23          MS. COYNE:  And if you look at the terms, they're not

24    specifically designed to, you know, terms like "salary," "pay,"

25    "analytics," which is, as I said, the name of the department,

M4dWjacC

1    is not geared towards comparison.  But in any event, I think

2    that one of the problems here is that we're working off of a

3    proposed ESI protocol that was proposed some months ago, and

4    unfortunately, the production that's happened since has caused

5    very, very little change in the plaintiff's position in terms

6    of what electronic searches they would like us to do.

7           So while we previously urged them to take a look at

8    what you have and see if you feel -- to go to your Honor's

9    initial question, if you feel that there are areas that you're

10   missing so that we could then consider them.  Instead, they

11   continue to press for all of these search terms without regard

12   to what's already been produced, unfortunately.  And based on

13   what we know about the unique search terms and the unique hits

14   to come, we're closer -- with their proposed terms, we're

15   closer to the beginning than we are to the end, because there's

16   still going to be, again, thousands of pages that would still

17   be produced if we have to do all of these searches.

18          THE COURT:  To be clear, the ones that are yellow

19   highlighted are the disputed ones; you've already produced Rob

20   Jackson and salary, pay, duties, etc., right?

21          MS. COYNE:  Yes, your Honor.

22          MR. CRABILL:  Your Honor, if I could just be heard in

23   response to that argument?

24          THE COURT:  Go ahead.

25          MR. CRABILL:  Sure.

M4dWjacC

1          So, I guess maybe some color as to the ESI negotiation

2     process would be helpful.  When we first engaged in this

3     process, we were going back and forth on search terms, and at

4     some point defense counsel decided that they would run a search

5     and produce documents for the undisputed terms while the

6     parties decided to -- while the parties would work out the no

7     negotiation as to the terms that still remained.  At the time

8     we were, you know, on phone calls and in emails, we stressed to

9     defense counsel that this could create an issue later on in

10    terms of arguments being made that, you know, X amount of

11    documents have been produced or we spent this amount of money

12    doing ESI, and then if we decided to do more ESI related to the

13    disputed search terms (inaudible) tipping point over the top.

14         So from the beginning we've kind of (inaudible) those

15    arguments as to maybe these were cherry-picked terms that

16    defendants were picking out and then hoping to make argument

17    later on, you know, that because it's going to be more than

18    what they've already done, then, you know, that's why those

19    documents shouldn't be produced.

20         In connection with the disputed terms that remain in

21    this section compared to the ones that defendants have already

22    agreed to produce, if you look at, for example, qualifying

23    experience, those go directly to what we're looking for in

24    terms of what they were looking for in terms of the background

25    of the candidate, what the qualifications were, what they'd

M4dWjacC

1    need in order to do the job.  And while, you know, some

2    documents may have been produced that go to that, it's

3    impossible for us to know, given that defendants are in

4    possession of virtually every relevant document in this case,

5    what those other documents say, documents that are hit by these

6    search terms, that aren't hit by the search terms that have

7    already been run and produced.

8            THE COURT:  Why do you want Caroline or Chin?  Is that

9    that just to say on the idea that there's a comparison between

10   the person who was doing the job before?

11           MR. CRABILL:  Sure, your Honor.

12           Caroline Chin was an employee that was leaving the

13   ACLU, and our client was brought in to replace her but not to

14   replace her in the exact same role that she was doing.  She was

15   more of a technical coding employee.  He was brought in based

16   on the hiring committee's assessment of what they needed; he

17   was brought in to serve a different role, more of a stakeholder

18   management role.  So there was likely discussion as to whether

19   they needed someone like Caroline Chin or whether they could,

20   you know, target somebody else who could bring different skills

21   or values to the team and then ultimately what the

22   qualifications, skills, or experience between the two, between

23   the potential candidate and Caroline Chin would be and why they

24   would be important.

25           THE COURT:  The word "and" anywhere in this email,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

M4dWjacC

1    they both appear.  Does that include, like, a long email chain,

2    where it's, like, four emails down?

3             That's a question for Ms. Coyne, probably.

4             MS. COYNE:  I'm sorry, your Honor.  I didn't follow

5    the question.  Could you repeat that?

6             THE COURT:  When you say Rob Jackson and one of these

7    other words, does that pick up any email where they both appear

8    regardless of how many words they're separated by, even if --

9    you know, the way these searches work, usually if there's an

10   inclusive chain of emails where there could be, like, 20

11   emails, would it include that, or is it some separate email

12   down the chain?

13            MS. COYNE:  Your Honor, that's right.  If it appeared

14   anywhere in the chain, it would pick it up.

15            And just to not belabor the Caroline Chin point, but

16   what Mr. Crabill just described is completely the speculative

17   nature of these searches that I was referring to before, the

18   notion that there could be an email in which somebody compared

19   Rob Jackson to Caroline Chin is completely speculative.  We

20   have already produced many documents, including sought Black

21   messages, that went through issues around responsibility to

22   technical ability and all of that.  And what the plaintiff is

23   sort of contemplating is that it's possible that there's

24   something that would be missed, and that's not the standards

25   for electronic discovery, that it's possible that something

M4dWjacC

1    exists, and that Caroline Chin was spoken about in a

2    comparative fashion.

3           Obviously that's one example.  We're not talking about

4    terms like "analytics," and the like.  So in a case that is not

5    a failure to hire case, these are just some examples of why

6    these searches have already yielded so many results and will

7    yield thousands and thousands more.

8           THE COURT:  I'm going to require an additional search

9    because this is a really narrow period, really three months.

10   I'm going to require some additional searches of the

11   following -- and if you can do it by, rather than "and," if you

12   can do it by within 30, you can do that as to these.  If not,

13   (inaudible):  "Hire"; "offer"; "responsibilit," exclamation

14   point; "qualif" with an exclamation point, and that's it.

15          Section 2B, plaintiff's supervisor.  This strikes me

16   as too broad.

17          Plaintiff, do you want to make your best argument for

18   a minute?

19          MR. CRABILL:  Sure, your Honor.

20          So, there's two subsets here.  The first subset deals

21   with the Southern Convening, which is a conference the ACLU

22   held, annual conference; 2019 was in Montgomery, Alabama, and

23   that was where plaintiff and his colleagues first made their

24   protected complaints about lack of diversity at the ACLU,

25   especially in leadership positions, and that was motivated, in

M4dWjacC

```
1   large part, due to a picture that a, you know, high-ranking
2   ACLU employee took with Jeff Sessions at the time.  It
3   obviously caused some stir amongst ACLU staff (inaudible) and I
4   think was really the jumping-off point to our client's claim
5   (inaudible) him and colleagues engaged in, (inaudible).  The
6   first set of terms are specifically geared towards that
7   situation.  They're limited to the Southern Convening, to Jeff
8   Sessions and the different positions that he held as part of
9   the Trump administration.  There's the names of plaintiff's
10  colleagues.
11           THE COURT:  I got it.
12           Ms. Coyne.
13           MS. COYNE:  Yes, your Honor.
14           So, you can immediately see that for an organization
15  like the ACLU, searching for the name of the attorney general
16  of the United States for a one-year period is going to yield a
17  lot of irrelevant materials.  There's no dispute that a
18  photograph was taken with Attorney General Jeff Sessions, that
19  it caused a good deal of upset.  It happened at the Southern
20  Convening.  The picture is actually contained in the complaint
21  in this matter.
22           There's also no dispute that an apology was issued.
23  Plaintiff has the apology, and there's no dispute that a speech
24  was made by various people, including Mr. Jackson, and the text
25  of that speech has been produced as well.  And I believe
```

M4dWjacC

```
1   there's a videotape of it as well.  I don't know what other

2   information could possibly be yielded that could be relevant or

3   proportional by searching for Attorney General Jeff Sessions

4   for a one-year period, I believe, yes, very speculative.

5           THE COURT:  I agree with you.  I think they're all too

6   broad.  They're not proportional to the needs of the case.

7           What about, though, the last one, Rob Stephens; why

8   can't you just (inaudible) emails with his name from his

9   supervisors?

10          MS. COYNE:  I'm sorry, your Honor.  I didn't follow

11  your question.  The terms that are modified by Rob Jackson?

12          THE COURT:  I'm sorry.

13          MS. COYNE:  Is that the question?

14          THE COURT:  Oh, yeah.  I got confused.  I was thinking

15  it was Rob Jackson.

16          Who is Rob Stephens?

17          MR. CRABILL:  Sure, your Honor.

18          Rob Stephens was one of our client's colleagues who

19  complained during the Southern Convening.  He worked at one of

20  the ACLU affiliate offices, I believe (inaudible).

21          THE COURT:  OK.  I'm going to deny the ones that are

22  not tied to Rob Jackson.

23          Now, the ones that are connected to Rob Jackson, let's

24  see.  Remind me, Kary, what's the significance of that term?

25          MR. CRABILL:  Sure, your Honor.
```

M4dWjacC

1          Kary refers to Kary Moss, who was a director at the

2     ACLU.  She was the person who had taken a picture with Jeff

3     Sessions that set off the events leading to our client's

4     protected activity.

5          THE COURT:  By the way, what was the apology by the

6     ACLU for?  For taking a picture with Jeff Sessions?

7          MS. COYNE:  Sorry, your Honor.  There was an apology

8     that Kary Moss issued.

9          THE COURT:  For what?

10         MS. COYNE:  It was related to any impression that was

11    created by the photograph.

12         THE COURT:  Which was just, like, he's toxic and we

13    shouldn't be taking pictures with him?

14         (Indiscernible overlap)

15         MR. CRABILL:  Sure, your Honor.

16         During the Southern Convening, our client and the rest

17    of the ACLU staff that were there went on several, you know,

18    different trips to museums specifically related to, you know,

19    slavery, discrimination against African Americans, lynching,

20    and I think Jeff Sessions has a well-known kind of path in

21    terms of positions on certain, you know, situations related to

22    racial justice.  And so that's what really struck a nerve with

23    our client and his colleagues, that someone from the ACLU

24    would, while this event's going on specifically (inaudible)

25    racial justice issues that by taking a picture with someone

M4dWjacC

1    who, maybe, held positions that were contrary to that, they

2    took offense to that.

3            THE COURT:  OK.  It seems like pretty broad terms:

4    "position"; "replace"; "separate."

5            MS. COYNE:  Your Honor, if I may?

6            THE COURT:  Yes.

7            MS. COYNE:  You will see that -- sorry.  There's

8    several layers of this.  You will see that among the

9    highlighted terms there are some that are not struck through:

10   "Racism"; "discrimination"; "issue maps"; "work-study."  In an

11   effort to try to come to an agreement here, we had suggested

12   that we would do those additional search terms, and you'll see

13   that there are others as we get to other categories, but I just

14   wanted to explain why those were not struck through.  In trying

15   to resolve this, we had offered to search for those, but that

16   was rejected.

17           THE COURT:  Sorry.  I'm not seeing strike-through.  Am

18   I looking at the wrong thing?

19           MS. COYNE:  I don't think so, your Honor.  You just

20   asked about Kary.

21           THE COURT:  Yeah.

22           MS. COYNE:  If you go a couple search terms down,

23   you'll see "racism"; "discrim," exclamation point, we had

24   offered to search for those, which is why you don't see a red

25   strike-through; you just see them highlighted.  So it's meant

M4dWjacC

1    to reflect -- sorry it's not kind of clear, but it's meant to

2    reflect that we had offered to try to resolve this and search

3    for those.

4              THE COURT:  OK.  I'm not seeing strike-throughs.  I'm

5    just looking at a document that has yellow highlights, document

6    24-2.  Am I looking at the wrong thing?

7              MR. CRABILL:  Your Honor, that is our submission as to

8    the disputed search terms.  I believe the defendants submitted

9    their own exhibit as to the disputed search terms and that they

10   indicated their strike-throughs, you know, rather than what's

11   just at dispute here.

12             THE COURT:  Are they the same?

13             MR. CRABILL:  Yes, your Honor.

14             MS. COYNE:  Ours.

15             THE COURT:  So the strike-throughs are the same as the

16   yellow highlighting on plaintiff's version?

17             MR. CRABILL:  Sorry, your Honor.

18             So, the highlights in our version are the disputed

19   terms, and the strike-throughs aren't reflected here.  That

20   would be part of the unhighlighted terms, ones that have

21   already been searched.

22             MS. COYNE:  Your Honor, I believe the document I was

23   referring to was 27-8.

24             THE COURT:  Got it.

25             OK.  I see.  So this just shows more of the progress

M4dWjacC

1    made in the back-and-forth.  I understand now.

2                MS. COYNE:  Thank you, your Honor.  Sorry to introduce

3    confusion there.

4                THE COURT:  Oh, no.  I didn't realize there was a

5    different version.

6                MR. CRABILL:  Your Honor, just to that point

7    (inaudible) terms agreed to if that's still an issue.

8                THE COURT:  They have been agreed to?

9                MR. CRABILL:  Sorry, your Honor.

10               Just pulling it up.  So, I guess in defendants'

11   version -- sorry.  The highlighted terms without the

12   strike-through are the ones that have been agreed to that are

13   reflected in our version.

14               THE COURT:  Got it, got it, got it.

15               OK.  In the category of plaintiff's supervisors, why

16   do you have something like "incarceration"?

17               MR. CRABILL:  Sure, your Honor.

18               That is related to a project that our client worked on

19   (inaudible) times, specifically geared towards -- this project

20   that he was working on related to incarceration and ways the

21   ACLU could drive initiatives to help people return to society

22   after being incarcerated.

23               THE COURT:  OK.  Let me ask Ms. Coyne.

24               What's your problem with words like the plaintiff's

25   name plus "replace" or "separate"?

M4dWjacC

1          MS. COYNE:  I'm looking for that, your Honor.

2          In terms of those, those are just, in our view,

3     generic terms.  We've, of course, produced lots and lots of

4     documents, Black messages about the circumstances that led to

5     the plaintiff's termination from employment, including lots of

6     performance-related documents.  But what we're starting to find

7     in these searches is that we're just getting so many generic

8     documents.

9          So, for example, the ACLU puts out newsletters about

10    the kinds of work that they're doing, projects with certain

11    kinds of things.  And so those go out to, for example, all

12    employees at the national office, including Mr. Jackson.  And

13    so by introducing the terms like that, you're getting so many

14    irrelevant, irrelevant hits because it's hitting on his email.

15    It might be his email along with every other person that works

16    at the ACLU and any other of these terms.  And that's a large

17    part of the problem here.  So generic terms like that, when

18    we've already produced the underlying documents relating to his

19    separation, for example, are why we object to terms like that.

20         MR. CRABILL:  Your Honor, I'm happy to respond to

21    that.

22         THE COURT:  OK.

23         MR. CRABILL:  Those terms are obviously specifically

24    related to the adverse action taken against him, right?

25    Demotion and probably more specifically the termination, an

M4dWjacC

1    obviously huge issue in this case.  And there's no way for us

2    to know, because defendants are in possession of all the

3    documents, what exists behind the scenes.  Again, plaintiff's

4    counsel suggests they produced and they have certain documents

5    related to his termination, that doesn't mean that there aren't

6    relevant documents specifically for these two terms which go to

7    a big issue in the case, which are the adverse actions, and

8    there's no way for us to know what those documents are unless

9    there's some sort of search for them.  So specifically related

10   to a big issue in the case, and that's why we're insisting on

11   their inclusion.

12        MS. COYNE:  Your Honor, we've already searched for

13   "probation"; "fire"; "fires"; "firing", "terminated"; "laid

14   off"; "laying off"; "let go"; "unemployed"; "severance".  You

15   know, the plaintiff is looking for sort of every synonym,

16   because again, there conceivably could be an email when we've

17   already produced the underlying documents.  The emails where

18   people are talking about his performance issues and terms like

19   "replace" and "separate" can come up in lots of different

20   contexts that don't have anything to do with terminating

21   somebody's employment.

22        THE COURT:  I agree with defendants on that.  I'm not

23   going to require any more searches.

24        Next one is stakeholders for particular projects, Rob

25   Jackson or his emails, and the disputed ones that remain are

 1   "projects"; "table"; and "FY" and "timeline" and "deadline."  I

 2   don't think I need to hear more on that.  I think those are

 3   more broad, and I'm not going to require more search for those.

 4        Human resources officers, disputes covering RJ, first

 5   of all, as a disjunctive term.

 6        Before we move on from that, Ms. Coyne, why do you

 7   object to using RJ?  Is that something that isn't reasonably

 8   assumed to be a shorthand for him?

 9        MS. COYNE:  Your Honor, that's correct.  This came out

10   in a communication to your Honor.  I don't believe that was

11   ever mentioned before.  It's not in the ESI protocol.  I don't

12   even know what that is likely to yield.  You know, throughout

13   this process we've been agreeing to various versions of Rob

14   Jackson.

15        As it happens, Mr. Jackson has a fairly common first

16   and last name, and so we've been, you know, sort of working

17   against Rob Jackson and his email address.  So I don't know

18   where RJ comes from.  I don't know that that's something that

19   people referred to him about particularly without (inaudible)

20   full name.  Certainly I've seen emails with other people where

21   they've used initials, but it's only after they've used the

22   person's name.  So I don't know where that's coming from, but

23   again, that's going to expand (inaudible) theoretical basis.

24        I suppose the short answer to your question is that I

25   don't know that he was commonly referred to as RJ.

M4dWjacC

1          MR. CRABILL:  Your Honor, I'm happy to explain

2     (inaudible) RJ.

3          THE COURT:  All right.

4          MR. CRABILL:  So, you go to Plaintiff's Exhibit E

5     attached to the letter that we submitted in connection with

6     this, motion, which is document 24-5 -- I'm happy to wait until

7     the Court is there.

8          THE COURT:  Yes, I have it.

9          MR. CRABILL:  So, the subject of that line is "re

10    confidential -- RJ decision," and it very clearly discussion

11    between Lucia Tian, who is the head of the analytics

12    department, and our client's supervisor, as well as Aaron

13    Horowitz, who was the No. 2 in the analytics department -- the

14    document subject line reads "confidential -- RJ decision," an

15    email from Sophia Goldmacher to Lucia Tian (inaudible), Aaron

16    Horowitz, Allison Kelley.

17         Lucia Tian was the head of the analytics department,

18    one of our client's supervisors.

19         Aaron Horowitz was the (inaudible) No. 2, analytics

20    department.

21         Allison Kelley became our client's direct supervisor

22    after he was demoted.

23         This is an email from June 18, 2020, which is after

24    our client had been demoted and around the time that he was

25    told that he wouldn't pass a second probationary period related

M4dWjacC

1    to his new position.  The email chain clearly is related to our

2    client and a project he was working on and certain

3    circumstances around that project.  So clearly, it was common

4    for his -- the main players in this case to be referring to him

5    as RJ, and specifically in connection with this email was just

6    prior to his termination so also related to the adverse actions

7    in this case.  I believe -- just one second, your Honor.

8            THE COURT:  Yes, it's in the subject line, but then in

9    the body of the email, they keep calling him Rob.

10            MR. CRABILL:  Sure.  Sure, your Honor.

11            So, I guess the point here is that, that he was

12    referred to as RJ, so it's not out of the realm of possibility

13    that it's some sort of chat function, which they do like Black

14    chat function, that he was referred to simply as RJ.  It's

15    just -- and if anything, it's more specific than -- you know,

16    defense counsel pointed out that Rob and Jackson are fairly

17    common.  It's more specific than those (inaudible) more likely

18    to target our client.

19            THE COURT:  Ms. Coyne.

20            MS. COYNE:  Thank you, your Honor.

21            The fact that he's referred to as RJ in the subject

22    line of one document out of 4,000, I don't think we can

23    conclude that it was fairly common that he was referred to that

24    way.  As your Honor pointed out, he's also referred to as Rob

25    in that same email, and Mr. Crabill is correct.  It's not

M4dWjacC

1    outside the realm of possibility that there's an email that has

2    RJ in it and just RJ, but that's, again, not the standard that

3    applies here, of we have to find absolutely every email.

4            That's not typically how he was referred to.  We know

5    that, and that was not a part of the ESI protocol that the

6    parties discussed.  As you can see, it's not in there, and I

7    genuinely don't know how much that would extend, expand the

8    search, one of the contexts RJ could possibly come up in that

9    wouldn't refer to Mr. Jackson, but it's very speculative to

10   suggest there could be a circumstance where he was only

11   referred to as RJ.

12           MR. CRABILL:  Your Honor, if I can just respond to

13   that?

14           THE COURT:  Yes.

15           MR. CRABILL:  So, I guess the whole -- I mean part of

16   this whole ESI process is targeting relevant documents.  Of

17   course, it would be somewhat speculative that we don't know

18   what defendants have and that we're using search terms in order

19   to target those relevant documents.  So you know suggestion

20   that (inaudible) echoed, I don't think it's justified in

21   terms -- in excluding that term from the protocol when it's

22   clearly been used in an important email in the case related to

23   our client and we -- certain decisions that his direct

24   supervisors and HR were making related to his employment and

25   his job duties.

M4dWjacC

| | |
|---|---|
| 1 | THE COURT: You know what? It's a close one, but |
| 2 | given that there is an email or there's some emails, a string |
| 3 | of emails talking about RJ and they use the word "Rob" and Rob |
| 4 | wouldn't otherwise pick it up, I do think using RJ is not an |
| 5 | unreasonable -- and it's not something that's likely to yield a |
| 6 | huge amount of documents, I am going to require that that |
| 7 | category expand to RJ as another disjunctive (inaudible) Rob |
| 8 | Jackson. |
| 9 | Now, on the other end, I'm going to only add a couple. |
| 10 | I'm going to add "speech" and "perform" and "pay." That's it. |
| 11 | MS. COYNE: Your Honor, if I may ask for |
| 12 | clarification? |
| 13 | So, we're limiting the RJ to this HR category of |
| 14 | documents for all of the search terms that we've done in this |
| 15 | category, if you will, plus these additional "speech"; |
| 16 | "perform"; "pay." Do I understand that correctly? |
| 17 | THE COURT: Yes, exactly. |
| 18 | MS. COYNE: Thank you. |
| 19 | THE COURT: And the next category is (inaudible). I |
| 20 | understand you've agreed on, I guess plaintiff's ACLU emails |
| 21 | for Southern Convening, Southern Collective, and Jeff Sessions, |
| 22 | and then several other "racism"; "discrimination"; etc., and |
| 23 | there are several disputes. |
| 24 | Maybe, Mr. Crabill, you can tell me which ones you |
| 25 | think are most important. |

M4dWjacC

1          MR. CRABILL:  Sure, your Honor.  (inaudible) second to

2     (inaudible).

3          Sure, your Honor.

4          So, just going down the list here, starting from the

5     top, the highlighted, I believe the first three are important.

6     Obviously Kary would be Kary Moss in the situation with

7     Southern Convening.

8          Speech is related to the speech that our client and

9     his colleagues made during the Southern Convening.

10         Complaint, you know, certainly goes to anything that

11    our client would be complaining about in terms of (inaudible)

12    discriminated against or complaining about lack of diversity in

13    the ACLU.  So certainly starting with those three, we would

14    think need to be included.

15         THE COURT:  Ms. Coyne.

16         MS. COYNE:  So, your Honor, I don't know if you wanted

17    me just to respond to the three that Mr. Crabill just referred

18    to or more broadly than that.  But again, the issue around Kary

19    Moss and the Southern Convening speech, there's really just no

20    dispute about what happened there.  So looking through him as a

21    custodian just for her first name, it's speculative and

22    completely irrelevant when the fact of -- there was the

23    picture, the email, the speech is not in dispute.  The

24    significance of it surely is, but the facts of it are not.

25         THE COURT:  OK.

M4dWjacC

1          MR. CRABILL:  I can respond to that, your Honor.

2          THE COURT:  All right.

3          MR. CRABILL:  So, obviously the Kary Moss situation

4    had a big impact on the ACLU, and defense counsel mentioned it

5    resulted in her having to issue ACLU-wide email apologizing to

6    it.  So, you know, it was very clear and obvious that our

7    client was, you know, one of the people who made the

8    complaints.  He stood up on stage.  Hundreds of ACLU employees

9    saw that he was participating in this conduct, and this term is

10   looking for not only what happened on that day but other

11   responses to it from other employees, including employees that

12   may have also been discriminated against or felt that they had,

13   you know, suffered the same treatment at the ACLU.  And we've

14   seen these (inaudible) emails in response to our client's

15   (inaudible) email, where numerous ACLU employees have reached

16   out to him saying that, you know, we believe that, you know,

17   we've suffered the same type of discrimination, retaliation you

18   have, you know, appreciate you standing up for minority

19   employees at the ACLU.

20          So it's not -- that's what this term would also go to,

21   is the communications with other employees who, maybe, reached

22   out to him related to other discrimination that they

23   experienced at the ACLU.

24          MS. COYNE:  Your Honor, if I may?

25          To look for the name Kary under the theory that it's

M4dWjacC

1   going to sort of yield those specific emails, again, is where

2   we find the problem, because Kary Moss was an employee of the

3   ACLU.  So just searching for her name or just searching for the

4   word "speech," there are any number of speeches that would have

5   taken place that, you know, might be in Mr. Jackson's email

6   inbox that were sent out by somebody over a one-year period.

7   Again, based on the kind of work that the ACLU does, you can

8   imagine any number of references to speech.

9           And then the last thing I'll say is with regards to

10  the word "complaint," again, we're looking at this category

11  with respect to Mr. Jackson's inbox.  We have "complain" and

12  have searched for "complain."  There are an awful lot of

13  custodians I don't see here, such as in the HR -- the HR group,

14  if you will.  So this would just be Mr. Jackson had a complaint

15  email, I guess, in his own email that wasn't, for example,

16  something that went to HR.

17          So these are all very speculative notions that the

18  word "speech" is going to yield something, for example, having

19  to do with that particular speech about which there is very

20  little dispute.

21          THE COURT:  OK.  On this one I'm not going to require

22  A search for Kary, but I am going to require "speech"; "equal";

23  "promote" and "assign" and "perform."  And that's it.

24          MR. CRABILL:  Your Honor, if I could just be heard on

25  just a few others?

M4dWjacC

| | |
|---|---|
| 1 | THE COURT:  You can be heard, but I'm losing you. |
| 2 | Go ahead. |
| 3 | MR. CRABILL:  Just very quickly. |
| 4 | There are a couple terms here related to our client's |
| 5 | performance and specific projects that he worked on, and |
| 6 | defendants (inaudible) earlier main contention is to the reason |
| 7 | our client was terminated is related to his performance.  So |
| 8 | certainly any documents hitting on, you know, how well our |
| 9 | client was doing on certain projects, whether he was, you know, |
| 10 | hitting deadlines or missing deadlines, certainly that's going |
| 11 | to be important for, you know, rebutting any arguments made in |
| 12 | that regard. |
| 13 | So terms such as "budget," budget goes to a budget |
| 14 | project that he was working on. |
| 15 | "Incarceration," incarceration goes to incarceration |
| 16 | project that I referenced earlier. |
| 17 | "Black Lives" refers to, relates to a Black Lives |
| 18 | conference that was happening at MIT.  Our client pitched to be |
| 19 | able to present during that conference and ultimately was |
| 20 | denied that opportunity and as well as "deadlines." |
| 21 | Main contention of defendants is that our client, |
| 22 | maybe, wasn't hitting certain deadlines, so understanding the |
| 23 | situation around the deadlines certainly is important to this |
| 24 | case. |
| 25 | THE COURT:  All right. |

M4dWjacC

1          Ms. Coyne.

2          MS. COYNE:  Thank you, your Honor.

3          So, again, we're talking about Mr. Jackson's email

4     box.  So terms like "Black Lives" during that one-year period

5     that happened to be emails, for example, that he received are

6     going to come out of searches like that, having nothing to do

7     with, you know, any project that he was on or, like, a word

8     like "budget."  Again, these are very generic terms that just

9     so happened to be in his mailbox and not in the mailboxes --

10    excuse me, the emails that we've already produced that have to

11    do with his performance issues.  We have produced many, many,

12    many documents, many, many, many emails about his performance

13    issues and what led to his termination of employment, and to

14    just sort of search generically for terms like "budget" or

15    "Black Lives" is just going to have so many, you know, false

16    positives, as it were.

17         THE COURT:  I'm going to add the word "perform" to the

18    other ones I've already said.  This is obviously an inexact

19    science, but that's (inaudible).

20         Last, Ms. Coyne, can you tell me about these two

21    emails?  What can you represent about the allegedly privileged

22    emails?

23         MS. COYNE:  So, your Honor, Terrence Dougherty is the

24    general counsel of the ACLU, so there's emails on which he was

25    is copied that have to do with decisions being made with

M4dWjacC

1    respect to Mr. Jackson's employment and decisions about his

2    employment on which Mr. Dougherty is copied in order to give

3    advice to the organization about what could end up being an

4    inclement decision that would lead to a lawsuit, for example.

5    So he's updated with respect to the decisions and the plans

6    with respect to Mr. Jackson's employment.

7              THE COURT:  And these are two emails that were to him.

8              MS. COYNE:  Correct.

9              THE COURT:  All right.

10             Mr. Crabill, what basis is there to believe that

11   that's something like business, a business advice kind of

12   communications?

13             MR. CRABILL:  Sure, your Honor.

14             Again, going to exhibit E of the letter (inaudible)

15   submitted on document No. 24-5.

16             THE COURT:  Yes.

17             MR. CRABILL:  The first email on the Bates number 913,

18   the first email after the redacted portion, the email just

19   clearly discusses our client's (inaudible) and a project that

20   he's working on.  Right?  The first line says "thanks so much,

21   Lucia," suggesting that email previous to this was an email

22   that had actually been sent by Lucia Tian, defendant in this

23   case.  And then it's saying "refer you to detail on the

24   project."  So -- and then the rest of the whole, the rest of

25   the email chain goes on to discuss the way to (inaudible) to

M4dWjacC

1    work with our client on this project.  (inaudible) email chain

2    that suggests that there was any discussion about any legal

3    ramifications as to terminating our client or any legal risk at

4    all.

5          So it appears that, you know, maybe what happened in

6    the previous conversation was to get general counsel's input as

7    to the specific, you know, business decision and how to handle

8    this situation with (inaudible) with our client.

9          MS. COYNE:  Your Honor, the fact that there is no

10   legal discussion in the rest of the emails we produced, I

11   think, makes the point, which is that Mr. Dougherty is no

12   longer copied on those subsequent emails.  So that's exactly

13   why.

14         MR. CRABILL:  Your Honor, just to be heard on that

15   again.

16         There's -- not that there -- there's no (inaudible)

17   that there was some sort of legal discussion, like, (inaudible)

18   follow general counsel's advice here, we need to make sure that

19   we're doing X,Y, and Z in order to make sure that we're not

20   creating liability (inaudible).  There's nothing to that effect

21   amongst these employees.  It's only a discussion about our

22   client and this one specific project.

23         THE COURT:  Well, sure.  If they had included language

24   that said Dougherty tells us this (inaudible) legal advice, it

25   would be privileged because it's within the organization.  So I

M4dWjacC

1    don't hear anything, other than pure speculation, that suggests

2    that the emails to the general counsel (inaudible) would not be

3    privileged.  It seems to me that they're privileged.  I don't

4    see any need to review it *in camera*, so I'm going to deny the

5    request.

6            That covers everything.  Please order the transcript.

7    Split the cost between the parties 50-50, and that's it.

8            I think I extended the fact discovery deadline by 60

9    days.  If that turns out not to be enough, you can submit

10   another letter, but hopefully it will.

11           You haven't done any depositions yet, or have you,

12   Mr. Crabill?

13           MR. CRABILL:  We have not yet, no, your Honor.

14           THE COURT:  All right.

15           Anything else today from plaintiff?

16           MR. CRABILL:  No.

17           THE COURT:  Defendants.

18           MS. COYNE:  No.  Thank you, your Honor.

19           THE COURT:  Thanks, everyone.

20           We're adjourned.

21           (Adjourned)

22

23

24

25