```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

ROBERT JACKSON,

              Plaintiff,

         v.                          21 CV 05037(JPO)
                                     Telephone Conference
AMERICAN CIVIL LIBERTIES
UNION, INC., et al.,

              Defendants.
------------------------------x
                                     New York, N.Y.
                                     January 5, 2024
                                     3:30 p.m.
Before:

                    HON. J. PAUL OETKEN,

                                     District Judge

                         APPEARANCES

FARUQI & FARUQI LLP
     Attorneys for Plaintiff
BY:  TAYLOR CRABILL

KAUFF MCGUIRE & MARGOLIS LLP
     Attorneys for Defendants
BY:  MICHELE A. COYNE
     TAMANNA RUBYA
```

O156JACC

          (The Court and all parties appearing telephonically)

          (Case called)

          MR. CRABILL:  Good afternoon, your Honor.

          This is Taylor Crabill for the plaintiff, Robert Jackson.

          THE COURT:  Good afternoon.

          Counsel for defendant.

          MS. COYNE:  Good afternoon, your Honor.

          This is Michele Coyne from Kauff McGuire & Margolis, for defendants, as well as my colleague, Tamanna Rubya.

          MR. RUBYA:  Good afternoon.

          THE COURT:  Good afternoon.

          I scheduled the call in response to receiving the letters on December 8 and December 15 and December 19 regarding some issues relating to expert discovery.  So I believe the first letter is from plaintiff's counsel, Mr. Crabill.

          So the first request is for the underlying data.  Describe for me what is the data that you seek that you don't have.

          MR. CRABILL:  Sure, your Honor.  Just by way of brief background, the case involves claims of race discrimination and retaliation for engaging in protected activities.  Of course, in connection with those claims, plaintiff is seeking emotional distress damages.  The parties retained respective experts.  Defendants retained Dr. Karen Dahlman, who conducted seven

tests in connection with her examination of plaintiff.

These are tests that defendants moved to have the Court permit her to be able to administer because the parties had disagreements on parameters for her examination. Ultimately, the Court permitted Dr. Dahlman to conduct these tests on Mr. Jackson. Our understanding of the test, because we don't have the raw data, is that Mr. Jackson provided certain information in response to questions, for example, as part of these standardized tests. And some of these questions are reflected in Dr. Dahlman's rebuttal report.

So the underlying data goes to Dr. Dahlman's examination of Mr. Jackson, who is suffering from post-traumatic stress disorder, and her assessment as to his reliability as to his answers in connection with those tests.

THE COURT:  Okay.  But in terms of the actual data, what exactly is it?  Can you describe it?

MR. CRABILL:  Sure.  For example, just directing the Court to Exhibit C of the December 8 submission, it's docketed 68-3.  And that is the rebuttal report of Dr. Dahlman, the defendants' expert.

If you look on Page 3 of that document, the second full paragraph has examples of the sort of questions that Mr. Jackson was asked to answer in connection with at least one of the various tests that Dr. Dahlman administered to him.  The examples that Dr. Dahlman provided in her rebuttal report.  She

1  states, quote, Mr. Jackson endorsed as true the following
2  statements seen as consistent with ideas of persecution, and it
3  says, colon, ghost or spirits can influence people for good or
4  bad, I feel I have often been punished without cause, people
5  say insulting and vulgar things about me.
6  　　　　　She goes on to say he endorsed apparent experiences as
7  follows:  I also feel I can read other people's minds, true; I
8  have had very strange, peculiar experiences, true; I've never
9  seen a vision, false; and there are other examples as well.
10 　　　　　THE COURT:  The actual questions and answers you want?
11 　　　　　MR. CRABILL:  Questions and answers as well as other
12 underlying data that may be collected in connection with the
13 other tests, which is not readily apparent from the information
14 that's been provided.
15 　　　　　THE COURT:  Okay.  Well, Ms. Coyne, let me ask you,
16 what's the problem with producing that?  It is true that under
17 the rule typically, any underlying data of an expert would be
18 produced, obviously subject to confidentiality, since I
19 understand that this is a Pearson component test, and there's
20 confidentiality issues with that.  But why couldn't you produce
21 it subject to confidentiality?
22 　　　　　MS. COYNE:  Your Honor, my colleague, Ms. Rubya, is
23 going to address these issues.
24 　　　　　THE COURT:  Okay.
25 　　　　　MR. RUBYA:  Hi, your Honor.  This is Tamanna Rubya for

1    the defendants.

2            By way of background, our expert -- defendant's
3    expert, Dr. Karen Dahlman, she's a neuropsychologist.  She
4    conducted eight neuropsychological tests as part of her
5    examination, not seven.  And going to the underlying data, it
6    consists of raw data, as mentioned.  That includes hundreds of
7    questions as part of her eight different tests administered.
8    It includes plaintiff's responses to the questions.  It
9    includes individualized scores.

10           Now, Dr. Dahlman has already provided a comprehensive
11   appendix to her IME report with summarized versions of the data
12   collected, includes charts, includes graphs.  It also
13   includes -- she also provided examples as Mr. Crabill mentioned
14   in her rebuttal report as to some of the questions that were
15   collected.

16           Now, this was done back in August of 2023, which she
17   provided her appendix.  It wasn't until the middle of her
18   deposition in October, three days before the close of expert
19   discovery, where plaintiff requested for the first time the
20   underlying data, the raw data that was collected.  And at the
21   deposition, the plaintiff also didn't ask her any questions
22   about the test that she administered about the underlying data
23   to get more information about what she collected -- the
24   underlying materials that were even needed.

25           So in response to your earlier question as to why the

1   data can't be provided, we explained in our motion papers that
2   Dr. Dahlman has a use agreement with Pearson that prohibits her
3   from releasing this information to parties that are -- parties
4   she is not permitted to present information to under the
5   American Psychological Association standard.
6            So, normally, as part of her standards and practices,
7   she produces this information to protect testing integrity
8   whether -- sorry, to an opposing psychologist, never a party,
9   never counsel, and never a psychiatrist, because none of these
10  individuals are really qualified, or qualified to interpret the
11  data.
12           So the issue here is really more so about the fact
13  that there's no one on the plaintiff's side that is capable of
14  interpreting the data.  So we've explained to the plaintiff
15  that Dr. Dahlman generally, as part of her standard practice,
16  is only allowed to share with another psychologist because --
17  with an opposing psychologist, directly with that psychologist,
18  because that would be the only individual that would be
19  qualified to interpret the data.  So what happened --
20           THE COURT:  What happened about Figarola?
21           MR. RUBYA:  That's a good question, your Honor.
22  Dr. Figarola is a psychiatrist, and he's not capable of
23  interpreting the data.  He doesn't have the credentials because
24  this is psychological --  neuropsychological assessment.  So he
25  would not be able to interpret the data.

1      THE COURT: You said it's not allowed to be produced
2  per the Pearson agreement. That's subject to court order.
3  There's an exception for court order, right?
4      MR. RUBYA: Correct, yes. So that's why, you know,
5  Dr. Dahlman wasn't able to produce it right away because there
6  was no order at the time with regard to a pending request for
7  discovery.
8      THE COURT: Okay. But if I issue an order, you can
9  actually physically produce the data, right?
10     MR. RUBYA: Yes. If the Court issues an order, we can
11 physically produce the data. The issue, thought, still remains
12 that there's no one who's qualified to interpret the data. The
13 fact of the matter is we don't have the data. Defendants don't
14 have the data. And the end result would be that we would end
15 up producing a bunch of data to the plaintiff that would just
16 be used to confuse the jury. We're not going to be using the
17 data as part of our case as a jury.
18     The data really has to deal with Dr. Dahlman's
19 assessment and psychological assessment. And so the potential
20 value of the data really is not -- the value is really the
21 issue here, because even if we did produce the data, it is
22 really about having no one to actually interpret the data.
23     THE COURT: Right. I mean, I take your point, but
24 there is a paragraph in the rebuttal report where there are
25 examples of his answers from the evaluation. And your argument

that it can't be interpreted, that it's misleading, is really a relevance argument as opposed to what I think is a discoverability argument. I mean, since she does give examples, it seems to me you should have to produce the data, as you would any other expert.

Now, whether I allow questioning about it at trial or whatever, that's a different question. But if nothing else, it shows context for what she is using in her report in some ways. So I'm going to order that be produced, subject to confidentiality, obviously.

MR. RUBYA: Understood, your Honor.

THE COURT: And have you all reached agreement on the expert fees yet, Mr. Crabill?

MR. CRABILL: No, your Honor, we have not.

THE COURT: Okay. Well, I've read your letters on the issue of the expert fees. As I understand it, plaintiffs argue that defendant's expert, Dahlman, is asking for too much in terms of preparation for the deposition, in terms of hours, which I think was 17, then reduced to 10. And defendant is arguing that plaintiff's expert has an hourly rate that's too high of 875, versus Dahlman's rate of 812. Those are the principal issues as I understand it.

Is there anything you want to add on those points, Mr. Crabill?

MR. CRABILL: Just, you know, your Honor, I believe

you summed it up correctly, that the main disputes as to the hours of preparation compared to what Dr. Figarola put into his preparation and considerations of -- Dr. Dahlman's deposition was really weeks, if not only just a couple months, after she had fully examined plaintiff, had issued her report and rebuttal report. So, yes, the number of hours is disproportionate.

The 812 rate in connection with what Dr. Dahlman is seeking is considering for her reserving eight hours for deposition. In reality, Dr. Dahlman was only deposed for a total time, not including only on the record, but total time of just over six hours. When considering the rate over the time that has she was actually deposed, actually spent for the deposition, the rate comes out to over $1,000 per hour.

THE COURT: So you think it should be what, 6 hours?

MR. CRABILL: The total time from the start of the deposition until the record was closed was 6 hours and 17 minutes.

THE COURT: Okay. So --

MR. CRABILL: So if you take Dr. Dahlman was initially requesting a $6,500 flat fee, if you take that flat fee over the 6 hours and 17 minutes, which comes out to 6.628 hours, the hourly rate is 1,035.03.

THE COURT: Okay. Ms. Coyne, Ms. Rubya?

MR. RUBYA: Yes, your Honor. So there's a couple

O156JACC

inaccuracies with plaintiff's statements.

First, we have long withdrawn our request for a flat fee. We initially did send an invoice for a flat fee. Our requested rate for Dr. Dahlman is $812.50 per hour. And that's the full eight hours she reserved for the deposition. Plaintiff is arguing -- so this $1,000 rate is not what we're asking at all. We're asking for 812.50 per hours, for eight hours. And so the eight hours is based on the time she reserved for the deposition.

Plaintiff is seeking to cut that down based on the amount of time her deposition actually lasted. And we've explained, and we have cited case law in our motion papers explaining that the -- an expert should be compensated for the time that the expert reserved for the deposition. There's case law to that effect.

And, importantly, Dr. Dahlman, she was note noticed for a full day, she reserved a full day, and she had foregone accepting patients for the time she reserved, which was a full day, it's a full eight hours. And she was never informed that her deposition would be shorter. She was never informed that it would only be a half day long or less amount of time. So our position is she should be compensated for the amount of time she reserved, which was the full eight-hour day.

And, your Honor, also with regard to the preparation fees, you're correct that the fees were -- the hours, the

1   number of hours were cut down for Dr. Dahlman from 17 to
2   10 hours.  Here, again, Dr. Dahlman had to do a significant
3   amount of prep work for her deposition, given the complexity of
4   her IME.  Again, she conducted eight different
5   neuropsychological tests over a two-day period.  And she had to
6   be able to break down each and every single one of those tests
7   in layman terms.  Then she also reviewed a number of documents
8   as part of her IME report.
9           Now, while plaintiff said that her IME report was held
10  pretty closely to her deposition, that there were a number
11  of months separating the two, and she was also provided with a
12  number of documents way back in March.  So between March and
13  October, there's a big gap in time there, and she reviewed
14  deposition -- the deposition transcript of the plaintiff and
15  the accompanying exhibits.  So that involved -- with the
16  explaining of all of the tests, that involved a lot of prep
17  work that we, again, significantly cut down.
18          Plaintiff is only willing to compensate her for
19  four hours out of ten hours because that was the amount of time
20  plaintiff spent on the record with her.  But our position is
21  that there's case law, again, in this jurisdiction that warns
22  against any kind of blanket rule awarding hours based on the
23  amount of time spent on the record.  In fact, ten hours have
24  been found reasonable in cases, including one case that we
25  noted in our motion papers, *Conte v. Newsday*, where the expert

O156JACC

1  spent ten hours preparing and was not ultimately deposed at
2  all.
3          So, again, the complexity and thoroughness of
4  Dr. Dahlman's IME, we believe, necessitates the full 10 hours
5  that we're requesting, not the 17 hours.  Again, we cut it down
6  significantly.
7          And I want to emphasize, your Honor, that we proposed
8  just to -- defendants propose just to resolve these unnecessary
9  fee issues, that the parties just simply pay their own fees,
10  especially if -- you know, plaintiff is saying that his
11  expert's fees are reasonable, then he should have no problem
12  paying for them, but the plaintiff has refused that proposal as
13  well.
14          MR. CRABILL:  Your Honor, if I could respond to a
15  couple points?
16          THE COURT:  Okay.
17          MR. CRABILL:  So Dr. Dahlman testified during her
18  deposition, and I'm happy to provide the Court with the exact
19  transcripts, and perhaps we did.  Just one second.
20          (Pause)
21          MR. CRABILL:  But Dr. Dahlman testified exactly to
22  what she reviewed in connection with her preparation and what
23  she actually ultimately considered in forming her report.  I
24  direct the Court to Exhibit A of plaintiff's letter from
25  December 8 on the docket at 68-1.  Dr. Dahlman's lists a number

O156JACC

1  of documents reviewed on Pages 1 and 2 of her report that
2  supposedly are -- or supposedly were -- or according to her,
3  helped her come to certain opinions in this case.
4         Ultimately, at her deposition, Dr. Dahlman conceded
5  that only a handful of these documents were actually relevant.
6  And so any review of documents that Dr. Dahlman will even
7  testify to or that weren't even relevant to her report or her
8  opinion should not be -- plaintiff should not have to pay for
9  time spent on unnecessary review.
10         THE COURT:  Okay.  Well, at the end of the day, I
11 think they have very similar credentials.  I think they're
12 comparable in terms of experience.  So I think in terms of an
13 objectively reasonable fee, the way I would do the calculation
14 is awarding something close to 800 an hour.  I would give
15 Figarola the nine hours.  That's 7200.  And then the four hours
16 of prep at $500 would be another 2,000 for a total of 9200.
17         For Dahlman, I would do the full eight hours at the
18 same $800 hour rate, which is 6400, because she took the whole
19 day.  And then I'd probably give her somewhat more in terms of
20 prep time, not the full 17 or 10, but I'd give her between 5
21 and 6 hours of prep time.  Let's say 5.75 times $500 prep rate
22 would be 2,875.  And that results in a total of 9,275.  So
23 since they both work out to just about 9200, I'm going to order
24 each side pay your own expert fee.
25         MR. CRABILL:  Thank you, your Honor.

O156JACC

1           MR. RUBYA:  Thank you, your Honor.

2           THE COURT:  Anything else for today?  Oh, you all have

3  a settlement conference coming up.

4           MR. CRABILL:  Yes, your Honor.  Sorry, this is

5  Taylor Crabill for the plaintiff.

6           We had an initial presettlement conference with the

7  magistrate a couple weeks ago, and then on Wednesday,

8  January 10, the parties have a follow-up presettlement

9  conference call with the magistrate to provide additional

10  information on the parties' positions and facts of the case to

11  ultimately determine whether an in-person or virtual settlement

12  conference would be productive.

13           THE COURT:  Okay.  All right.

14           MR. RUBYA:  Your Honor, we still have to discuss the

15  IME cancellation fee motion that was made by defendants.

16           THE COURT:  Yes.  You know, I mean, in light of

17  everything, I don't think there was bad faith on anybody's

18  party.  I'm not going to order, that shifted.  I mean, these

19  things happen.  I will credit the plaintiff's account that he

20  suffered a panic attack.  Obviously, this isn't something that

21  can become a pattern in terms of discovery or issues going

22  forward, but I'm not going to order any fee shifting with

23  respect to that on this one occasion.

24           MR. RUBYA:  Thank you, your Honor.

25           THE COURT:  All right.  Thanks, everyone.

O156JACC

1          Have a good weekend.

2          (Adjourned)