UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

ROBERT JACKSON,

                    Plaintiff,

          v.                          21 CV 5037 (JPO)

AMERICAN CIVIL LIBERTIES
UNION, INC. and LUCIA TIAN, in
her individual and
professional capacity,

                    Defendants.       Oral Argument
                                      (via Microsoft Teams)
------------------------------x
                                      New York, N.Y.
                                      August 21, 2024
                                      2:35 p.m.

Before:

                    HON. J. PAUL OETKEN,

                                      District Judge

                         APPEARANCES

TAYLOR CRABILL
     Attorney for Plaintiff

KAUFF McGUIRE & MARGOLIS, LLP
     Attorneys for Defendants
BY:  MICHELE A. COYNE

1              (Case called)

2              MR. CRABILL:  Good afternoon, your Honor, this is

3     Taylor Crabill for the plaintiff, Robert Jackson.

4              THE COURT:  Good afternoon.

5              MS. COYNE:  Good afternoon, your Honor, this is

6     Michele Coyne from Kauff McGuire & Margolis for defendants, the

7     American Civil Liberties Union and Lucia Tian.

8              THE COURT:  Good afternoon.

9              Thank you all for joining.  I'm sorry we have had to

10    put this off a couple of times.  But we are here for argument

11    on defendants' motion for summary judgment in this case.  I

12    have reviewed the papers, but I wanted to give you all a chance

13    to take whatever time -- I was thinking 15 or 20 minutes -- to

14    present any arguments you'd like to make on the motion.

15             As the movant, Ms. Coyne, you can begin.

16             MS. COYNE:  Thank you, your Honor.

17             May it please the Court, defendants are entitled to

18    summary judgment on all of the plaintiff's claims.

19             And I just want to sort of start out by setting where

20    this case is, which is, it's a case involving a short-term

21    probationary employee.  He was hired and fired by the same

22    person in the space of fewer than 10 months.  He was only

23    assigned two projects in his entire tenure and produced

24    virtually no useable work.

25             The record in this case is thick, in light of what I

1   have just said in terms of what the facts are.  But most of the

2   briefing and most of plaintiff's briefing really goes to the

3   point of, he disputes the performance feedback that he

4   received.

5          A lot of the briefing has to do with, was he really

6   qualified, was he misled as to what the role was supposed to

7   be?  It was supposed to be one thing and it was another.

8   Whether the ACLU's expectations were clear or reasonable,

9   whether the deadlines were real ones or they could be moved,

10  and things of that nature.

11         But of course it's not the Court's role to parse

12  whether the performance feedback was wise or fair, but whether

13  there is evidence here of discrimination or retaliation.

14         And I will start with retaliation, which really

15  centers on the plaintiff standing in front of a group with

16  eight other people, not speaking, to raise issues around the

17  ACLU.  Presuming that he has established a *prima facie* case,

18  our position is that he cannot establish pretext.

19         Again, a lot of this has to do with one thing, which

20  is temporal proximity.  So when somebody is an employee for 10

21  months and begins displaying poor performance immediately,

22  yeah, things are close in time.  However, the case law is

23  clear, in our view, that temporal proximity alone is not

24  enough.

25         In addition, here we see that the criticism of his

1   performance started almost immediately.  So he starts in

2   October of 2019.  By November of 2019, he has already sent a

3   message saying, I recognize this isn't great performance by me.

4   In employment relationships for the performance to already be a

5   problem within a month is pretty fast.

6           There are other messages also that establish those

7   performance issues, and why that's relevant here is that when

8   the performance feedback predates any protected activity, which

9   surely it does here, it undermines the notion of pretext.

10          Secondly, the temporal proximity here, he relies a lot

11  on comments that he attributes to Lucia Tian, words to the

12  effect of, keep quiet, be the cooler head.  Our view is that

13  that's not -- while we have to assume that that happened for

14  purposes of this motion, that that's not evidence of anything.

15  He admits, after meeting with Lucia, that he felt supported,

16  that she had been supportive of him, that everyone had been

17  supportive of him, so he certainly didn't see it as evidence of

18  anything, and it's not.

19          THE COURT:  What is your explanation of those

20  comments?  First of all, I am not sure -- I didn't go back and

21  check if that comes from a deposition or a document.

22          So after the Southern Convening, he meets with his

23  boss, Ms. Tian, and she instructs him to keep quiet, be the

24  cooler head in the room, and keep calm.

25          Is that from a deposition?

1          MS. COYNE:  That's his testimony as well as in the

2     complaint, yes.  Of course we dispute those comments, but we

3     understand that for purposes of this motion we will have to

4     assume that they happened.

5          However, part of his testimony also is that after the

6     conversation -- and, as I said, we dispute that's what was

7     said -- but what's certainly true and what he testified to is

8     that after the conversation, whatever happened, that he sends

9     an email talking about how supportive and, frankly, honored he

10    feels.  So whatever about the substance of that conversation,

11    he certainly took it as I'm being supported and I'm being

12    honored.

13         In addition, we cite cases in the briefs about the

14    offer that he received of the lower position, the lower

15    position that he ultimately took, and cases that go to the

16    point of when somebody is a probationary employee and surely

17    could have been terminated without further recourse, the fact

18    that the ACLU in this case attempted to continue his employment

19    cuts against a finding of retaliation.

20         Finally -- and again there is cases cited in the

21    briefs -- as I said, he stood on stage, or at least stood in

22    front of the room with eight other people, some of whom were

23    ACLU employees of what they call the national office and some

24    of whom were employees of what are called affiliates of the

25    ACLU.  But with respect to others who were national office

1    employees who engaged in the same exact behavior as Mr. Jackson

2    did, meaning standing in front of a room, there is citations in

3    the record of good things that happened to them thereafter,

4    having engaged in the same behavior, one receiving a promotion

5    and another getting a raise.

6         If I can turn now to the discrimination case, I think

7    the most important point here, and I don't really think the

8    plaintiff has answered it, is the same actor inference.  While

9    we recognize that that's not a mandatory inference for the

10   Court to draw, we think in this circumstance it's a very strong

11   inference for a couple of reasons.

12        First of all, again, it's a very short period of time.

13   He is hired and within a couple of months he is saying, well,

14   they are discriminating against me.  Ms. Tian was responsible

15   for his hiring and was also a large contributor to the decision

16   to terminate him, a decision that was communicated to him

17   around eight months after he started.  So where there is a very

18   short period of time, we think that there is a very strong

19   same-actor inference to be drawn here.

20        As I said, I don't really think the plaintiff answers

21   this, the notion that Ms. Tian may have suddenly decided to

22   adopt racial animus within those few months.  And we cite,

23   again, to a case in the brief, the *Paul* case, where the Court

24   said, well, seven months doesn't make sense that somebody could

25   have adopted a discriminatory animus in that short period of

1    time.  It's even less here.

2          The same legitimate nondiscriminatory reasons apply

3    here as they do in the retaliation case, although they are not

4    addressed in the plaintiff's briefing, but there is really no

5    real dispute here that Ms. Tian was responsible for the hiring.

6    They have admitted in the 56.1 counter statement that she is

7    the one that submitted the request that he be hired.  There is

8    some discussion in the briefing that maybe, even though she

9    hired him, maybe she really didn't want to.  That's not borne

10   out in the record whatsoever.

11         David Oliver, who testified about that, admitted in

12   his deposition, and it's cited in our brief, that he didn't

13   know that to be the case.

14         The plaintiff assumes that she wanted a different

15   candidate and incorrectly identifies an Asian candidate by the

16   wrong name as being the person he suspects she wanted to hire.

17   The reality is that she was the hiring manager, she requested

18   the hiring and also contributed to the termination decision.

19         Finally, I'll just note that the plaintiff has

20   withdrawn the aiding and abetting claim against Ms. Tian, so I

21   think that's a moot point.

22         THE COURT:  Let me just clarify the hiring and

23   termination decision maker.  Was she clearly the individual who

24   hired Mr. Jackson, or was that a number of people involved in

25   the decision to hire initially?

1          MS. COYNE:  Your Honor, frankly I think it's both.

2  There were a committee or a group of people who were

3  responsible for interviewing the plaintiff, and I don't think

4  there is any dispute about this.  There were a group of people

5  who were involved in rating the candidates.  Ultimately,

6  though, the decision is made by Ms. Tian.

7          We cited also in our briefs to her contemporaneous

8  emails saying, I really want to get Rob in here.  He seems

9  really qualified.  He cares a lot about our work.  There is no

10  dispute that she is the one that made the request to HR to hire

11  him.

12          So like lots of hiring decisions, there are people who

13  interview a candidate who give their input, but there is no

14  real genuine dispute here that she is the one that made the

15  decision to hire him.

16          THE COURT:  In terms of the termination, again, going

17  back to that, she is the one who submits the memo.  She has

18  this committee.  And you would say that the record shows that

19  that committee is making a recommendation to her?

20          MS. COYNE:  So they are all ranking the candidates

21  that they interview and they are all contributing to that.  Her

22  view is consistent with that of the others, which is, he is the

23  one that should be hired.  It can be sort of difficult -- as I

24  said, in most circumstances not just one person contributes to

25  the decision.  People have input.  They give opinions.  But

1   ultimately it's her decision.

2          THE COURT:  And with respect to the termination, same

3   question.  Who is involved in the termination, and is there one

4   person who is the ultimate decision maker?

5          MS. COYNE:  Ultimately, it's her decision to make but

6   like in all organizations, she is consulting with other people.

7   At that point he was reporting to a different supervisor,

8   Allison Kelley.  Ms. Kelley then reported up to Ms. Tian.  And

9   of course HR is involved in those discussions and those

10  decisions as well.

11         If you look at the case, the *Jones v. Yonkers* case

12  that we cited in our brief, the same-actor inference is not

13  just dependent on somebody having sole authority, and there are

14  very few of us that have sole authority to hire and fire people

15  without anybody else weighing in, but it applies when they have

16  input into the hiring and firing decision that is significant,

17  which Ms. Tian certainly did.  So she doesn't have to be the

18  sole person.

19         THE COURT:  Who recommended his termination?  Was it

20  Horowitz, Kelley, and Ms. Tian?

21         MS. COYNE:  Technically speaking, I suppose, there is

22  two different decisions here.  When he is hired, he is a

23  probationary employee.  And then there is a decision made by

24  Ms. Tian that he's not going to pass probation.  I say it is

25  sort of technically a separate decision because he is not then

1    fired.  She makes the evaluation -- maybe evaluation is the

2    word I should use -- that he is not going to pass probation.

3    That is sort of step one.

4           The next decision is, what are we going to do about

5    it?  And in that instance they made the decision to offer him

6    the other role, the lower-level role.

7           Similarly, the sort of mirror of that is, at the end

8    of several more months, when he is reporting to Ms. Kelley,

9    Allison Kelley makes the decision again, he is not going to

10   pass probation.  So now, again, we have to make a decision

11   about what we do about that, and in that instance the decision

12   is to terminate him, but that's a decision ultimately that

13   Ms. Tian is making, again, with consultation with other people.

14           THE COURT:  Is there evidence in the record of anyone

15   involved in those consultations saying, we should not terminate

16   him or decline to let him pass probation?

17           MS. COYNE:  No.

18           THE COURT:  I know there is somebody named Ms. Eigo.

19   I am not sure how you say her name.

20           MS. COYNE:  That's right, Eigo.

21           THE COURT:  Ms. Eigo seems to be someone who expressed

22   reservations about his termination, perhaps.  Was she on the

23   same level as he was?  What was her connection to him in the

24   first role and the second role?  I gather she was in the second

25   role?

1          MS. COYNE:  Right.  So Ms. Eigo did not have any --

2    she was deposed.  She was in a role similar to his.  She didn't

3    have any supervisory authority over him.  And there is also

4    lots of testimony in the record that she didn't really know

5    what he was doing.  She didn't have any reason to know what

6    specifically he was working on.  She speaks about having seen

7    his computer screen and it having looked like something that

8    she has worked on.  So she wasn't in a position to make any

9    decision, recommend any decision.  She was a peer.

10          THE COURT:  Thank you.

11          Mr. Crabill, I want to give you a chance to respond

12   however you see fit.

13          MR. CRABILL:  Sure, your Honor.  Thank you for the

14   arguments today and for conducting them virtually.

15          The record is clear that there is at least, at the

16   very, very least, a question about whether the adverse actions

17   taken against Mr. Jackson were motivated by discriminatory or

18   retaliatory intent.

19          Opposing counsel just cited to some evidence in the

20   record, but has excluded references to other pieces of evidence

21   that would contradict or go against what defendants are putting

22   forward as their explanation for their reasons for the demotion

23   of Mr. Jackson and his ultimate termination.  And this evidence

24   could clearly be interpreted by a jury to demonstrate

25   discriminatory and retaliatory animus.

1          If we go first to Mr. Jackson's retaliation claims,

2     there is a stark contrast in how Mr. Jackson was treated prior

3     to his initial complaints at the Southern Convening in December

4     of 2019, and the treatment of him afterwards.

5          Opposing counsel has pointed to supposed performance

6     issues prior to the initial protected activities at the

7     Southern Convening, but there is evidence in the record that

8     Mr. Jackson was praised for his work on the first phase of the

9     work-study project, which is the main project he was working on

10    prior to and after the Southern Convening, that he was the one

11    that actually set deadlines related to the project that were

12    approved by the stakeholder, Karolyn Bonfanti, and it was

13    Bonfanti that had to push deadlines related to her own work

14    schedule and inability to work on the project and review

15    Mr. Jackson's work.

16         Again, there is clear evidence that goes against

17    defendants' claims that these performance issues popped up

18    before he engaged in these protected activities.

19         They cite only to one Slack message where he mentions

20    one part of his work, but if you look at the overall record

21    related to that first phase of the work-study project and his

22    work prior to his engaging in protected activities at the

23    Southern Convening, it paints an overall positive picture of

24    his work performance.

25         THE COURT:  There is clearly evidence that Ms. Tian

1    and Mr. Horowitz were talking about the fact that he was

2    incapable of doing some of the technical stuff that they hoped

3    he was doing, and he was behind on the work, and that he was

4    missing deadlines.

5         And then by December or January, they are saying to

6    each other, we have got to find something else for him.  We

7    clearly hired someone who doesn't have the technical skills to

8    do this job.

9         Are you saying that that was pretextual?

10         MR. CRABILL:  That was pretextual and those sort of

11    critiques were happening after the Southern Convening and these

12    additional protected activities.

13         The work-study project that is the thing that

14    defendants cite to as supposed performance issues and why he

15    was ultimately demoted was broken up into two phases.  The

16    first part of the work-study project was sending out a survey

17    to ACLU employees, collecting data.  And he worked with Karolyn

18    Bonfanti to do that and ultimately was praised for that.

19         The more technical parts of the project that came in

20    connection with the work-study project, the work-study report,

21    was later, was after -- was mainly after the protected

22    complaints at the Southern Convening and then the follow-ups

23    thereafter, right.

24         At one point even in, I believe, Slack communications

25    between Horowitz and Tian, Horowitz is stating to Tian, hey,

1    listen, I think it could have been Bonfanti that was the cause

2    of these delays, right?

3         Ultimately, Mr. Jackson didn't know about these

4    deadlines until Bonfanti sprung them on him at the last second.

5    Instead of sort of investigating and looking into, hey, was Rob

6    at fault here, was Karolyn at fault here, Tian moves

7    immediately to sort of blame this on Mr. Jackson and then use

8    that as a basis to justify the adverse actions that they

9    ultimately took against him.

10         It's clear then, following the Southern Convening, in

11    Ms. Tian's private communications, in Slack messages, that she

12    was upset by what he had done, right.  There was the initial

13    comment in the meeting with Mr. Jackson about, hey, be quiet.

14    Let other people talk, kind of let this go.

15         And he didn't do that.  He continued to speak out.  He

16    continued to follow up with HR about the initiatives that him

17    and his colleagues proposed at the Southern Convening, and Tian

18    was annoyed by it.  And the record is clear.  It's clear in

19    those Slack messages and it's clear in her testimony that she

20    was upset that it was causing Rob to be distressed, and she was

21    upset that it was causing distress to her team.

22         And it's not only that portion of the evidence, but

23    also supported by Mr. Jackson's colleagues, who observed the

24    change in treatment of him before and after the Southern

25    Convening, noticing that Tian tried to shut down any sort of

1   discussions about the Southern Convening and what was discussed

2   there during those analytic meetings, and also the way that she

3   was supervising him.  So there is clear evidence going to that

4   retaliatory intent.  At the very least, a jury could look into

5   to that and say, these messages demonstrate that this demotion

6   was motivated by a retaliatory intent.

7          THE COURT:  When you say these messages, could you

8   tell me exactly what you're talking about.

9          MR. CRABILL:  Sure.  One second, your Honor.

10          If you look in plaintiff's response to paragraph 27 of

11   defendants' local rule 56.1 statement of facts, on page 15 of

12   the counter statement it specifically references these private

13   one-on-one Slack messages with Horowitz from 3:30 p.m. on

14   December 18, 2019, in which he stated to Horowitz:  "This

15   Southern Convening thing is turning into a whole thing."

16   That's Exhibit HH of plaintiff's exhibits.

17          Tian then goes on to say the -- she goes on to her

18   admit that her statement was related to "a lot of consternation

19   among the staff at the ACLU for what happened around the

20   Southern Convening."  That's from Tian deposition transcript at

21   page 108, lines 6 to 17.

22          Tian also testified:  "I believe at this point I had

23   also had the conversation with Rob and understood his concerns

24   and understood that he was upset, so I wanted to -- I think

25   that's an expression of the fact that, you know, this event was

1    causing both individuals on the team, specifically Rob, to be

2    upset, and also further discussion in the organization."

3    That's at Tian's transcript, page 108, lines 6 to 25:

4            Tian then followed up the Slack messages to Horowitz

5    with a message of a screaming face emoticon that she used to

6    express her, quote, horror that members of the analytics team

7    were, quote, upset by the events of the Southern Convening.

8    That's all outlined --

9            THE COURT:  You can almost read some of those messages

10   as her being upset with the situation that led people to

11   complain.  In other words, was she sort of expressing upset

12   that we are in this situation where people have to express

13   frustration about the challenges within the ACLU of getting and

14   maintaining the kind of racially diverse workforce that we

15   want, and that she was upset about that, about the same thing

16   they were complaining about.

17           MR. CRABILL:  That could be one possible

18   interpretation by a fact finder.

19           Another interpretation could certainly be that this is

20   related to the fact that Rob is continuing to talk about this

21   during his meetings with other analytics employees.  There are

22   specific references here to how it is causing a problem with

23   members of her team.

24           There is a very clear understanding that she was upset

25   by how Rob's actions at the Southern Convening and afterwards

1    were causing her team to be disrupted.

2             Looking even at additional parts of her testimony, she

3    admits exactly that, that she was "not happy with the fact that

4    the event then caused indirect impact on my own staff that

5    caused my staff to be upset."

6             THE COURT:  But there is a distinction between being

7    upset about someone for complaining about discrimination and

8    being upset with someone for complaining in a way that disrupts

9    the work force and/or prevents a department from getting their

10   work done, right?

11            MR. CRABILL:  Sure, your Honor.  But this was a

12   situation -- it wasn't just a situation where, let's say,

13   Mr. Jackson had not been on the team, that there still would

14   have been a disruption within the team.

15            It was the fact that Rob was on her team and part of

16   those conversations, part of those complaints, part of them

17   continuing those complaints and discussions at the ACLU, with

18   human resources, and with his coworkers that caused that sort

19   of disruption and caused what was happening with her team.

20   That's clear from declarations submitted by Mr. Jackson's

21   coworkers about the fact that Ms. Tian was trying to shut him

22   down when he was discussing those things.

23            Sorry.  I'm just reviewing my notes.  One second, your

24   Honor.

25            Plus, counsel also cited to, temporal proximity was

1    not enough.  Of course there was a short temporal proximity

2    here between the protected activities, specifically the

3    complaints made during the Southern Convening in mid December

4    2019, and then the ultimate demotion just weeks later.

5          And it wasn't just weeks between the initial protected

6    activity.  Like I mentioned, Mr. Jackson continued to engage in

7    these protected activities, which was what was causing the

8    disruption with Ms. Tian's team that we just discussed.  The

9    idea that his case is based only on temporal proximity is just

10   not true, based on the record.

11         THE COURT:  Any other points you wanted to highlight?

12         MR. CRABILL:  Yes, your Honor.

13         In connection with opposing counsel's claim that

14   defendants continued to employ Mr. Jackson after his

15   probationary period, the reality is is that the ACLU, Ms. Tian,

16   they decided to demote Mr. Jackson, and that was in an effort

17   to try to force him out.  They didn't just demote him.  They

18   tried -- they demoted him four levels from where he was,

19   slashed his salary in half, and presented him with an

20   ultimatum:  Either accept this demotion or you're fired.  This

21   wasn't a sort of charitable act, as it may being portrayed to

22   be, and that could certainly be inferred from what's in the

23   record by members of a jury.

24         There is also discussion about how the ACLU didn't

25   discriminate against the other black men who complained, and

1    that also is not true.  One of the people who Mr. Jackson

2    complained was at Southern Convening Anwar Young.  Anwar Young

3    made a clear complaint that he was suffering discrimination at

4    one of the affiliate offices in connection with what happened

5    during the Southern Convening.  And Mr. Jackson, as part of his

6    further protected activities, brought those complaints to HR at

7    Mr. Young's request.

8         So this wasn't some sort of disconnect between the

9    ACLU national and ACLU affiliate.  They are very much

10   intertwined, especially at the HR level, and so there was

11   discrimination and retaliation towards at least one other

12   member of a group who complained during the Southern Convening.

13        For the two other gentlemen that opposing counsel

14   mentioned, while they may have advanced at the ACLU, they

15   weren't working under the Lucia Tian, who was the main driver

16   of the discrimination and retaliation against Mr. Jackson.

17        Moving on to the discrimination claims, there was a

18   discussion about the same act or inference, how there was --

19   and discussion about the hiring committee and Ms. Tian's role.

20   David Oliver's declaration, which was provided in support of

21   Mr. Jackson, very clearly outlines that there was this

22   committee put together to hire for this new special-projects

23   lead role and that the committee members, including Mr. Oliver

24   and some of the other members who had been at the ACLU, even

25   predating Ms. Tian, saw the opportunity to add more diversity

1    to the ACLU with the hire and also add someone who was not a

2    technical employee.  They had enough data scientists.  They had

3    enough data analysts.  They needed someone who could work

4    between the group and the ACLU's other offices in order to

5    facilitate projects.

6            So in his declaration, and likely testimony at trial,

7    he mentioned that Tian had very different desires on who to

8    hire and that ultimately while it was the group decision in

9    hiring Mr. Jackson, Ms. Tian had a different preference and it

10   wasn't for Mr. Jackson.

11           THE COURT:  Was Oliver deposed?

12           MR. CRABILL:  Oliver was deposed, yes.

13           THE COURT:  The statements you're mentioning, are they

14   in a declaration or in his deposition?

15           MR. CRABILL:  They are in his declaration, and I would

16   need to check back to the deposition transcript to see exactly

17   what was said in connection with those.  I believe he was

18   questioned on the statements that he made, but I would need to

19   check back to see if it was also mentioned in his deposition.

20           THE COURT:  So as I understand it, he says something

21   like, Ms. Tian wanted someone with more technical experience,

22   but doesn't indicate who, but ultimately agrees with the others

23   that Mr. Jackson should be hired, right?

24           MR. CRABILL:  Ultimately, yes.  Against what she

25   preferred, she followed the group's decision to hire

1    Mr. Jackson, that is correct.

2            THE COURT:  But it was her decision.  She was the

3    boss, right?

4            MR. CRABILL:  I believe she was the ultimate decision

5    maker, yes.

6            THE COURT:  Mr. Oliver, he doesn't testify about

7    anything about the performance issues, does he?

8            MR. CRABILL:  In connection with Mr. Jackson?

9            THE COURT:  Yeah.

10           MR. CRABILL:  I don't believe he did.  He testified

11   specifically about the change in behavior towards Mr. Jackson

12   pre and post protected activities, but I don't believe that he

13   commented on performance in either role or in connection with

14   his projects.

15           THE COURT:  Is the declaration you mentioned attached

16   to your opposition?

17           MR. CRABILL:  It is, your Honor.  I can get you the

18   exhibit number.

19           THE COURT:  That's fine.  I have them all here.  I can

20   find it.

21           MR. CRABILL:  Exhibit F it is.

22           THE COURT:  OK.  Thanks.

23           MR. CRABILL:  If we are looking at additional evidence

24   that shows that this case should go to trial, one key point of

25   evidence is Ms. Kelley's message in response to Rob's farewell

 1   email.

 2          In August of 2020, which was Mr. Jackson's last day at

 3   the ACLU, he sends an email about the discrimination and

 4   retaliation that he has been experiencing at the ACLU.  He

 5   outlines it.

 6          In response to that, Kelley sends a message, a Slack

 7   message, in which she admits -- let me just get the language --

 8   in which she, in part, mentions "I want to acknowledge that I

 9   completely understand why Rob shared what he did yesterday.  I

10   see the ways in which racism and white supremacy played a part

11   in his experience here and how he was experiencing things

12   differently than I was.  I take responsibility for not

13   exploring what was happening in the org, and especially around

14   the Southern Convening, and have been reflecting on this a lot.

15   I know there was real harm done, and there is no excuse for

16   it."

17          Clearly, a jury could infer from this message that

18   Kelley is acknowledging the racism, white supremacy,

19   discrimination that Rob has been experiencing at the ACLU.

20          At that point she had been his supervisor for many

21   months, six, seven months, since she had come on.  She had been

22   interacting with Tian the entire way in her management of Rob.

23   Tian had a hand in that the entire time.

24          And so in response to his message and when she says,

25   hey, listen, I've been discriminated against the entire time I

1    was here, Kelley is saying, yeah, I had a chance to, you know,

2    be with Rob for many months now, and that's what happened to

3    him.  That certainly could be an inference that a jury makes

4    and further evidence why this case should go to trial.

5          Further supporting that, Kelley, before she sends this

6    message, confides in a coworker in private Slack messages, one

7    on one, hey, listen, I'm thinking of sending this message.

8    What do you think, basically?  Right.  And in those messages

9    they discuss how Tian, Horowitz, the ACLU at large could be

10   very upset by what she is sending.  They talk about the

11   ultimate HR question in which, by sending this message, do I

12   put myself at risk for retaliation.  There are very key pieces

13   of evidence here that defendants might try to ignore or don't

14   want to acknowledge at this point of the litigation, but, at

15   the very least, should be presented to a jury.

16         THE COURT:  Doesn't she explain in her deposition that

17   she knew that sending a message like this expressing empathy

18   for someone in Mr. Jackson's position and sort of acknowledging

19   systemic racism, I guess, she knew HR wouldn't like it because

20   it would show up in a plaintiff's brief, and here we are

21   talking about it in a plaintiff's brief.  Isn't that what she

22   was talking about?

23         MR. CRABILL:  She could have been, or the inference

24   based on the additional evidence in the case could be that she

25   was acknowledging the discrimination and retaliation that he

1    experienced at the ACLU, right.

2            The fact that she testified after the lawsuit has been

3    filed about what she claims her intent was is certainly

4    something to be examined by the jury.  How credible is that.

5    She made these statements never thinking -- thinking maybe they

6    could be part of a lawsuit, but certainly doing them -- at

7    least the ones with her colleague, Brooke Madubuonwu, in

8    private Slack messages.

9            Let's let a jury decide what intent she had and what

10   her credibility is in her deposition testimony.

11           THE COURT:  She was his boss and recommended that he

12   be terminated, right?

13           MR. CRABILL:  She ultimately, in collaboration with

14   Tian and others, ultimately decided that he should not pass the

15   probation period related to the data analyst position, but very

16   much that was Tian's final decision.

17           If you're looking at the statement that I just

18   referenced, she is acknowledging her own failures in mentoring

19   him and essentially saying I wish I had done more, I wish I had

20   been more racially literate to understand what was happening to

21   Rob so I could be a better supervisor.

22           It could be argued to a jury that she understood

23   exactly what was going on in terms of what Tian's ultimate

24   motivation was in trying to drive Rob out of the ACLU and, for

25   those reasons, had to go along with what she understood to be

1   Tian's desire.

2              THE COURT:  Thank you.

3              Anything else?

4              MR. CRABILL:  Nothing from plaintiff, your Honor.

5              THE COURT:  Ms. Coyne, anything you would like to

6   reply to?

7              And specifically I wonder if you could address the

8   comment that plaintiff's counsel made about the sprung

9   deadlines and Ms. Bonfanti sort of springing those deadlines on

10  him so that he was essentially -- it was her fault that he was

11  behind and not anything relating to his own performance.

12             MS. COYNE:  Yes.  Thank you, your Honor.

13             So, first off, as I said at the very outset of my

14  argument, that's arguing around not fair or, it shouldn't have

15  been that way.  Those are not within the purview of the Court

16  to say whether or not the deadlines were fair, were they real

17  deadlines, could they have been moved.

18             And I want to refer back to something your Honor

19  raised a question about, which is evidence of the performance

20  issues before the Southern Convening.  If we go back, he starts

21  in October.  The Southern Convening is December 13.  That there

22  is any evidence of poor performance for somebody that's been

23  there just two months is somewhat surprising, but that's how

24  bad it is.

25             And you referenced Slack messages.  There are Slack

1      messages that Ms. Tian sends to Mr. Jackson.  It's Exhibit 19

2      of my declaration where she is saying, hey, what's going on

3      with this?  I haven't heard from you.  And it's in that

4      exchange that he says, I recognize this isn't great performance

5      or good performance from me.

6              So the fact that there is those indications even that

7      early into somebody's employment -- again, we are talking about

8      a very truncated period of time.  To say it wasn't fair or it

9      was really Karolyn Bonfanti's fault is about arguing around

10     whether we were fair or whether the decisions that we made

11     about judging his performance were correct ones.

12             Secondly, I want to reference a couple of other points

13     on that.  Mr. Crabill mentioned that there are coworkers who

14     said that his treatment changed.  I believe Mr. Crabill is

15     referencing David Oliver.  This is reference in our papers.  He

16     cites to Mr. Oliver's deposition, pages 151 to 154, for that

17     sweeping conclusion.

18             Mr. Oliver -- and there is a reason why he cites to

19     three pages, because there is a long back and forth about,

20     well, there was some meeting, and Rob said something about

21     something, and she said something about, take this off line.

22     And when I questioned him about other occasions where something

23     like that happened, he specifically says no, he can't remember

24     any.  To just say, well, there is coworkers who say, you really

25     have to look at those pages in Mr. Oliver's testimony.

 1          Mr. Crabill also mentioned Anwar Young.  Mr. Young was

 2   not an employee of the ACLU national.  The two people that we

 3   referenced who were treated favorably after the Southern

 4   Convening are employees of the national entity, the ACLU, as

 5   opposed to one of its affiliates.  The ACLU doesn't control the

 6   employment of those folks.

 7          If I can also refer to a couple of points on the

 8   discrimination piece.  Again, Mr. Oliver was deposed about

 9   whose decision it was and whether there was some majority rule.

10   That's on pages 110 to 111 of his deposition.  He doesn't

11   support the notion that it had some majority rule to it.

12          As Mr. Crabill has already acknowledged just moments

13   ago, Ms. Tian was ultimately the decision maker with respect to

14   the termination, so we think we have got a very clear

15   same-actor inference here.

16          Also, Mr. Crabill again selectively quotes from that

17   Allison Kelley message.  So if you want to sort of say, well,

18   this is what she must have meant, we know what she meant

19   because she goes on to say that she feels a lot of anger at how

20   Mr. Jackson has portrayed the situation and changed the

21   narrative, and how she is hurt specifically for Lucia, who

22   advocated for Rob more than anyone.  Mr. Crabill doesn't

23   reference that in his brief or here today, but in terms of that

24   message, that's what she refers to.  She specifically is

25   calling out her view that Ms. Tian advocated for Rob more than

1    anybody else did.

2              Finally, you are correct, of course, your Honor, that

3    Ms. Kelley testified about having sort of spoken without

4    approval from HR about the circumstances of Mr. Jackson's

5    employment.  To say she was afraid of retaliation or something

6    is made up out of whole cloth.

7              MR. CRABILL:  Your Honor, if I can just respond.

8              THE COURT:  Before you do, just one quick follow-up.

9              I want to go back to the issue of performance again.

10   I guess I am just wondering.  Other than the Slack message that

11   you mentioned, Exhibit 19, that you rely on, which is

12   Mr. Jackson saying something about his own performance on the

13   project, or whatever it was about his performance.  Then there

14   is a reference later, like in January, about Mr. Horowitz

15   saying, well, was it partly the delay of Bonfanti?  And

16   Ms. Tian saying, well, no.  It's the performance thing.

17             Is there other stuff in between, sort of

18   contemporaneous evidence that they at the time, in that

19   October, November, December period, that they had issues with

20   performance?  Are there other Slack messages either between

21   Horowitz and Tian or other evidence besides those sort of

22   couple of circumstantial data points?

23             MS. COYNE:  I believe before the Southern Convening

24   it's the messages that are at Exhibit 19, which are a series of

25   messages, not just one.

1              As I said, he has been there a month.  So the fact

2      that his supervisor is saying, hey, what's going on with this,

3      can you send me what you have, I haven't heard from you for a

4      few days, can you sign into the meeting, for an employee who

5      has been there for a month is a lot in terms of performance.

6      Yeah, it's the messages that are Exhibit 19 of my declaration.

7              THE COURT:  Thank you.

8              Mr. Crabill.

9              MR. CRABILL:  Sure.

10             First, to go back to your Honor's initial follow-up

11     question around the Bonfanti situation in connection with the

12     work-study project and the deadlines.  It's not a situation

13     about whether the work-study report, whether the graphs were

14     correct, whether the numbers were right.  It's about the way in

15     which Mr. Jackson was treated compared to other people who were

16     clearly -- or at least Ms. Bonfanti clearly demonstrating not

17     the greatest performance, right.  She is not letting

18     Mr. Jackson know about a deadline that he is supposed to know

19     about.  She at this time, leading up to late January 2020, she

20     is scrambling to get survey responses, which she is supposed to

21     be responsible for.

22             If you look even to Slack messages between

23     Mr. Horowitz and Mr. Jackson from May of 2020, Mr. Horowitz is

24     still working on the work-study project, and he's working with

25     Bonfanti, and he is critical, to say the least, of

1    Ms. Bonfanti's work and, frankly, his wanting to work with her.

2              This was a project that was the first time that the

3    analytics department was helping with this project.  Prior to

4    2019, 2020, the analytics department didn't do this.  Bonfanti

5    was doing this on her own, and they had to use what she had

6    gathered over several years to help put this report together.

7              And so Bonfanti is dropping the ball, Horowitz is

8    acknowledging the difficulties with Bonfanti and how that may

9    have contributed to what was happening back in January.  And so

10   it's not about, oh, you know, the work-study report should have

11   been this way and not this way and related to the arguments

12   that opposing counsel is making.  It's about how is he being

13   treated differently than other people who may have had a hand

14   in what was not going right with the work-study project at that

15   time.

16             Tellingly, the decision to terminate Mr. Jackson is

17   made, Tian is going to her supervisors and saying, hey, let's

18   give an extension to Horowitz to finish this project, to finish

19   the technical parts of this project.

20             Horowitz was the technical guy.  Horowitz is the

21   coding guy.  That's the reason he was hired.  If you have a

22   problem with something technical or coding, you go to Horowitz,

23   right, and it took him additional time to complete the project,

24   and then he was still working on it months later.

25             The idea that the circumstances around the work-study

1    project are somehow not relevant, because it supposedly is

2    criticizing what the ACLU's assessment of his work was, is just

3    not accurate.  The evidence is showing that this opportunity

4    was used as a way to get the squeaky wheel out of the ACLU,

5    which eventually defendants did.

6              MS. COYNE:  Your Honor, if I may.

7              THE COURT:  Yes.

8              MS. COYNE:  To be clear, again, I think that was just

9    an argument about thinking we did the project wrong or should

10   have been handled differently.  But from a legal perspective,

11   if Mr. Crabill is suggesting that Ms. Bonfanti was treated more

12   favorably, she is not similarly situated to the plaintiff

13   anyway.  She is in finance.  She didn't report to Ms. Tian.  So

14   whether she should have done it differently or her deadlines

15   were wrong or something is of no consequence.

16             Mr. Horowitz is also not similarly situated to the

17   plaintiff.  And the fact that Mr. Horowitz was working on it

18   was because the plaintiff didn't finish it.

19             In any case, they are not similarly situated to the

20   plaintiff in terms of being comparators.

21             THE COURT:  I think his argument is that it goes to

22   pretext; in other words, the idea that she was kind of looking

23   for problems with his work and saying, oh, he's clearly in

24   above his head, etc., etc., when in fact it was this other

25   person who was causing the delays, and that sort of goes to the

1    idea that she really was annoyed with him because he was a

2    troublemaker, and he was complaining about the issues from the

3    Southern Convening, and she was looking to nitpick.

4         MS. COYNE:  That's exactly why, as I said before, it's

5    not about -- that's why the Court doesn't get into decisions

6    about whether or not we are handling our projects properly and

7    whether Karolyn Bonfanti moved the deadline or it was really

8    her fault or not.  That's what this is all about is, I don't

9    think -- Mr. Crabill just said, they used to do the project

10   differently.  They are entitled to make those decisions.

11   Whether or not there is evidence of pretext is the question.

12        And the fact that somebody may look at it and say,

13   well, the deadline should have been different, and Mr. Horowitz

14   really should have been assigned the project from the beginning

15   is outside the Court's purview.  That's not evidence of

16   pretext.

17        THE COURT:  Unless it suggests that she is lying,

18   right.  If it undermines the credibility or the genuineness of

19   her performance, stated performance concerns, that is what

20   pretext is, right?

21        MS. COYNE:  Understood.  But as we have already

22   pointed out, these were ongoing problems since before the

23   Southern Convening even happened.

24        THE COURT:  And I'm asking, what evidence is there for

25   that other than the one message from him saying, sorry I'm

 1    late, this isn't my best performance.  Is there more?

 2          MS. COYNE:  There are those messages as well as

 3    Ms. Tian's testimony about what was going on, which was cited

 4    in the briefs as well.

 5          MR. CRABILL:  Your Honor, if I could just respond to

 6    that point.

 7          If you're looking at the email exchanges between Tian,

 8    Bonfanti, and Mr. Jackson in connection with the first phase of

 9    the work-study project, it is painting a very different picture

10    about what his performance is, and ultimately his performance

11    over weeks, not just one or two messages that are being

12    referenced here about the survey and how it was -- I can get

13    the direct language, but how it was great, being praised for

14    that ultimate good performance in connection with that phase of

15    the project.  It is very, very clear that all of that was

16    happening before the Southern Convening and the protected

17    activities.

18          Going to the discrimination claims, it's clear that

19    Tian had race on her mind.  She had race on her mind in

20    connection with Mr. Jackson and what he was doing.  That is why

21    I believe in the spring of 2020 she had messages with Horowitz

22    around what Mr. Jackson was continuing to speak out about, what

23    happened to him in connection with the demotion, and she had

24    very -- she had Slack messages with him where she had, hey, I

25    want to protect you, and then she removed that conversation --

1   she didn't delete it.  She moved to a different conversation

2   text messages, most likely because she thought it would be an

3   even more private place than the Slack messages, and said, hey,

4   I wanted to protect you because you're a white guy.  I wanted

5   to protect you, because you're a white man, from this black

6   person who is making these complaints.  That's certainly an

7   inference that could be made by a jury.

8          And the ACLU's reply papers, they even admit that the

9   ACLU apparently has this sort -- has this culture where maybe

10  minority or nonwhite employees are going to maybe jump the gun

11  or jump the gun about attacking white employees for

12  discrimination.

13         It's clear that race was on Tian's mind throughout the

14  relevant events of this case.

15         MS. COYNE:  Your Honor, can I just respond to that

16  point alone?

17         THE COURT:  Sure.

18         MS. COYNE:  That's not at all what that message says.

19  There is no reference to it being about Mr. Jackson's protected

20  activity.  That's also the language that Mr. Crabill uses in

21  his brief.  He says it's in response to plaintiff's protected

22  activity.  There is absolutely no support for that whatsoever.

23         This message comes five months later, in May.  It

24  doesn't have anything to do or reference any protected activity

25  by the plaintiff.

1          What the discussion is about is how to handle the team

2     morale about Mr. Jackson's upcoming termination and about how

3     they are going to communicate that decision.  To then say it's

4     about his protected activity or she has race on her mind is not

5     supported at all by the message.

6          THE COURT:  OK.  I understand.

7          Just to be clear, I had asked about kind of the

8     evidence of the performance issues, and I know there is

9     deposition testimony by Ms. Tian explaining it, and I assume

10    also Horowitz and Kelley perhaps as well.

11         You mentioned Exhibit 19.  Is Exhibit 19 the one place

12    where I would find the evidence before the Southern Convening

13    that existed at the time?

14         MS. COYNE:  That's right, your Honor, along with the

15    testimony.

16         THE COURT:  Great.  Thank you.

17         I think you've answered all of my questions.  I

18    appreciate it.  That's helpful.

19         Anything else?

20         I can't give you a date yet when I am going to rule,

21    but this is helpful.

22         I would appreciate having the transcript.  If you can

23    order it, that would be great.  If you go to the Southern

24    District website, you go to the menu at the upper right corner

25    and go to trial support, it tells you how to order the

1   transcript.

2              Anything else, Mr. Crabill?

3              MR. CRABILL:  Nothing from us, your Honor.

4              THE COURT:  Ms. Coyne.

5              MS. COYNE:  No, your Honor.  Thank you.

6              THE COURT:  Thanks, everyone.  We are adjourned.  Bye

7   now.

8              (Adjourned)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25