UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ROBERT JACKSON,

                            Plaintiff,

            -v-

AMERICAN CIVIL LIBERTIES
UNION, INC., *et al.*,

                            Defendants.

21-CV-5037 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

        Plaintiff Robert Jackson, a former employee in the analytics department of the American

Civil Liberties Union, Inc. (the "ACLU"), brings this action against the ACLU and his former

manager, Lucia Tian, alleging discrimination and retaliation under Title VII of the Civil Rights

Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.*, 42 U.S.C. § 1981, the New York State

Human Rights Law ("NYSHRL"), and the New York City Human Rights Law ("NYCHRL").

Jackson claims that he experienced discrimination based on his identity as a Black man, and

retaliation for his participation in an organized effort among ACLU employees to criticize racial

discrimination at the organization.  Before the Court is Defendants' joint motion for summary

judgment on all claims.  For the reasons that follow, the motion is denied.

## I.      Background

### A.      Factual Background

        The following facts are drawn from the parties' Local Rule 56.1 statements and

responses.  (ECF Nos. 87 ("Def. SOF"), 95 ("Pl. SOF"), 100 ("Def. Reply SOF").)  These facts

are undisputed unless otherwise noted, and they are construed in the light most favorable to the

Plaintiff as the non-moving party.  *See Friend v. Gasparino*, 61 F.4th 77, 84 (2d Cir. 2023)

(citing *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

### 1.    The ACLU Hires Plaintiff

Defendant ACLU is a "not-for-profit legal organization[]" and Defendant Lucia Tian was its "Chief Analytics Officer." (Def. SOF ¶¶ 1-2.) Plaintiff Robert Jackson was employed by the ACLU in various roles from October 2019 through August 2020. (Pl. SOF at 2.) According to Defendants, Jackson's first role, "Special Projects Lead," "was a senior individual contributor role." (Def. SOF ¶¶ 5-6.) Per Jackson's account, the role did not require "high level technical [or] coding skills," but rather was "centered around . . . stakeholder and project management." (Pl. SOF at 3-4.) Jackson claims that for technical tasks, he "collaborate[d] closely with a team of experienced data scientists." (*Id.* at 4.)

After Jackson applied to the Special Projects Lead position, he spoke briefly with Tian. (*See* Def. SOF ¶ 8; Pl. SOF at 4.) Jackson then sat for an in-person interview, comprising three meetings: one with David Oliver, Nikki Deutsch, and Brooke Madubuonwu; one with Aaron Horowitz, the ACLU's Deputy Chief Analytics Officer; and one with Tian. (*Id.* ¶ 11.) The parties dispute how the interviewers rated Jackson (*compare* Def. SOF ¶ 12 *with* Pl. SOF at 5-6) but agree that he was hired and began work on October 1, 2019. (Pl. SOF at 6.) As is customary at the ACLU, Jackson was subject to a six-month "probationary period," initially reporting directly to Tian. (*Id.* at 6.)

### 2.    Plaintiff's Work Pre-Southern Convening

Upon starting, Jackson was assigned to work with Karalyn Bonfanti, "the Associate Director of Finance at the ACLU," on the "Work Study Project," "a report and set of charts using employee survey data to show how the ACLU was spending staff time and resources across key issue areas." (Def. SOF ¶ 17.) Defendants claim that this was Jackson's "single substantive project" (*id.*); Jackson disagrees, pointing to several other responsibilities he held (Pl. SOF at 7).

The parties agree that progress on the Work Study Project quickly fell behind, though they disagree vehemently on the causes.  (*Compare* Def. SOF ¶ 19-20 *with* Pl. SOF at 8-9.)

According to Defendants, "the estimated time for an analyst to complete the Work Study Project was two to three weeks," but, "because Plaintiff was a new employee, he was given a six-week deadline as a buffer, to which he agreed."  (Def. SOF ¶ 18)  "Within a few weeks . . . Plaintiff fell behind on producing required deliverables and repeatedly failed to check-in with Tian to the point where she had to press him for his work multiple times, usually via Slack message."  (*Id*. ¶ 19.)  As evidence of underperformance, Defendants point to a Slack message in which Jackson wrote, "I recognize this isn't a great performance by me. I won't make excuses."  (*Id*. ¶ 20.)

Jackson paints a different picture, focusing on Bonfanti's management.  (*See* Pl. SOF at 6.)  Bonfanti initially approved a schedule of interim deadlines proposed by Jackson, telling him that "[t]he board presentation isn't until January" and that the ultimate deadline was therefore "not looming."  (*Id.* at 8.)  According to Jackson, Bonfanti then "caused delays to the Work Study Project (*id.*), and Bonfanti was routinely late in replying to his communications, which he documented in emails with Bonfanti and Tian.  (*Id.* at 9.)  Jackson denies that Tian ever pressed him for his work, characterizing her Slack messages as mere requests for updates.  (*Id.* at 9-10.)  At times, Tian and others "praised Jackson's progress on the Work Study Project."  (*Id.* at 10.)

### 3.    The Southern Convening

"On November 14, 2019, Tian recommended Plaintiff for 'the Southern Convening,' a gathering of employees from ACLU National and its affiliates in the southern states, as a representative of the Analytics Department of ACLU National to identify areas in which the Department could potentially support the affiliates through analytics work."  (Def. SOF ¶ 21.)

Jackson claims that he had "been helping prepare for the Southern Convening [as early as] October 3, 2019." (Pl. SOF at 11.)

The Convening took place on December 11 through 13, 2019. (Def. SOF ¶ 22.) At the Convening, Jackson and a group of Black employees of the ACLU and its affiliates presented a speech critical of the ACLU and its leadership. (*Id.* ¶¶ 24-26; Pl. SOF at 11-12.) According to Defendants, the speech was "received incredibly well throughout the organization and garnered much praise." (Def. SOF ¶ 27.) They also claim that "[t]he views expressed" in the speech "closely aligned with the policies and initiatives of ACLU National, where the proposals by the [speakers] were already in place at the Organization or in the process of being implemented even prior to the speech." (*Id.* ¶ 28.)

While Jackson admits that some at the ACLU praised the speech, he distinguishes Tian, who he says reacted more negatively. (Pl. SOF at 12-13.) Specifically, Jackson states that Tian told him "to 'keep quiet,' 'be the cooler head in the room,' and 'keep calm.'" (*Id.* at 13.) Jackson characterizes this as a "directive aimed at silencing him." (*Id.*) Notwithstanding these comments, Jackson continued to discuss the Convening and his colleagues' speech, including in emails and team meetings. (*Id.* at 14-15.) Jackson also emailed Tian on December 18, 2019, writing that the aftermath of the speech had left him "unable to focus and feeling physically ill," and that he needed to "take the day to get [his] body and mind right." (*Id.* at 13-14.) Jackson states that, "[w]henever [he] discussed the Southern Convening and reiterated his complaints during team meetings, Tian consistently cut [him] off and told him they would 'talk about this offline.'" (*Id.* at 14-15.) In December 2019, Tian, "[i]n response to [his] continued complaints, . . . expressed her frustration and annoyance towards Jackson . . . in private, one-on-one Slack messages with Horowitz." (*Id.* at 15.)

4

The parties dispute what happened to the other men who took the stage during the speech at the Southern Convening.  Defendants claim that the other employees were praised and rewarded for their job performance (Def. SOF ¶ 39); Jackson denies this, pointing to an employee at the ACLU's South Carolina affiliate office who experienced an "unhealthy work environment" following the Convening (Pl. SOF at 20).  Neither party alleges that the other employees had any contact with Tian or members of the analytics team.

### 4.  Plaintiff's Work Post-Southern Convening

After the Southern Convening, Jackson kept working with Bonfanti and Tian on the Work Study Project.  (Def. SOF ¶¶ 41-47; Pl. SOF at 22-27.)  Defendants claim that Tian continued meeting with Jackson "weekly and on an ad hoc basis."  (Def. SOF ¶ 41.)  Jackson denies this, claiming that Tian only met with him regularly before the Southern Convening, and that she "did not collaborate with or support [him]  in connection with his work the same way" afterwards.  (Pl. SOF at 23.)

According to Defendants, Jackson fell behind on his work, missing deadlines, failing to respond promptly to requests, turning in shoddy work, and ultimately leaving the project to be completed by Horowitz.  (Def. SOF ¶¶ 42-49.)  Specifically, Jackson missed the initial deadline of November 22, 2019, by which time he was supposed to have submitted a final draft of the project report to Bonfanti.  (*Id.* ¶ 42.)  Defendants also point to an episode on January 21, 2020, when Bonfanti requested a draft of the report several times from Jackson before he shared it with her.  (*Id.* ¶ 44-45.)  The draft he then provided was allegedly "less close to final product than [Bonfanti] was anticipating receiving . . . ."  (*Id.* ¶ 46.)

Jackson's story differs.  First, he blames Bonfanti for his missing the November 22, 2019 deadline.  (Pl. SOF at 23-24.)  Specifically, Bonfanti only distributed the survey from which Jackson's data was to come on November 13, just one week before the deadline, and continued

to solicit responses to the survey as late as January 24, 2020.  (Pl. SOF at 24.)  Tian and Bonfanti also failed to reply to Jackson's messages seeking feedback and clarification.  (*Id.* at 24-25.)  For example, Jackson "provide[d] a draft of the Work Study report to Bonfanti and Tian on December 2, 2019," one week before the Southern Convening, but Tian did not review the draft until after January 13, 2020.  (*Id.* at 24.)  Jackson interprets his interactions with Bonfanti on January 21, 2020 differently from Defendants, pointing to her failure to respond to some of his messages and noting that she praised his work even though it was not a "final product."  (*Id.* at 26.)

Defendants contend that, despite Tian and Horowitz "spen[ding] a significant amount of time working with [Jackson] hands-on to assist him with resolving issues with and completing the [project]," he continued making "significant errors," and the "work product lacked attention to detail."  (Def. SOF ¶¶ 47-49.)  On February 4, 2020, Tian and Sophie Kim Goldmacher, the ACLU's "Chief People Officer" informed Jackson that he had not passed his "probationary period," removed him from the Work Study project, and offered him a lower-paying role—"Data Analyst II"—reporting to Allison Kelley, Director of Engagement Analytics.  (*Id.* ¶ 52; Pl. SOF at 30.)  Tian was ultimately responsible for this decision, but consulted with Horowitz and Kelley, and received approval from Goldmacher.  (Pl. SOF at 32.)  She appears to have decided on this course of action in late-January 2020.  (*Id.*)  Once Jackson was demoted, Tian "obtained an extension of the deadline to complete the Work Study Project to February 14, 2020."  (*Id.* at 27.)  Horowitz continued working on the project for several months after the extended deadline, including at one point "reach[ing] out to Jackson to help update the project."  (*Id.* at 29.)

Even though Jackson disagreed with Defendants' evaluation of his performance, he accepted the new role.  (Pl. SOF at 34.)  As an analyst, Jackson was assigned to the "Sustainer

Segmentation Project," also known as the "Dashboard Project," starting in March 2020.  (*Id.* at 35-37.)  Defendants claim that this was Jackson's only "substantive project" (Def. SOF ¶ 56); Jackson again disputes this, noting that he also prepared a presentation for the Black Lives Matter conference at the Massachusetts Institute of Technology.  (Pl. SOF at 35-36.)

"The Dashboard Project required Plaintiff to take the data from a predictive model . . . and craft it into a dashboard for stakeholders" at the ACLU.  (Def. SOF ¶ 57.) Defendants state that the project was "initially scheduled to be a one-month project," but that Jackson "repeatedly fell behind on deadlines and produced poor quality work that did not meet expectations, consisting of errors and illegible data, which required the Project to be continually rescoped, resulting in a *three*-plus month project."  (*Id.* ¶ 58.)  Gillian Eigo, a former member of the analytics team, attested that Jackson was moved to the new role "very quickly" and that the data he was working with was "fast and complicated and messy, and [that] it takes a really long time to get up to speed."  (Pl. SOF at 37.)  According to Eigo, Jackson's project was "hard and had a complicated model."  (*Id.* at 38.)  During one of the analytics team's routine problem-solving sessions, Eigo "reviewed Jackson's work on the Dashboard Project" and found it to be of "similar quality to ones that I produced and other analysts produced," albeit "not maybe a final version that we would give to a stakeholder at that point."  (*Id.* at 37-38.)  According to Eigo, "Tian and Horowitz were 'hostile' to Jackson" during one such problem-solving session, including being "very critical and antagonistic," which Eigo perceived as "a shift in tone of that meeting."  (*Id.* at 38.)  Eigo also testified that it was typical on the analytics team to push deadlines, and that she had personally done so in the past without being reprimanded.  (*Id.* at 38-39.)

The parties dispute whether and how much Kelley mentored or coached Jackson during their time working together.  (*Compare* Def. SOF ¶ 59 *with* Pl. SOF at 40.)  The parties also dispute whether Jackson "missed meetings with Kelley on several occasions, failed to implement her repeated feedback, and prioritized voluntary non-Analytics meetings and work without Kelley's approval at the expense of completing his assignments."  (Def. SOF ¶ 62; *but see* Pl. SOF at 41.)

### 5.    Plaintiff's Termination

Defendants allege that "[a]s a result of his continuous performance issues in the Data Analyst II role, Kelley, with input from her supervisors Tian and Horowitz, determined that she would be unable to pass Plaintiff from his probationary period."  (Def. SOF ¶ 63.)  Jackson argues that this was pretext, and that Defendants did so "because he engaged in protected activities and is a Black man."  (Pl. SOF at 41.)  Jackson points to an email exchange on his last day at the ACLU, in which he complained about "discrimination and retaliation."  (*Id.* at 41.)  Kelley responded to that email in part as follows:

> I wanted to acknowledge that I completely understand why Rob shared what he did yesterday.  I see the ways in which racism and white supremacy played a part in his experience here, and how he was experiencing things differently than I was.  I take responsibility for not exploring what was happening in the org and especially around southern convening, and have been reflecting on this a lot.  I know there was real harm done and there is no excuse for it.

> I have gone through so many emotions in dealing with this over the past 7 months.  Sadness, as a budding friendship with Rob turned toxic when the power dynamics shifted between us.  Failure at my inability to coach and mentor him.  Embarrassment at not being as racially literate as he needed me to be.  Confusion at a lot of his reactions.  And if I'm being honest, a lot of anger at how he portrayed the situation and changed the narrative.

> Now.  I mostly just hurt.  I hurt for Rob that this was his experience here and that I played a role in it.  I hurt for this team.  All of you have been the most open and honest and caring, people with regards to Rob's specific situation and with broader EDIB issues. I hurt for Lucia, who I watched advocate for Rob more than anyone.

(*Id.* at 41-42.) Before sending the email, Kelley shared a draft of the message with another member of the analytics team, Brooke Madubuonwu, who responded "I really like this." (*Id.* at 43.) Kelley also asked Madubuonwu if she thought "everyone [is] gonna freak out if I share this" (referring to Tian and Horowitz). (*Id.*) Madubuonwu responded that "this is what people want to hear" and that "the question of 'do you put yourself at risk' is the ultimate HR [question]." (*Id.*)

"On July 1, 2020, Plaintiff was informed that he did not successfully pass his probationary period and that the ACLU would be terminating his employment." (Def. SOF ¶ 65.) Shortly before Jackson was notified of his termination, Tian sent a series of messages to Horowitz apparently regarding what information about Jackson's termination to share with the rest of the analytics team. (ECF No. 96-4 at 2-3.) Tian wrote that it was "managers prerogative" what to communicate to Jackson and the analytics team regarding Jackson's termination, that she did not want to "outsource all the thinking to HR," and that "[t]o be frank, [she] wanted to protect [Horowitz] because [he's] a white guy." (*Id.*) Horowitz replied "that makes sense," but that "he want[ed] to hear hr guidance in general." (*Id.*) Defendants argue that this exchange was not about "Plaintiff's alleged protected activities," and that Tian was expressing her belief that "'any kind of negative decision or negative statement around [Plaintiff's] work performance would have been better coming from a person of color' . . . rather than Horowitz, 'who presents as a white guy.'" (ECF No. 100 ("Def. Reply SOF") at 3 (quoting ECF No. 96-2 ("Tian Tr.") at 218:12-21).)[1] Tian also asked Horowitz whether "Brooke [Madubuonwu] is going to defend our/Allison's decisions on the Rob [Jackson] front," to which Horowitz responded "I don't know

---

[1] For transcripts, this opinion cites the internal page number of the transcript rather than the page number generated by the ECF system.

that she'll lean into it . . . but I don't think she'll, like, bash us." (ECF No. 96-4 at 3.) For the next two months, Jackson "was assigned to work on a discreet [sic] project under Kim Goldmacher in the Human Resources Department." (Def. SOF ¶ 66.) Jackson's last day at the ACLU was August 31, 2020. (Pl. SOF at 44.)

### B.    Procedural Background

Jackson filed this action on June 8, 2021, naming as defendants the ACLU and Lucia Tian, in both her personal and professional capacities. (ECF No. 1.) Defendants answered on June 14, 2021. (ECF No. 9.) After completing discovery, Defendants moved for summary judgment on May 10, 2024. (ECF No. 85.) Plaintiff opposed the motion on June 25, 2024 (ECF No. 94 ("Opp.")), and Defendants replied on July 15, 2024 (ECF No. 99.) Defendants filed a Local Rule 56.1 statement of material facts (Def. SOF), Plaintiff filed a counter-statement (Pl. SOF), and Defendants filed a counter-counter-statement (Def. Reply SOF).

## II.    Legal Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine if, considering the record as a whole, a rational jury could find in favor of the non-moving party. *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009). The Court must "resolve all ambiguities and draw all permissible inferences in favor of the [non-movant]." *Friend*, 61 F.4th at 84 (quotation marks omitted).

Courts must be "particularly cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is in question." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997). And "[b]ecause direct evidence of an employer's discriminatory intent will rarely be found, affidavits and depositions must be carefully

scrutinized for circumstantial proof which, if believed, would show discrimination." *Id.* (quotation marks and citation omitted). "The resulting 'mosaic of intentional discrimination,' may be sufficient" to justify proceeding to trial. *Banks v. Gen. Motors, LLC*, 81 F.4th 242, 259 (2d Cir. 2023) (citation omitted) (quoting *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 86 (2d Cir. 2015)).

Nonetheless, "the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to . . . other areas of litigation." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) (quotation marks omitted). Thus, even in a discrimination case, "a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment," *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008), and may not rely solely upon "their own self-serving testimony," *Deebs v. Alstom Transp., Inc.*, 346 F. App'x 654, 656 (2d Cir. 2009) (summary order). "Where it is clear that no rational finder of fact 'could find in favor of the nonmoving party because the evidence to support its case is so slight,' summary judgment should be granted." *F.D.I.C. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (quoting *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).

## III.    Discussion

Plaintiff asserts claims for retaliation and for racial discrimination.[2]  The Court addresses each in turn.

---

[2] Jackson initially asserted aiding-and-abetting claims against Tian but abandoned them in his opposition to Defendants' motion for summary judgment.  (Opp. at 29-30.)

A.      **Discrimination**

Plaintiff asserts federal discrimination claims under Title VII and Section 1981, state

discrimination claims under the NYSHRL, and city discrimination claims under the NYCHRL.

In considering summary judgment in Title VII and Section 1981 cases, the Second Circuit has

instructed lower courts to "analyze race discrimination claims under the three-step *McDonnell*

*Douglas* burden-shifting framework." *Fletcher v. ABM Bldg. Value,* 775 F. App'x 8, 12 (2d Cir.

2019) (summary order) (citing *Kirkland v. Cablevision Sys.*, 760 F.3d 223, 225 (2d Cir. 2014)).

At the first step, "an employee must present a prima facie case of race discrimination." *Id.* If

Plaintiff carriers his burden of establishing a prima facie case, then, at step two, the "burden

shifts to the [Defendants] to give a legitimate, non-discriminatory reason for its actions." *Id.*

(quotation marks omitted) (quoting *Kirkland v. Cablevision Sys.*, 760 F.3d 223, 225 (2d Cir.

2014)). If the Defendants establish a legitimate, nondiscriminatory reason for their actions, the

Court must grant them summary judgment unless, at step three, Plaintiff carries "the burden of

'showing that the employer's explanation is a pretext for . . . discrimination'" against a protected

class. *Id.* (cleaned up) (quoting *Kirkland*, 760 F.3d at 225). All of Jackson's other claims are

analyzed under the same general framework, so, in the interests of judicial economy, the Court

considers them together. *Hernandez v. Off. of Comm'r of Baseball*, No. 18-CV-9035, 2021 WL

1226499, at *10 (S.D.N.Y. Mar. 31, 2021).[3]

---

[3] While Jackson's NYCHRL and NYSHRL claims are also analyzed under the basic
*McDonnell Douglas* burden-shifting framework, *Robinson v. MSG Ent. Grp., LLC*, No. 23-CV-
9366, 2024 WL 3938361, at *13 (S.D.N.Y. Aug. 26, 2024), they have been construed more
expansively than analogous federal anti-discrimination laws. Jackson's "NYCHRL claim must
be construed 'independently from and more liberally than' his federal claim." *Sandler v.
Montefiore Health Sys., Inc.*, No. 16-CV-2258, 2018 WL 4636835, at *7 (S.D.N.Y. Sept. 27,
2018) (quotation marks omitted) (quoting *Ben-Levy v. Bloomberg L.P.*, 518 F. App'x 17, 19–20
(2d Cir. 2013) (summary order));*see also Allen v. A.R.E.B.A. Casriel, Inc.*, No. 15-CV-9965,
2017 WL 4046127, at *12 (S.D.N.Y. Sept. 12, 2017) ("[T]he analysis mirrors the *McDonnell
Douglas* framework, but accords Plaintiff a lesser burden . . . ."). Because Jackson can proceed

1.      *Prima Facie* **Case**

"Under the *McDonnell Douglas* framework, a plaintiff must first make out a *prima facie* showing of discrimination by showing that: '(1) she is a member of a protected class; (2) she is qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination.'" *Banks*, 81 F.4th at 270 (quoting *Weinstock*, 224 F.3d at 42). "[A] plaintiff's burden of 'establishing a *prima facie* case . . . is not onerous.'" *Id.* (omission in original) (quoting *Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981)).

As Defendants must, they accept that Jackson is a member of a protected class—he is Black—and suffered adverse employment actions—demotion to a role with lesser pay and then termination. They also do not challenge that he was qualified for his role, though they do argue that he was ultimately terminated for failing to perform at expectations. (*See, e.g.*, Mem. at 10-11 (acknowledging that Tian described Jackson as "very qualified" at the time of his hiring).) Rather, Defendants focus on the fourth prong of the prima facie case, arguing that Jackson cannot establish the requisite "inference of discrimination." (*Id.* at 22-26.)

First, Defendants ask the Court to apply the "same[-]actor inference," because Tian both hired and fired Jackson. (*Id.* at 22.) In general, "where the person who made the decision to fire

---

to trial on his federal claims, it follows that he can proceed on his NYCHRL claims. The same is true of Jackson's NYSHRL claims. Until recently, courts in this Circuit treated "federal-law and NYSHRL discrimination claims . . . as coextensive," but "the NYSHRL was amended in 2019 to 'be construed liberally for the accomplishment of the remedial purposes thereof, regardless of whether federal civil rights laws . . . have been so construed.'" *Cooper v. Franklin Templeton Invs.*, No. 22-2763, 2023 WL 3882977, at *3 (2d Cir. June 8, 2023) (summary order) (quoting N.Y. Exec. Law § 300); *see also Lehey v. Northwell Health, Inc.*, No. 23-CV-04708, 2024 WL 1703697, at *3 (S.D.N.Y. Apr. 19, 2024) ("The effect of the amendment is to make the standard for NYSHRL claims closer to the more liberal standards of the [NYCHRL].") Regardless, the fact that Jackson's federal claims survive means his NYSHRL claims do as well.

was the same person who made the decision to hire, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire." *Cordell v. Verizon Commc'ns, Inc.*, 331 F. App'x 56, 58 (2d Cir. 2009) (summary order) (quotation marks omitted) (quoting *Schnabel v. Abramson*, 232 F.3d 83, 91 (2d Cir.2000)).  This inference is "a highly relevant factor in adjudicating a motion for summary judgment," particularly "when the firing has occurred only a short time after the hiring." *Id.* (quotation marks omitted) (quoting *Schnabel*, 232 F.3d at 91, and *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir.1997)).

Plaintiff notes correctly that the Court need not weigh the same-actor inference even if it formally applies.  (Opp. at 26-27.)  "[E]ven at the summary judgment stage of litigation, the same-actor inference is permissive, not mandatory." *Miller v. Levi & Korsinsky, LLP*, 695 F. Supp. 3d 397, 414 (S.D.N.Y. 2023) (quotation marks omitted) (quoting *Ehrbar v. Forest Hills Hosp.*, 131 F. Supp. 3d 5, 24-25 (E.D.N.Y. 2015)).  The Second Circuit has also applied the inference only in Age Discrimination in Employment Act (ADEA) cases, and it is not clear whether it may be used in the Title VII or Section 1981 contexts.  *See Buon v. Spindler*, 65 F.4th 64, 84 (2d Cir. 2023) ("[W]e have not determined whether the same-actor inference, which we have applied in the context of age discrimination claims under the ADEA, should also apply to claims under Title VII."); *see also Feingold v. New York*, 366 F.3d 138, 155 n.15 (2d Cir. 2004) (same); *Hill v. Soar Restaurants II LLC*, No. 23-CV-396, 2024 WL 1257415, at *6 (N.D.N.Y. Mar. 25, 2024) (same).

Assuming without deciding that the inference is applicable outside the ADEA context, the Court nonetheless determines that any such inference does not bear much weight in this case. While it is true that courts have, at times, drawn the inference "even when the supervisor at issue . . . is not the only person with input into the hiring and firing decision," *Jones v. Yonkers*

*Pub. Schs.*, 326 F. Supp. 2d 536, 546 (S.D.N.Y. 2004), it is weaker when, as here, there is a "lack of clarity as to who was responsible for the relevant employment actions." *Colandrea v. Hunter-Tannersville Cent. Sch. Dist.*, No. 15-CV-456, 2017 WL 1082439, at *9 (N.D.N.Y. Mar. 22, 2017). While some of the same decisionmakers were involved in Jackson's hiring and firing—namely, Tian and Horowitz—the parties dispute their degree of involvement. Jackson points to sworn testimony that the hiring decision was not made by Tian alone. While Tian "performed the initial screening of Plaintiff, emphasized the importance of interviewing Plaintiff to Horowitz, and individually evaluated Plaintiff during his round of interviews" (Mem. at 22), she did so as a member of a five-person "hiring committee" (Pl. SOF at 3). Three of the members of the committee—David Oliver, Nikki Deutsch, and Brooke Madubuonwu—played no role in Jackson's firing (*id.* at 29; Def. SOF ¶ 50), and at least one was opposed to the firing (ECF 96-6 ("Oliver Dec.") ¶ 44.) Horowitz corroborated that the hiring committee reached its decisions by "consensus," though he did not recall whether any member opposed hiring Jackson. (ECF No. 96-8 ("Horowitz Tr.") 63:14-64:8.) Though the members of the committee did memorialize "rank[ings]" for the candidates, the rankings were anonymous and therefore do not elucidate the individual committee members' views.[4] (Tian Tr. 53:10-25.) While Defendants note that Tian signed and sent the hiring request for Jackson (Mem. at 22), the letter is written from the perspective of "we" not "I," and states that "[t]he team"—not just Tian—"felt that Rob Jackson was the strongest candidate. . . ." (ECF No. 91-17 at 2.)

---

[4] The actual rankings assigned could support Oliver's account that Tian pushed against hiring Jackson, and certainly do not show that all the interviewers agreed unanimously that he was the top choice based on his interviews. (ECF No. 91-16 at 14.) Tian's non-anonymous comments on the interview present a mixed picture—some praise for Jackson's performance, alongside some reservations. (*Id.* at 8, 11, 13.)

Moreover, Oliver testified that he, Deutsch, and Madubuonwu—not Tian—were the committee members who pushed to hire Jackson.  (ECF No. 96-7 ("Oliver Tr.") 198:14-201:9.)  According to Oliver, Tian advocated for hiring other candidates, and acquiesced to Jackson only when "she was outnumbered" by the other members of the committee.  (Oliver Tr. ¶ 37.)  Tian disputes this, claiming that, as the "hiring manager," it was typically her role to "make a decision about who to hire."  (Tian Tr. 54:1-2.)  Resolving this factual dispute in Defendants' favor, however, would be inappropriate at summary judgment.  *See Allen*, 64 F.3d at 79.  Given the minimal weight of the same-actor inference on this record, it is also not dispositive that only "a short period of time" passed before the subsequent adverse actions. (*Cf.* Mem. at 23.)

Second, Defendants argue that the circumstances do not give rise to an inference of race discrimination, as is required for a prima facie case.  Specifically, Defendants argue that the testimony of David Oliver—also a Black man—is unreliable because "the evidence establishes that Tian treated Oliver favorably in his employment," that Jackson lacks any evidence of "Tian shutting down conversations about race," and that Jackson fails to point to any "similarly situated" colleagues who were treated more favorably.  (*Id.* at 24-26.)

Defendants fail to conclusively discredit Oliver's declaration and testimony.  The key fact that Defendants highlight is that Oliver was promoted under Tian from "Business Insights Manager" to "Associate Director of Data Infrastructure."  (*Id.* at 24.)  Relying on only Oliver's own deposition testimony, Defendants argue that this was a "promot[ion] into a *better* title and salary."  (*Id.*)  However, Oliver characterizes the change differently.  Rather than a promotion, he says, it was part of an organization-wide "role leveling exercise," in which his role was realigned to better reflect the work that he was already doing.  (Oliver Tr. 77:2.)  He testified explicitly that it was "not that I was promoted away from being a business insights manager to an associate

director."  (*Id.* 77:15-77:17.)  While the role did have higher pay, this "promotion" may be interpreted two ways:  (1) that Oliver was actually advanced in the ACLU organization by Tian, or (2) that Oliver was underpaid until that underpayment was corrected by an organization-wide releveling.  Of course, Defendants prefer the former and Oliver prefers the latter.  But, because both are reasonable, the Court must adopt the non-movant's interpretation at summary judgment. Beyond pointing to Oliver's promotion, Defendants do not contest Oliver's sworn declaration that Tian "unjustly criticiz[ed]" him, "micromanag[ed]" him, "stripped [him] of [his] . . . responsibilities . . . direct reports . . . [and] authority to hire" and gave them to "a white man," and did so "with[out] any warning about [his] performance or notice that [he] needed to improve."  (Oliver Dec. ¶¶ 8, 9, 11.)  While insufficient to prove discrimination on its own, a pattern of poor treatment of employees in the same protected class as a race-discrimination plaintiff is relevant evidence and weighs against granting summary judgment.  *See, e.g.*, *McGuinness v. Lincoln Hall*, 263 F.3d 49, 56 (2d Cir. 2001) (denying summary judgment based in part on a pattern of less favorable treatment of similarly situated employees); *accord Walker v. Johnson*, 798 F.3d 1085, 1092 (D.C. Cir. 2015) ("A plaintiff may support an inference that the employer's . . . real reasons were prohibited discrimination or retaliation, by citing . . .  the employer's pattern of poor treatment of other employees in the same protected group as the plaintiff . . . .").

Regarding Tian "shutting down" discussions of race, Defendants state that "[t]he only 'facts' that Plaintiff provides . . . is a reference to an intern lunch . . . ."  (Mem. at 25.)  This is not true.  Rather, Jackson points to Tian telling him to "keep quiet" and be "the cooler head in the room."  (ECF No. 14 ("AC") ¶ 64.)  One can rationally read these comments as "shutting

down" discussions about racism that Jackson tried to initiate.[5]  Whether or not Tian's actions at

the intern lunch, on their own, appear innocuous, they are consistent with Jackson's other

evidence that Tian was unwilling to engage with his complaints of racism, and thus

incrementally add to an overall picture of Tian as potentially motivated, at least in part, by racial

bias.  Defendants also claim that Tian allowed other team members to "discuss race and other

matters . . . as freely as they would like." (Mem. at 25.)  This is irrelevant; the fact that Tian

reacted well to non-Black individuals discussing race does not disprove that she reacted

differently when Jackson attempted to discuss the same issues.

Regarding Jackson's evidence of other, better-treated employees, Defendants are correct

that differential treatment alone is "insufficient to establish an inference of discrimination."

(Mem. at 26.)  Yet, as with Oliver's testimony, such evidence does go into the broader mix of

circumstances that the Court must assess.  In any event, Defendants are wrong that Jackson fails

to identify "similarly situated" comparators.  For example, Jackson proffers a sworn statement by

Eigo that Jackson was treated worse than other employees of comparable rank in the analytics

---

[5] Defendants interpret these comments as primarily going to Jackson's *retaliation* claims rather than his *discrimination* claims.  (Mem. at 18.)  But, as courts in this Circuit have long recognized, the two issues can be "inextricably intertwined."  *Dominic v. Consol. Edison Co. of N.Y., Inc.,* 822 F.2d 1249, 1259 (2d Cir.1987); *see also Concha v. Purchase Coll. State Univ. of N.Y.*, No. 17-CV-8501, 2019 WL 3219386, at *10 (S.D.N.Y. July 17, 2019) ("The Second Circuit recognized that 'retaliation is a form of discrimination,' and when an employer 'retaliates against an employee because he complained of discrimination, the retaliation constitutes intentional discrimination against him for purposes of the Equal Protection Clause.'" (quoting *Vega*, 801 F.3d at 82.))  Here, Jackson claims that Tian's racial bias against Black people was at the root of both her mistreatment of Jackson on the job and her unwillingness to listen to Jackson's complaints about discrimination throughout the ACLU.  Evidence of the latter, insofar as it is part of the overall "mosaic" of circumstances supporting an inference of racial bias, may also support the former.  *See Vega*, 801 F.3d at 86.

department.  (ECF No. 96-66 ("Eigo Dec.") ¶¶ 11-34.)  According to Eigo, when she joined the

ACLU as a "Data Reporting Analyst," she was given "time and training" to help her with

"onboarding and getting up to speed."  (*Id.* ¶¶ 1, 19-20.)  Eigo states that "the ACLU—and Tian,

specifically—did not show Jackson nearly the same patience."  (*Id.* ¶ 21.)  Rather, she says that

Tian and Horowitz treated Jackson harshly, "[r]ather than engaging with [him]" "as [was]

typically the case."  (*Id.* ¶¶ 31, 34.)  Eigo believes that such treatment was unwarranted, as

Jackson's work was "similar quality to [work] that [she] produced and other analysts produced."

(ECF No. 96-31 ("Eigo Tr.") 66:22-66:23.)  Tian also used a program called "Looker" to "check

on Jackson's unfinished work . . . despite knowing that Jackson's work was still in progress," but

Eigo "cannot recall [Looker] every being used in this manner" with respect to other employees.

(Eigo Dec. ¶¶ 47-49.)  While Eigo "personally pushed deadlines on [her] own projects" without

consequence, Jackson was reprimanded and then fired for the same conduct.  (*Id.* ¶¶ 58-60.)

While Defendants deny that any of Jackson's alleged comparators are similarly situated,

it is unclear how that denial applies to Eigo.  Based on her deposition and sworn declaration, she

began her tenure at the ACLU as a "Data Reporting Analyst" and was later promoted to a

"Senior Data Analyst."  (*Id.* ¶¶ 1-2.)  The role that Jackson assumed after his demotion was also

as a "data analyst" on the same team as Eigo.  (*See, e.g.*, Pl. Tr. 248-249.)  While Jackson's

formal title was "Data Analyst II," not "Data Reporting Analyst" or "Senior Data Analyst," it

would be wrong to require a precise, one-to-one correspondence with respect to comparators.

Rather, being similarly situated "requires a reasonably close resemblance of the facts and

circumstances of plaintiff's and comparator's cases."  *Graham v. Long Island R.R.*, 230 F.3d 34,

40 (2d Cir. 2000) (quoting *Conward v. Cambridge Sch. Comm.*, 171 F.3d 12, 20 (1st Cir. 1999),

for the proposition that "[r]easonableness is the touchstone" and "the plaintiff's case and the

comparison cases . . . need not be perfect replicas"); *see also Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 109 n.7 (2d Cir. 2010) ("Although an employee's position is relevant to the analysis, employees need not be of the exact same rank to be considered 'similarly situated.'"). Given that Eigo and Jackson shared a similar job title, had similarly seniority at times, and shared the same managers, the Court cannot reject comparability as a matter of law at this point. Finally, given the fact-intensive nature of the inquiry, "[w]hether two employees are similarly situated ordinarily presents a question of fact for the jury." *Graham*, 230 F.3d at 39; *see also Gem Fin. Serv., Inc. v. City of New York*, No. 13-CV-1686, 2015 WL 1475853, at *7 (E.D.N.Y. Mar. 31, 2015) (collecting cases).

In addition to Eigo's and Oliver's testimony, Jackson submits evidence of additional conversations between his managers acknowledging that their evaluation of Jackson was atypical. (*See, e.g.*, ECF No. 96-50 at 3 (quoting Kelley as saying "I think we need to start going through the job rubrics with everyone at the end of probation because everyone else just got a 'yay you passed!' and so were confused that there was actually an evaluation with Rob.").) He also points to a conversation in which Tian appears to express explicit racial preferences. In connection with Jackson's firing, Tian messaged Horowitz that "[she] wanted to protect [him] because [he's] a white guy." (ECF No. 96-4 at 2.) Tian explained her comment as "protecting [Horowitz] from potential[] anger directed his way from team members," because "any kind of negative decision or negative statement around his work performance would have been better coming from a person of color." (Tian Tr 218:15-218:25.) Defendants also note that the exchange "does not mention or even allude to Plaintiff's alleged protected activities." (Reply SOMF at 3.) But Defendants' interpretation is not the only rational one—going above and beyond as a manager to shield White employees (because they are White) from negative

consequences while declining to do so for Black employees (because they are Black) could also be viewed as evidence of racially discriminatory intent. At the very least, such a comment adds to the overall "mosaic" that a jury must weigh. Choosing among these interpretations is not a job for a court considering a motion for summary judgment.

Given the evidence that (1) Jackson was treated worse than similarly situated non-Black employees, (2) Tian had a pattern of mistreating Black employees, and (3) Tian made comments that could be interpreted as her favoring non-Black employees, the Court concludes that Jackson has stated a *prima facie* case of race discrimination.

### 2.    Legitimate Non-Discriminatory Reason

"Once a plaintiff makes out a prima facie case of discrimination, the defendants have the burden of showing a legitimate, nondiscriminatory reason for their actions. In order to prevent summary judgment in favor of the plaintiff at this stage, that explanation must, if taken as true, '*permit* the conclusion that there was a nondiscriminatory reason for the adverse action.'" *Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 123 (2d Cir. 2004) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)). Defendants claim that "Plaintiff was terminated for his consistently poor performance and work ethic both in the Special Projects Lead position and the Data Analyst II position, which had absolutely nothing to do with his race." (Mem. at 27.) It is well established that poor performance can be a legitimate reason for taking an adverse employment action. *Johnson v. Schmid*, 750 F. App'x 12, 17 (2d Cir. 2018). "Upon the defendant's articulation of such a non-discriminatory reason for the employment action, the presumption of discrimination arising with the establishment of the *prima facie* case drops from the picture. For the case to continue, the plaintiff must then come forward with evidence that the defendant's proffered, non-discriminatory reason is a mere pretext for actual

discrimination." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000).  The Court next considers whether Plaintiff has sufficiently demonstrated pretext.

### 3.    Pretext

To show pretext, Plaintiff "must produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action." *Weinstock*, 224 F.3d at 42 (quotation marks and brackets omitted). "To get to the jury, 'it is not enough . . . to disbelieve the employer; the factfinder must also believe the plaintiff's explanation of intentional discrimination.'" *Id.* (brackets omitted) (quoting *Hicks*, 509 U.S. at 519).  Here, Jackson has raised material questions of fact as to whether he actually had performance problems, and whether Defendants harbored discriminatory intent.

### a.    Plaintiff's Job Performance

Defendants state that there is "overwhelming evidence of Plaintiff's performance issues." (Mem. at 28.)  Specifically, his "deficient work performance and failure to meet the fundamental requirements of his two positions were corroborated by all three supervisors who were familiar with his work product and ethic (Tian, Horowitz, and Kelley)." (*Id.*)

Defendants are correct that it is not the Court's job to evaluate the wisdom or prudence of the management practices at the ACLU.  *See Luxenberg v. Guardian Life Ins. Co.*, No. 02-CV-9116, 2004 WL 385116, at *7 (S.D.N.Y. Mar. 2, 2004) ("The court's role is to prevent unlawful employment practices, not to act as a superpersonnel department that second guesses employers' business judgments." (cleaned up)).  At the same time, "[c]ourts have recognized that an employer's disregard or misjudgment of a plaintiff's job qualifications may undermine the credibility of an employer's stated justification for an employment decision." *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 103 (2d Cir. 2001), *superseded in part on other grounds* by

Fed. R. Civ. P. 37(e); *accord Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C.

Cir.1996) ("Evidence indicating that an employer misjudged an employee's performance or

qualifications is, of course, relevant to the question whether its stated reason is a pretext masking

prohibited discrimination.").  While "nothing in [Title VII] prohibited [Defendants] from firing

[Jackson] on the basis of erroneous beliefs," a "jury could . . . take[] the extent to which

[Defendants'] 'reasons' were wide of the mark as evidence that they were manufactured to cover

discrimination."  *Hagelthorn v. Kennecott Corp.*, 710 F.2d 76, 83 (2d Cir. 1983).

        Here, Jackson points to substantial (albeit disputed) evidence undermining the claim that

he was fired due to his own poor performance.  Specifically, he offers evidence that his work

product was typical of other employees in his role (*see, e.g.*, Eigo Dec. ¶¶ 32-34; Eigo Tr. 66:19-

67:2), and that he was singled out for atypically harsh scrutiny and criticism and was

"treated . . . with open hostility and ire"  (*see, e.g.*, Eigo Dec. ¶¶ 47-49, 24).  He also contends

that Tian intentionally manufactured the conditions that allowed her to later claim he had

performance issues, including by assigning him "advanced technical assignments even though

she was aware that he did not have the same technical experience as his predecessor, and [] not

provid[ing] him with any opportunity or training to hone those skills" (Oliver Dec. ¶ 49; *see also*

Eigo Dec. ¶ 23).  Moreover, Defendants' conduct toward him allegedly only became hostile once

he began speaking up about racism at the ACLU, undermining the notion that the change was

based solely on his performance.  (*Id.* ¶¶ 40-43.)

        Jackson also undercuts particular statements Defendants make about his performance.

For example, Defendants raise the fact that Jackson did not complete the Work Study Project by

his initial deadline of November 22, 2019.  (Def. SOF ¶ 42.)  But Jackson points out, and

Defendants do not contest, that Bonfanti delayed providing him data that he needed until after

that date, in part because she did not send out the survey on which the project was based until

November 13.  (Pl. SOF at 23-24.)  Similarly, Defendants allege that Jackson was late delivering

a draft report on January 21, 2020.  (Def. SOF ¶ 44.)  But Jackson actually sent a draft on

December 2, 2019, and Jackson and Bonfanti failed to respond to or review it until January 13,

2020.  (Pl. SOF ¶ at 24.)  Finally, while "Horowitz ended up having to complete the [Work

Study] project himself" (ACLU SOF ¶ 49), Jackson notes that Tian obtained an extension on his

behalf that she was unwilling to provide to Jackson, and that despite the extension, Horowitz still

missed the deadline (Pl. SOF at 27-28).  In fact, he was "still working on the Work Study Project

in May 2020," and even reached out to Jackson to ask questions about the project.  (*Id.* at 28.)  In

that conversation, Horowitz acknowledged that at least some of the shoddy work Defendants

blame on Jackson was the result of Bonfanti's errors, not Jackson's.  (*Id.* at 28-29.)

### b.    Evidence of Intent

Defendants are correct that it is not enough for Jackson to undermine their stated reasons

for their actions, as "a reason cannot be proved to be a pretext for discrimination unless it is

shown both that the reason was false, and that discrimination was the real reason."  *St. Mary's

Honor Ctr.*, 509 U.S. at 515 (quotation marks and emphasis omitted).[6]  However, Jackson also

presents evidence that he was treated differently (and worse) than other employees and that Tian

---

[6] Under the 1991 amendments to Title VII, Jackson could also skip the pretext inquiry and instead show that discrimination was a "motivating factor" for Defendants' actions, though he would be precluded from being awarded damages if Defendants proved that they would have taken the "same action" even absent the discrimination.  *Bart v. Golub Corp.*, 96 F.4th 566, 570-72 (2d Cir. 2024), *cert. denied*, No. 23-1346, 2024 WL 4426694 (U.S. Oct. 7, 2024).  Similarly, under the NYSHRL and the NYCHRL, Plaintiff can prevail on his claims by merely establishing that discrimination was a "motivating factor" for Defendants' decision.  *Lee v. Riverbay Corp.*, No. 22-CV-7504, 2024 WL 4312166, at *5 (S.D.N.Y. Sept. 27, 2024).  Regardless, because Jackson briefs the issue as one of pretext, the Court follows that path for purposes of this opinion.

at least once acknowledged that she engaged in racially motivated conduct, *see infra* Section III.A.1.  Taken together, Jackson's attack on the justifications for his negative performance reviews and his (admittedly circumstantial) evidence of racial bias sum up to a "mosaic" from which a rational fact-finder could conclude that Defendants' proffered reasons are pretext for discrimination.  *Banks*, 81 F.4th at 259; *see also Byrnie*, 243 F.3d at 102 ("At summary judgment in an employment discrimination case, a court should examine the record as a whole, just as a jury would . . . ."); *Walsh v. N.Y.C. Hous. Auth.*, 828 F.3d 70, 76 (2d Cir. 2016) ("[A] plaintiff may satisfy her burden by building a wall out of individual evidentiary bricks . . . .").  Because Jackson has successfully raised a dispute of fact as to whether Defendants' justifications were pretextual, the Court declines Defendants' request for summary judgment on his discrimination claims.

### B.    Retaliation

The legal standard for Jackson's retaliation claims is largely the same as for his discrimination claims.  The three-step *McDonnell Douglas* framework applies, *Hicks v. Baines*, 593 F.3d 159, 164 (2d. Cir. 2010), though the elements of the prima facie case differ, *Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 129 (2d Cir. 2012).  At the pretext stage, a retaliation plaintiff's burden is lesser in some ways and greater in others.  On one hand, the threshold for harm is lower.  Rather than only actions that "affect the terms and conditions of employment," actions that would "dissuade a reasonable worker from making or supporting a charge of discrimination" count as well.  *Carr v. N.Y.C. Transit Auth.*, 76 F.4th 172, 179 (2d Cir. 2023).  On the other hand, while discrimination can be a "substantial" or "motivating" factor, retaliation must be a "but-for" cause of an adverse action.  *Vega*, 801 F.3d at 90-91.  That is, a plaintiff must show "that the adverse action would not have occurred in the absence of the retaliatory motive."  *Id.* (quotation marks omitted) (quoting *Zann Kwan v. Andalex Grp. LLC*,

737 F.3d 834, 846 (2d Cir. 2013)).  That said, "[t]he determination of whether retaliation was a 'but-for' cause, rather than just a motivating factor, is particularly poorly suited to disposition by summary judgment, because it requires weighing of the disputed facts, rather than a determination that there is no genuine dispute as to any material fact." *Zann Kwan*, 737 F.3d at 846 n.5.

The proper disposition of Jackson's retaliation claims follows straightforwardly from the foregoing analysis of his discrimination claims.  Defendants have not challenged Jackson's *prima facie* case, and the non-discriminatory reason they rely on here is identical—"i.e., his continuous poor performance."  (Mem. at 16.)  The Court can therefore begin at step three of the inquiry and assess Jackson's case for pretext.  Here, as before, Jackson has presented sufficient evidence from which a jury could conclude that Defendants' proffered rationale is false.  All the Court need assess, then, is whether Jackson has also presented sufficient evidence for a jury to conclude that retaliation was a but-for cause.

The Second Circuit has held that "[a] plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action.  From such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason." *Zann Kwan*, 737 F.3d at 846.  Such inconsistencies, combined with "very close temporal proximity between [a plaintiff's] protected conduct and her termination are sufficient to create a triable issue of fact with regard to whether the [protected conduct] was a but-for cause of her termination." *Id.* at 847; *see also Villetti v. Guidepoint Glob. LLC*, No. 21-2059, 2022 WL 2525662, at *6 (2d Cir. July 7, 2022) (summary order) (same); *Ehrlich v. N.Y.C. Leadership Acad.*, No. 12-CV-2565, 2014 WL 2767179, at *8 (S.D.N.Y. May

29, 2014) ("[A] reasonable juror might infer that the [movant's] witnesses are lying because there are no contemporaneous documents . . . and because, when deposed . . . witnesses testified that they could not recall certain events and gave conflicting testimony.").

Here, Jackson shows temporal proximity between the protected activity and the adverse actions, real disputes about his job performance, and direct quotes that may reflect Defendants' dissatisfaction with Jackson's complaints about racism at the ACLU. Taken together, and drawing all reasonable inferences in Jackson's favor, a rational jury could conclude that Defendants would not have demoted and fired Jackson absent retaliatory intent. The Court thus declines to grant summary judgment on Jackson's retaliation claims.

## IV. Conclusion

For the foregoing reasons, Defendants' motion for summary judgment is DENIED.

The Clerk of Court is directed to close the motion at Docket Number 85.

SO ORDERED.

Dated:  November 13, 2024
        New York, New York

                                    J. PAUL OETKEN
                                United States District Judge